**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 3:12-cv-95 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| ITS FINANCIAL, LLC, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**DECISION AFTER TRIAL TO THE COURT:**
**OPINION AND ORDER**
**WITH FINDINGS OF FACTS AND CONCLUSIONS OF LAW**
**GRANTING JUDGMENT TO PLAINTIFF**
**AND PERMANENTLY ENJOINING DEFENDANTS**
**FROM OPERATING, OR BEING INVOLVED WITH IN ANY WAY,**
**ANY BUSINESS RELATING IN ANY WAY**
**TO PREPARATION OF TAX RETURNS**

As the attorney for the Government properly argued during closing:

"This case presents an astonishing array of repeated fraudulent and deceptive conduct"

by Defendants. (Doc. 138 at 1). The evidence at trial of the fraud and deception

perpetrated by Ogbazion and his Defendant companies, the fourth largest tax preparation

business in the country, was so overwhelming that the Court concludes easily than an

injunction under I.R.C. §§ 7402 and 7048 -- permanently barring Defendants from

operating, or being involved with in any way, any business relating in any way to

preparation of tax returns -- is necessary to protect the public and the Treasury.

The evidence at trial established that Ogbazion and his Defendant companies:

Clandestinely trained and encouraged ITS franchisees to prepare and file tax
returns prematurely with paycheck stubs that omitted and understated income, and
inevitably resulted in the submission of false federal tax returns;

Defrauded ITS customers, who are largely low-income, by marketing false and fraudulent loan products to lure customers into franchisees' tax preparation offices;

Defrauded ITS customers by requiring franchisees to charge phony fees, as well as exorbitant fees, of which Defendants kept an average of 18%;

Forged customers' signatures on loan checks and used those forged checks to operate Defendants' businesses;

Willfully failed to pay their own employment taxes, and then lied about assets in connection with the collection of those taxes, hiding money in a secret bank account, defrauding the United States and third party creditors;

Lied on government forms, and encouraged franchisees to lie on government forms, including lying on IRS applications for EFINs and on IRS Forms 8879;

Obstructed government agents and materially assisted franchisees in circumventing IRS law enforcement efforts involving the suspension of EFINs;

Told franchisees to lie to government agents in connection with IRS compliance visits; and

Violated the terms of the Order of Preliminary Injunction issued by this Court.

Defendants' repeated attempts at trial and in argument to downplay the gravity of their lawlessness was stunning. The Court concludes that even today Defendants have not fully recognized their culpability. Ultimately, the nature, scope, and gravity of Defendants' offenses, and the unrepentant attitude toward their commission, demonstrate the necessity for a complete injunction putting the Defendants permanently out of business.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This civil case is before the Court following a trial to bench on June 17, 18, 19, 20,

21, 24, 25, 26, and 27, 2013.   (Docs. 98, 100, 108, 112, 117, 121, 125, 128, 129, 130).

Following trial, the parties filed Closing Arguments (Docs. 138, 139) and proposed

Findings of Fact and Conclusions of Law.  (Docs. 136, 137, 140).  Pursuant to Fed. R.

Civ. P. 52, the Court now sets forth and enters its Findings of Fact and Conclusions of

Law.

## I.      FINDINGS OF FACT[1]

## BACKGROUND

1.      Fesum Ogbazion is the CEO and sole owner of ITS Financial.  Ogbazion is also

the CEO and sole owner of Defendants Tax Tree and TCA Financial.  Ogbazion

founded all three companies.  (Doc. 101 at 6:23-7:6; Doc. 77 at 3).

2.      Instant Tax Service is the brand of and for  ITS Financial franchises across the

United States.  Instant Tax Service is a nationwide tax preparation franchise that

Ogbazion developed.  Instant Tax Service claims to be the fourth largest tax

preparation franchise in the nation.  (Doc. 101 at 7:5-15; Doc. 77 at 3).

3.      As the founder, sole owner, and CEO of Instant Tax Service and ITS Financial,

Ogbazion currently makes all the significant decisions for the company.

Historically Ogbazion also made all significant decisions affecting the company.

Ogbazion has the final say on decisions as the founder, owner and CEO.  (Doc.

---

[1] Plaintiff's citations to the record in its Proposed Findings of Fact ranged from wildly inconsistent to borderline unintelligible, slowing the work of the Court significantly.

101 at 11:3-13; Doc. 104 at 83:10-84:3; Doc. 119 at 95:14-25, 99:3-101:4; Doc. 77 at 3).

4.     In addition to Ogbazion, the key management at ITS Financial during much of the time the business operated included Kyle Wade (Vice President of Franchise Development), Brook Wise (Vice President of Franchise Recruitment), Pete Samborsky (Chief Financial Officer), Todd Bryant (General Counsel), and Anita Boynton, Executive Assistant to Ogbazion. Other individuals who held management positions at ITS Financial for less extensive periods include James Mowery (CIO, and later President from 2008 to 2010), Greg Woryk (Vice President of Marketing), and Bill San Giacomo (Vice President of Financial Services). (Doc. 119 at 95:2-22; Doc. 118 at 3:19-25; Doc. 75-5 at 6:12-25; JX1 at 3-4; PX304).

5.     ITS Financial had a substantial number of layoffs in 2010. Ogbazion claimed that after those layoffs, he kept his best people. One of the people Ogbazion let go and did not bring back was James Mowrey, the company's purported President. One of the people Ogbazion rehired was Kyle Wade, who was let go only briefly before he was brought back. Ogbazion testified that it was his decision to bring back Wade. Kyle Wade pled the Fifth Amendment in this case with respect to questions about serious improprieties that took place while he was a Vice President of ITS and reported directly to Ogbazion. (Doc. 135 at 172:20-173:6; JX1 at 2).

**FORGERY OF ITS FINANCIAL CUSTOMERS' HSBC CHECKS IN 2007**

6. On January 10, 2007, Ogbazion instructed an Instant Tax Service employee to forge customers' signatures on a series of 26 HSBC loan checks. (Doc. 99 at 46:23-47:1, 47:11-14).

7. These 26 customers had their tax returns prepared at an Instant Tax Service office located across the street from the Instant Tax Service Financial Corporate headquarters. They received these HSBC checks from Instant Tax Service as part of Instant Tax Service's loan program. (*Id.* at 47:15-20, 48:5-9).

8. Ogbazion, through his corporate entity, owned the particular tax preparation office where these 26 customers had their tax returns prepared and signatures forged. (*Id.* at 47:21-23).

9. The HSBC checks were physically printed by an Instant Tax Service employee at the Corporate Instant Tax Service office. (*Id.* at 48:10-15).

10. An Instant Tax Service employee printed the duplicate checks. The duplicate checks had the 26 customers' names on them and were for the same amount that the customers had originally received. (*Id.* at 48:25-49:4).

11. All of the 26 customers took their original HSBC loan check from Instant Tax Services and either deposited the checks into their own account or cashed them at a check cashing establishment. (*Id.* at 48:16-20).

12.     After these 26 customers cashed their original loan checks, Ogbazion asked an employee of the Corporate Instant Tax Service office to reprint duplicates of those customers' checks.  (*Id.* at 48:21-24).

13.     Ogbazion told the Instant Tax Service employee to bring the duplicate checks over to the Corporate headquarters.  Ogbazion then instructed a low-level employee in the Corporate call center to sign the customers' names on the duplicate checks. (*Id.* at 49:25- 50:5, 49:12-17).

14.     After the call center employee forged the customers' signatures on the checks, Ogbazion instructed his CFO, Peter Samborsky, to deposit the forged checks into the company's Corporate checking account.  Samborsky, in fact, deposited the forged checks.  (*Id.* at 50:16- 51:9, 49:18-21).

15.     The forged duplicate checks totaled approximately $32,000.  (*Id.* at 50:13-15).

16.     ITS Financial then used the money from the forged duplicate checks to operate the company.  (*Id.* at 51:10-12, 57:8-15; PX19).

17.     Prior to having the customers' names forged on the checks, Ogbazion did not get permission from the customers to sign their names.  In fact, the customers did not even know that their names were being forged on duplicate checks.  (Doc. 99 at 50:6-12).

18.     The forged checks were deposited on January 10, 2007.  At that time, Defendants had no money in any bank account to operate the business.  (*Id.* at 51:18- 52:1, 57:8-15; PX669 at 11).

19.    On January 8th, 2007, two days prior to ITS forging the customer checks, CFO Pete Samborsky loaned the company $11,000.  (Doc. 99 at 54:24-55:4; PX669 at 13).

20.    By January 9th, 2007, ITS Financial had used all of the $11,000 that Samborsky loaned the company the day before.  (Doc. 99 at 55:6-15; PX669 at 11).

21.    On January 9th, 2007, one day prior to forging the customer checks, Samborsky loaned the company another $25,000.  (Doc. 99 at 56:6-13; PX669 at 14).

22.    On the same day the CFO loaned ITS Financial another $25,000, the company used all of that money to operate, leaving only $7.56 in the company's payroll account at the end of the day.  (Doc. 99 at 56:18-57:3; PX669 at 11).

23.    ITS Financial needed the money from the forged customer checks to continue operating.  On the same day the company deposited the $32,000 in forged customer checks into its payroll account, the company immediately used $14,000 from the forged checks (leaving $18,000 in the company's payroll account).  One week later, the company had used another $12,000 from the forged checks (leaving only $6,650 in the account).  (Doc. 99 at 55:16-56:2; PX669 at 11).

24.    All of the Defendants' bank accounts in 2007 were at Huntington Bank.  No one from ITS Financial told Huntington Bank that ITS Financial would be submitting checks with forged signatures before ITS Financial deposited the forged checks. (Doc. 99 at 51:13-17).

25.   Nobody asked Ogbazion to print duplicate checks and forge customers' signatures. It was entirely Ogbazion's idea.  (*Id.* at 57:16-20).

26.   After ITS Financial deposited the forged checks, and after ITS Financial used the proceeds from those forged checks, HSBC accused the innocent customers of check fraud.  (Doc. 107 at 11:5-12:1, 8:22-9:23; Doc. 99 at 60:6-22).

27.   The amount of the forged checks also went on some of the innocent customers' credit reports.  (Doc. 99 at 60:23-61:3).

28.   Tonya James, one of the innocent customers accused of check fraud by HSBC, testified at trial.  James is single and lives in Dayton, Ohio, with her two children. Between 2006 and 2007, James went to an Instant Tax Service in downtown Dayton, Ohio and applied for a loan. She received a $1,700 loan from Instant Tax Service and immediately cashed her loan check.  (Doc. 107 at 6:6-8:16).

29.   Sometime later, HSBC sent a letter to James accusing her of receiving and cashing a second loan check.  James immediately called HSBC.  HSBC told James that she had received and cashed a second check.  After James ended her call with HSBC, she called Instant Tax Service and spoke with an Instant Tax Service employee. James asked the Instant Tax Service employee to explain why she received a letter from HSBC accusing her of receiving and cashing a second check.  Neither the employee nor anyone at Instant Tax Service explained why HSBC had contacted her.  (*Id.* at 8:17-12:1).

8

30.     James did not give anyone at Instant Tax Service permission to sign a check made out in her name and has never held a Huntington National Bank account.  (*Id.*)

31.     Taneika Grady, another one of the innocent ITS customers accused of check fraud in 2007, also testified at trial.  Grady lives in Dayton, Ohio, has three children (ages 12, 11, and 9) and is the primary provider in her home.  (*Id.* at 15:8-25).

32.     In January 2007, Taneika Grady was working only part-time and was not earning very much money.  She learned through a television advertisement that Instant Tax Service in Dayton, Ohio was offering a rapid anticipation loan where a customer could apply for a loan with only a paystub (rather than a W-2 Form) and receive a loan within 24-48 hours.  Grady went to Instant Tax Service and applied for the rapid anticipation loan.  She received a $1,129 loan.  (*Id.* at 17:2-19:13).

33.     Instant Tax Service in downtown Dayton, Ohio called Grady approximately one week after she received her rapid anticipation loan and accused her of receiving and cashing a duplicate loan check at Huntington Bank in Columbus, Ohio.  (*Id.* at 20:6-21:5).

34.     Grady did not sign a duplicate loan check, did not give anyone permission to sign her name onto a duplicate loan check, and never had a Huntington Bank account.  (*Id.* at 20:19-21:14).

35.     For two weeks, Instant Tax Service repeatedly called Grady and told her that she had to repay the funds from the duplicate check.  Suddenly, in late January 2007, the phone calls stopped.  (*Id.* at 21:15- 22:15).

36. After Instant Tax Service stopped calling, Grady called Instant Tax Service. Instant Tax Service lied to Grady and told her that "[e]verything had been taken care of and that someone in the office had been duplicating checks and cashing them," but that that person had been terminated and no longer worked at Instant Tax Service. (*Id.* at 22:13-23:9).

37. Around March or April of 2007, Tina Davis, a regional manager for ITS's Corporate-owned stores at that time, started receiving phone calls from customers stating that HSBC was calling them trying to collect, claiming they had received duplicate loan checks. After Davis received the first phone call from a customer, she pulled the customer's file to see if there were two check stubs for the same amount in the file, and whether the customer had picked up two checks. When she saw only one check stub in the file, Davis called HSBC, who emailed Davis a copy of the duplicate check. Davis compared the signature on the duplicate to see if it matched the check stub in the file and the customer's signature on other documents in the file. The signatures did not appear to match. When Davis looked at the back of the check from HSBC, it was stamped "Huntington Bank" and had the Corporate account number on it. Davis then knew that the check had been deposited into Instant Tax Service's Corporate bank account. (Doc. 116 at 278:23-281:11).

38. After Davis determined that a duplicate check had been deposited in the ITS Corporate account, she walked across the street to the Corporate office and went

10

into Ogbazion's office. Davis told Ogbazion that she got a call from a customer who was threatening to sue ITS because he had been accused of receiving a duplicate check. She showed Ogbazion the copy of the check that HSBC had e-mailed her and showed him that the signature did not match the customer's. Ogbazion became very irate. He started yelling and cursing, told Davis it was none of her business, and said that Pete Samborsky had already handled it. Ogbazion told Davis to leave and she did. (*Id.* at 281:12-282:11).

39. Davis went back across the street to the Corporate store and spoke to the manager. The manager said the man's name on the duplicate check was also on a list of checks that Ogbazion had asked employee Shanti Abernathy to reprint. She showed the hand-printed list to Davis, which Davis recalled had about 27 to 30 customer names on it. Davis then looked up the names in Drake software and ran a "reprinted check report" to see if checks had been reprinted for everyone on the list, and they had been. The manager also indicated two other customers had been calling and that one of them said the duplicate check was on their credit report. (*Id.* at 282:12-283:11).

40. Davis then went back across the street to Ogbazion's office. When she asked Ogbazion about the checks again, he started cursing and yelling again. Ogbazion lied to Davis and said Samborsky had already taken care of it. Davis then explained that she needed something to tell the customers because the customers wanted answers. Ogbazion directed her to give them Samborsky's phone number

11

at the Corporate office. Because Davis knew that the checks had been deposited in the ITS Corporate account, she asked Ogbazion why were they deposited. Ogbazion looked at her and said: "Did you want to get a paycheck?" (*Id.* at 283:8-284:15).

41. Davis understood Ogbazion's admission, "[d]id you want to get a paycheck," to mean that there was not any money in the account and Ogbazion needed the money from the HSBC checks to cover her paycheck. Also, before and leading up to the HSBC incident, several of her paychecks from ITS had bounced. (*Id.* at 47:11-48:20).

42. Davis later instructed the manager of the Corporate store to give Samborsky's direct phone number to the customers who were calling and wanted to know why their checks were duplicated. After the customers were given Samborsky's phone number, they called Davis back because Samborsky would not take their phone calls or return their voice mails. (*Id.* at 284:16-285:6).

43. The Court credits the testimony of Tina Davis that the reason why Ogbazion had deposited the forged checks was that he needed the money to meet ITS's payroll. Davis' testimony is corroborated by Ogbazion's admission that he ordered the checks to be forged, told his CFO to deposit the forged checks, and used the proceeds from the forged checks to operate the company. Furthermore, Davis has been remarkably consistent over the years in telling her version of the HSBC story. For example, in 2009, she sent an e-mail to a former ITS franchisee

explaining how Ogbazion had forged the customers' checks and deposited them in the company's account at Huntington bank.  (PX689).

44.   Ogbazion, on the other hand, has offered different fabrications over the years to cover up the incident, including lies to his own corporate leadership, which Ogbazion now admits.  (Doc. 99 at 61:4-15).

45.   When customers first approached Defendants about the fraud,  Defendants made up stories to cover-up the forgeries.  Defendants told Taneika Grady that the forged checks were the result of a rogue employee, whom ITS Financial fired due to the misconduct (*see* FOF ¶ 36, Story 1: The Rogue Employee).  Only Ogbazion, who devised and ordered this check fraud, had motive to ensure that Defendants lied to Grady.  Ogbazion also lied to Davis after she discovered the forgeries (*see* FOF ¶¶ 38, 40), telling her that ITS CFO Pete Samborsky was taking care of it (Story 2:  ITS's CFO Would Fix the Problem).

46.   Ogbazion also told a false story to his leadership team about the forged HSBC checks in December 2009 (Story 3: Customers "Made it Up").  Ogbazion lied and said that allegations by one of the ITS customers, Robert Brown, whose signature was forged by ITS, and who had truthfully claimed his signature had been forged by ITS, were "completely made up."  Ogbazion now admits the customer's signature had, in fact, been forged, and the allegations were not completely made up.  (Doc. 99 at 61:16-63:25; PX101).

47.   Specifically, a member of the ITS Leadership team, Greg Woryk, forwarded
      Robert Brown's posting from the "Rip Off Report" to Ogbazion and members of
      the ITS Leadership Team.  The posting claimed that ITS forged Brown's signature
      to a check and it had damaged his credit report.  When Ogbazion responded that
      the story was "[c]ompletely made up," Woryk understood Ogbazion to be saying
      that the posting was made by "somebody who was disgruntled and there was no
      merit to the statements."  (Doc. 118 at 32:5-23; PX101).

48.   Robert Brown had also complained to ITS Financial and Ogbazion earlier in 2009,
      stating that his signature had been forged on an HSBC loan check for $1700.  He
      sent ITS Financial and Ogbazion a copy of the forged check by email.  (Doc. 99 at
      65:15-66:13; PX49 at 1-2, 4; PX669 at 19).

49.   Robert Brown told ITS Financial and Ogbazion that HSBC began collection
      proceedings against Brown in 2007, and ITS Financial and Ogbazion did nothing.
      Brown said he complained to the Corporate-owned Instant Tax Service office
      where his tax return was prepared, but Ogbazion claims he never heard about
      Brown's complaints.  Brown says the next year, in 2008, HSBC took part of
      Brown's tax refund to pay for the forged check.  ITS Financial and Ogbazion did
      nothing to make Brown whole, despite the fact that Ogbazion was the one who
      had Brown's name forged and who actually used the proceeds from that forged
      check to operate his business.  (Doc. 99 at 67:22-72:10; PX49; PX669 at 19).

50.     Ogbazion told another story about the HSBC checks to a small number of
        Corporate executives at ITS Financial in June 2009 (Story 4: HSBC's Fictitious
        Fraud Detection Program).  At that time, Ogbazion fabricated a story claiming that
        HSBC had asked him to submit forged checks to help HSBC as part of a fraud
        detection program it was running.  The HSBC fraud detection story was another
        lie by Ogbazion.  Ogbazion admitted at trial that he completely fabricated the
        story.  (Doc. 99 at 73:12-74:20).

51.     Ogbazion now claims that the reason why he had forged checks deposited in his
        payroll account was because he was trying to prove something to a third-party
        cash vault lender.  (*Id.* at 58:7-11).

52.     According to Ogbazion, only four other people knew anything about the forged
        duplicate checks at the time they were deposited: 1) Pete Samborsky; 2) Tina
        Davis; 3) the low-level employee in the call center who actually forged the
        signatures; and 4) a person from HSBC named Jermaine Shearin.  (*Id.* at 57:21-
        58:6).

53.     But Ogbazion says he did not tell Tina Davis anything about the forged checks; he
        does not think he told his CFO anything about the checks, other than to deposit
        them; and he cannot remember what he told the young woman in the call center
        who actually forged the customers' signatures.  (*Id.* at 58:23-59:12).

54.     The only other person that Ogbazion claims he told about the checks, Jermaine
        Shearin, did not testify at trial and was not deposed.  Nor did Ogbazion testify at

trial about what he supposedly told Shearin at the time. In any event, Ogbazion admits that he did not tell Shearin that he forged the names on customer checks. (*Id.* at 59:13-23).

55. No testimony and no exhibit at trial (*i.e.*, no record evidence) corroborates Ogbazion's new story (Story 5: Cash Vault Lender) about the HSBC checks. Ogbazion admitted that the cash vault lender did not ask him to forge customers' signatures and deposit those checks into his payroll account; did not ask him to actually use the proceeds from those forged checks to operate his business; and he did not disclose beforehand that he was going to forge checks and deposit them into his payroll account. (*Id.* at 58:12-22).

56. The Court finds that Ogbazion needed the money from the forged checks to continue operating his business and that he used those illicit proceeds to do just that. Samborsky confirmed that he would not have loaned the company $36,000 over two days if the company had money in any other account and he was not aware of any other funds. The company had no funds available on the day the forged checks were deposited—having used all of the money loaned to it by Samborsky— and Ogbazion thus had a clear motive for forging the checks so that the company could continue to operate. The Court also credits Tina Davis, who testified that Ogbazion told her in 2007 that the reason he forged the signatures and deposited the forged checks was that he needed the money to meet payroll. Ogbazion admits that the money was, in fact, deposited into the

company's payroll account.  Davis's testimony also is corroborated by the record evidence, and she has been consistent over the years, unlike Ogbazion, who has admittedly lied about the incident more than once, to different people.  Ogbazion also had a motive to prevaricate at trial about the reason for the forgery, *i.e.*, to absolve himself of any wrongdoing.  Consequently, the Court finds that Ogbazion lied at trial on June 17, 2013 when he told his new version of events regarding the checks, in an effort to explain away his criminal conduct in January 2007.

## DEFENDANTS' FAILURE TO PAY 2009 AND 2010 EMPLOYMENT TAXES AND LIES TO THE IRS

57.     In 2009, Ogbazion knew that legally he had to pay his company's employment taxes.  (Doc. 99 at 78:13-22; PX701).

58.     Despite knowing he legally had to pay his company's employment taxes, Ogbazion did not pay them for the second two quarters of 2009.  (Doc. 99 at 78:23-25; PX701).

59.     Ogbazion also did not pay his company's employment taxes for the first two quarters of 2010, despite knowing the law required him to pay them.  (Doc. 99 at 79:1-9; PX701).

60.     In the first quarter of 2010, when Ogbazion was not paying employment taxes, he paid other expenses, including costs for media.  (Doc. 99 at 79:10-22).

61.     Ogbazion knows that employment taxes are made up of two components, a component that the company pays directly, and a second component that is

withheld from employees' paychecks and is held in trust for the United States until paid to the government. (*Id.* at 79:23-81:4; PX701).

62. Ogbazion knew it was important not to willfully fail to pay employment taxes. But he made the decision not to pay his company's employment taxes and to use the government's money to fund the operation of his business. He knew that that money did not belong to him, yet he used it anyway. (Doc. 99 at 82:25-83:11).

63. ITS's outside counsel, Lisa Pierce, expressly told Ogbazion in September 2009 that he had to pay the employment taxes. Specifically, she instructed Ogbazion in an email: "Another reminder, always, always pay the withholding taxes. You don't want to go down that road again." (PX54). Ogbazion admitted at trial that he received the email, but he nonetheless did not pay the company's employment withholding taxes. In fact, he and ITS Financial failed to pay three additional quarters of employment withholding taxes, chosing instead to pay other creditors and expenses during that time. (Doc. 135 at 196:6-197:11; PX54).

64. ITS Financial sent notices to franchisees when they failed to pay employment taxes, telling them they had to pay their employment taxes. (Doc. 99 at 83:12-25; PX559).

65. After Ogbazion did not pay over $1,000,000 in employment taxes, he tried to settle the amount he owed to the IRS. He offered to pay the IRS $5,000 to settle all claims. That's the number he said he "wanted to pay." (Doc. 99 at 84:2-23).

66.  Before he offered the IRS $5,000 to settle the over $1,000,000 he owed in employment taxes, Ogbazion had one of his employees fill out an IRS Form 433-A financial statement on his behalf. (*Id.* at 84:24-85:11; PX664).

67.  The IRS Form 433-A required Ogbazion to list all of his assets. He listed a number of commercial properties that he owned at the time. (Doc. 99 at 86:2-19; PX664).

68.  The Form 433-A also asked Ogbazion to list all other assets, including investments, stocks, bonds, mutual funds, and interests in partnerships. (Doc. 99 at 87:18-88:12; PX664).

69.  Ogbazion included attachments to the Form 433-A, including a description of litigation in which he was involved. (Doc. 99 at 88:13-89:10; PX664).

70.  Ogbazion reviewed the Form 433-A and then signed it, under penalty of perjury. (Doc. 99 at 85:12-86:1, 90:17-22; PX664).

71.  Ogbazion did not include on the Form 433-A his interests in two partnerships that each owned a shopping center. Ogbazion now claims he had sold his interests in those partnerships / shopping centers before he signed the 433-A. Ogbazion's testimony is not credible. Less than one year after he signed the 433-A, those same shopping centers appear on Ogbazion's personal financial statement (PFS). That PFS was submitted to a U.S. bank in 2011. (Doc. 99 at 90:23-91:17; PX736).

72.  Although Ogbazion claims he had sold his interest in the two shopping centers when he signed the Form 433-A, he told the bank that he still owned the shopping

centers / partnerships as of February 2011. He also told the bank that he personally had a $1 million interest in the two shopping centers / partnerships at that time. (Doc. 99 at 91:19-95:1; PX736; PX664).

73. Ogbazion also discussed with his partner the prospect of selling one of the two partnerships, Burnett Plaza, in June 25, 2010 - one month after Ogbazion signed the Form 433-A. (PX35 at 19; PX664).

74. Ogbazion's self-serving testimony that he sold his interests in the shopping centers before he signed the Form 433-A is not credible, and no record evidence corroborates it. The Court credits Ogbazion's personal financial statement (PFS) - prepared prior to this litigation and submitted to a U.S. bank - which flatly contradicts his testimony. (PX736). (Pick your poison: If the Court did not credit the PFS, then Ogbazion lied to the bank (vs. the government). Furthermore, Exhibit PX35, at 19, also contradicts Ogbazion's testimony, as it reflects that Ogbazion's partner wanted to discuss selling one of the two partnerships in June 25, 2010 - one month after Ogbazion signed the Form 433-A. Ogbazion also received copies of financials for both properties on December 14, 2009 (PX35 at 18), shortly before he signed the Form 433-A. Finally, none of Defendants' rebuttal exhibits addressed this topic. (PX736; PX35 at 18-19; PX664).

**DEFENDANTS' INSTANT CASH LOANS ("ICLs") AND REFUND ANTICIPATION LOANS ("RALs")**

75. ITS Financial has offered a variety of different loan programs over the years. One of the programs is an ICL, or Instant Cash Loan, also sometimes called the

Holiday Loan.  The ICL is a pre-season product offered before the IRS accepts tax returns.  It is not collateralized by a tax refund, but the customer still has to have a tax return prepared and completed to apply for an ICL, which ITS Financial calls an estimate.  (Doc. 103 at 7:12-8:14; Doc. 77 at 4; PX696 at 1).

76.    Defendants claim that the terms of the ICL did not require ITS customers to file with them if they received the ICL.  But Ogbazion knew that franchisees lied to customers and told them they did have to file with ITS if they received the ICL. (PX640).

77.    Over the years, ITS Financial also has offered a RAL or Refund Anticipation Loan.  The RAL is similar to an ICL but is purportedly only offered after customers receive their W-2 Forms.  A RAL is also different from an ICL, because the RAL is collateralized by the customer's tax refund.  Therefore, the RAL is secured by and repaid directly from the proceeds of the customer's tax refund from the IRS.  (Doc. 103 at 7:12-8:14; Doc. 77 at 4; PX696 at 1).

78.    Defendants also offer a third product called a Refund Transfer (RT).  An RT is not advertised as a loan, but ITS internally identifies it as a "bank product."  An RT involves opening a temporary bank account, in the customer's name, for individuals who do not have a bank account to accept an IRS refund.  The IRS requires such an account before it will electronically transmit and deposit a taxpayer's refund.  (Doc. 103 at 9:12-23).

79.   Ogbazion considers ICLs and RALs crucial to the success of ITS Financial.   (*Id.* at 10:14-16).

80.   In ITS's view, the purpose of offering the ICL and the RAL is to get customers across the threshold of the franchisee's door, even when approvals for the loans are going to be, as Defendants admit, "very, very low."   (*Id.* at 9:24-10:12; PX760).

81.   Like Defendants, many ITS franchisees also "did not care about the percentage of approvals" regarding the ICL, for instance.  Instead, "Getting people in the door was the important part."  (PX102).

82.   For a brief time, ITS Financial called both the ICL and RAL products "advances" instead of "loans."  The products were the same.  Only the names of the products changed.  Ogbazion claims that re-labeling the products was all ITS Financial had to do in order to be a non-licensed lender and avoid complying with state licensing requirements.  (Doc. 103 at 8:15-9:11).

83.   One of the functions that ITS performs for franchisees is to create radio, television, and print advertisements.  ITS also directly buys radio and television advertisements from radio and television stations on behalf of franchisees.  ITS later deducts the cost of those advertisements from the franchisees' revenue.  ITS heavily advertises its loan products.  (*Id.* at 10:17-11:3).

## DEFENDANTS' FRAUDULENT ICL IN 2010

84.  For the 2009 tax year, ITS intended to use Advent, a third party lender, to fund its ICL and RAL loan programs for ITS customers. (Doc. 11 at 228:13-16).

85.  ITS Financial ran ICL ads nationwide in December 2009. Those ICL advertisements invited potential customers to "apply for your loan of up to $1,000 with your pay stub and get a check today." (Doc. 118 at 10:24-12:13; PX604).

86.  On December 30, 2009, ITS Financial notified all of its franchisees by e-mail that "The ICL for the 2009 tax season has ENDED as of 10:45 EST on 12-29-09." (Doc. 119 at 72:6-9; PX112).

87.  On December 30, 2009, the same day ITS Financial announced to its franchisees that the ICL program had ended, the company told its marketing agency to switch advertisements from the ICL advertisement to a Cash Back Fast (CBF) advertisement. The CBF advertisement did not include language regarding the ICL. ITS Financial made this switch because it knew the ICL was no longer available. (Doc. 119 at 71:6-72:4, 72:15-24; Doc. 118 at 9:5-10:16; PX100; Doc. 103 at 11:4-12; PX112; PX114; ; Doc. 105 at 115:21-116:15; Doc. 111 at 228:17-21; PX112).

88.  The Cash Back Fast advertisement, unlike the ICL advertisement, did not advertise an ICL. Rather, it advertised the Refund Anticipation Loan. (Doc. 118 at 12:24-13:15; PX605).

89.    After the ICL program ended and ITS Financial had changed advertising traffic from the ICL ad to the CBF ad, the company switched back to running ICL advertisements in certain markets for the non-existent loan program.  (Doc. 118 at 10:18-21; Doc. 111 at 228:22-229:1, 253:3-255:24; ; Doc. 105 at 116:7-117:9, 119:15-120:20; Doc. 122 4:1-5:17; PX730; PX126).

90.    For example, on December 31, 2009, at Ogbazion's instruction ("Per Fez"), ITS Financial switched from the Cash Back Fast advertisement, which did not promote an ICL product, "back to the ICL spot," which falsely advertised a non-existent ICL product in the San Antonio, Texas market.  (PX124; Doc. 114 at 123:16-24; Doc. 119 at 73:13-74:7; Doc. 118 at 13:18-15:2).

91.    ITS Financial decided to run the false advertisements in San Antonio because they were "generating calls."  (Doc. 11 at 229:8-230:20; PX654).

92.    At trial, Ogbazion initially denied making the decision to turn on the ICL advertisements in San Antonio.  PX124, an email between ITS Financial employees, states "Subject: San Antonio.  Kelley, per Fez, please change traffic in San Antonio back to the ICL spot today."  Ogbazion admitted that the email was sent on December 31, 2009, which was after the ICL advertisements had already been turned off.  After he was shown the email at trial, Ogbazion testified that some franchisee must have told him to turn the advertisements back on.  Ogbazion did not say who would have done so, no record evidence corroborates his testimony, and his testimony is not credible.  (Doc. 103 at 18:9-19:4).

93.   Ogbazion admitted that if ICL advertisements were running in markets where there was no ICL and no genuine loan, that would be false advertising.  Ogbazion further admitted that the ICL advertisements kept running in San Antonio after the ICL program was over and should not have been running there.  (*Id.* at 15:6-18:8; PX654).

94.   In another instance, ITS switched back to running ICL advertisements for the non-existent loans in Miami, Florida because David Franklin, a franchisee and area developer, stated that the ads were "generating phone calls."  In a separate e-mail instructing ITS Financial to continue running ICL ads, Franklin stated:  "Keep the ads running . . . the phones are ringing."  Franklin punctuated the sentence with a smiley face.  (Doc. 118 at 15:9-16:20; PX104; PX107).

95.   In Mobile, Alabama, ITS also continued running false ads at the request of one of its area developers.  (PX105).

96.   Similarly, ITS Financial agreed to allow its franchisee in Albuquerque, New Mexico to continue running ICL ads after the program was over, even though ITS knew that the franchisee did not have an ICL product.  Ogbazion claimed that pursuant to DX 116, those false ICL ads did not actually run in Albuquerque.  But, at trial, Ogbazion admitted that Corporate had, in fact, authorized the false ads to continue running, knowing the franchisee did not have an ICL, and that the decision to cancel the false advertisements was not made by ITS Financial.  (Doc. 135 at 184:9-185:16; PX747).

25

97.   Ogbazion admitted that in at least one or two markets, after the ICL advertisements were turned off, some franchisees who did not have an ICL product were nonetheless allowed to keep running the ICL advertisements. Ogbazion claimed, however, that he was not aware of that happening at the time. (Doc. 103 at 12:23-13:7).

98.   Ogbazion was personally involved in, and made the decisions, about which ITS advertisements would run in Instant Tax Service markets across the country, including the decision to keep running the ICL advertisements after the ICL program had ended.  Only Ogbazion could authorize the switch from CBF advertisements back to ICL advertisements after the ICL program had ended. (Doc. 118 at 25:24-26:23; ; Doc. 105 at 117:18-118:3).

99.   On January 4 and 5 of 2010,  ITS turned the ICL advertisements back on in multiple markets and scheduled them to run through January 10, 2010, well after the ICL program had ended.  ITS scheduled CBF ads to run from January 11 to January 31, 2010.  (Doc. 118 at 21:14-24:7, 19:21-20:17; PX730 at 6-7, 11-12, 14-15, 22-63, 72-80, 82-93).

100.  After the ICL program had officially ended, ITS continued to run false advertisements for the ICL program in at least 10 markets.  (Doc. 105 at 120:9-20; PX730).

101.  Multiple franchisees objected to the false ICL advertisements running in their markets, including:

## C.W. SMITH

a.  ITS franchisee C.W. Smith complained to ITS that - for two years in a row - the company falsely advertised a loan product that it did not have.  He wrote Ogbazion and Kyle Wade on December 30, 2009, and told them that "last year my issue was that we advertised, in a new market, a product we did not have, the ICL.  No one at ITS would listen, but finally the ad was pulled.  Now here we are again, advertising a product we do not have.  It might be interesting to know that [Jackson Hewitt] and H&R do not have ICL's but they are not out there telling the public that they do.  We are."  No record evidence indicates that ITS Financial disputed Smith's allegations.  (PX118).

## RUSSELL HUETTE

b.  Another franchisee, Russell Huette, complained that the ICL advertisements were still running in his market after the program ended.  ITS employee Amber Bennett responded to Huette's concerns by justifying ITS's decision to keep running ICL advertisements, stating that "the ICL is a marketing campaign. The purpose being that you have the ability to sell your service and self.  Not to hand out money."  Bennett also told the franchisee to lie to customers by omission, and don't "tell[] [them] you have nothing at the door."  "This is a business that goes hard and fast.  You have to grab your clients' attention and keep it.  We grabbed . . . you need to keep it."  Kyle Wade forwarded Bennett's email to Ogbazion and James Mowrey, calling it a "great email."  (PX126).

<u>PETROS BERHE</u>

c.  On January 4, 2010, another ITS franchisee, Petros Berhe, wrote to the company that "I'm getting several calls about the Instant Cash Loan, when are we going to stop advertising?  Can we stop advertising since we don't give them ICL Service anymore?"  ITS Financial falsely responded that the ads were only running because it "takes the stations 3-5 days to physically pull them."  (PX748).

d.  In fact, ITS Financial could change the traffic for its advertising and have replacement advertisements running within 24 hours.  (PX749).

<u>STACY RAGLAND</u>

e.  On January 8, 2010, another ITS franchisee, Stacy Ragland, complained to ITS about the false ICL advertisements being run by ITS in his market.  Ragland noted that the advertisements, which falsely promised a $300 ICL "to everyone for just $6," had been running in the San Antonio market throughout the week when, in fact, "THERE [WAS] NO SUCH LOAN AVAILABLE."  (emphasis in original).  Ragland sent the email to ITS employee Anita Boynton, and copied Priscilla Alonzo, another franchisee in San Antonio.  (Doc. 114 at 118:1-119:7; PX654 at 2).

f.  In his January 8th e-mail, Ragland complained that ITS had not responded to his earlier complaints about the false ICL advertisements.  Ragland also noted to Boynton that the false ICL ad, which ITS requires its franchisees to pay for,

was "stimulating calls" from potential customers seeking the non-existent loan. He insisted that the false advertisements were hurting the reputation of Instant Tax Service "and it MUST BE STOPPED!" (emphasis in original). (Doc. 114 at 12:8-19, 123:1-7, 122:4-10, 122:11-14; PX654 at 2).

g. Neither Ragland, nor any Instant Tax Service franchisee in the San Antonio area, was offering either the advertised ICL loan or any ICL loan at the time of the January 8, 2010 e-mails. (Doc. 114 at 121:10-23, 45:19-23; PX654 at 2).

h. Boynton responded to Ragland that running the false ICL advertisements in San Antonio was "a decision made here at corporate based on the number of calls [from potential customers] San Antonio had received." She also advised Ragland that ITS has "continued to run" the advertisements in other markets "with no issues," and that Instant Tax Service store owners like Ragland had to "make the decision how to handle a call or visit" by prospective customers responding to the false advertisements. (Doc. 11 at 229:8-230:20; Doc. 114 at 123:8-12, 123:13-124:13, 126:3-10; PX654 at 1).

102. On January 4, 2010, while ITS was turning ICL advertisements back on in markets across the country, Kyle Wade wrote to Greg Woryk to let him know a franchisee was complaining that ICL ads were running in the Norfolk market after the program had ended. Woryk informed Wade that the ad was running because "[w]e had a request to keep ICL advertising there." Wade then replied, "Ahhhh, okay, I won't tell him then." (PX659).

103.  Ogbazion now contends that ITS turned ICL advertising back on in certain

markets after the ICL ended because franchisees in those markets funded their

own ICLs.  Ogbazion's testimony is not credible and conflicts with the

documentary evidence that shows ITS ran the false advertisements simply because

they generated calls.  Moreover, the company concedes that it did nothing to

verify whether or not franchisees actually did obtain funding for their own ICLs.

(Doc. 119 at 77:15-78:2).

104.  Ogbazion claimed that ITS Financial made "mistakes" and admitted that he did

not do a good job of verifying whether franchisees who asked for the ICL

advertisements to continue running actually had any kind of loan program.  (Doc.

103 at 14:16-15:1).

105.  Additionally, Greg Woryk, the Vice President of Marketing in 2010, admitted that

he did not know of any franchisees who funded their own ICLs, would "not

necessarily know that it was done," and did nothing to check to determine if any

franchisees had in fact obtained financing on their own before the ICL

advertisements were turned back on.  (Doc. 118 at 42:10-16, 43:2-8).

106.  Moreover, the ICL advertisements that ran after the ICL program ended were

prepared by Corporate, not by the franchisees.  (*Id.* at 43:2-8).

107.  Franchisees who supposedly had their own ICL products did not ask if they could

run new advertisements tailored to their purported new local product.  Instead,

they asked ITS to keep running the Corporate ITS advertisements for the old

Corporate-run ICL, even though there was no ICL run through Corporate. (Doc. 103 at 15:2-5).

108. Ogbazion and ITS knew that they could not simply keep running existing ICL ads, but did so anyway, rationalizing that the "advertising disclaimers, et cetera, would vary, depending on the various criteria of [the franchisee's] loan program." (PX300 at ¶ 3). No record evidence indicates that ITS changed its advertisements in response to the supposed local ICL programs. Instead, as described above, Ogbazion admitted that ITS did not even check to see if any of those franchisees really had ICLs, and did not verify any criteria or amounts of the supposed loans. (Doc. 135 at 176:2-178:12; PX90; PX300 at ¶ 3).

109. Worse, Defendants ignored illegalities when certain franchisees notified Corporate employees at ITS that the franchisees offered non-existent ICLs and had customers complete fake bank applications. These franchisees lied to customers by telling them that the bank had denied their application, despite knowing that the ICL product did not exist and the franchisees had not even submitted their application to a bank. (Doc. 119 at 77:4-19). Examples include:

<u>LANCE DOHM</u>

a. Lance Dohm, who on January 5, 2010 wrote to Patricia Honeck, an ITS Financial employee, that "we've been taking fake bank apps and just denying everyone. Fun." Despite being put on notice of this fraudulent practice, no record evidence suggests that anyone at ITS Financial did

31

anything to stop the fraudulent and illegal practice. (Doc. 119 at 78:20-79:21; PX660 at 1).

"FARIS" (NEW YORK INSTANT TAX SERVICE FRANCHISE)

b. On January 1, 2010, an ITS tax return preparer from New York wrote to Ogbazion that "our customer . . . been asking us about the loan. We ain't telling them [expletive]. We told them come to our office and fill out application. If the [sic] denies. Which it will. LOL. We will give u 50 dollars off ur preparation fee. . . Most black folks used to getting denied so it won't come to them as a shock. I know that's a [expletive] thing to say, but it's the truth. (PX128 at 1).

c. Although the fraudulent automatic denial program is obviously fraudulent, and was described directly to Ogbazion, no record evidence suggests that the company/Defendants did anything to stop it. (Doc. 103 at 19:17-21:17; Doc. 119 at 79:22-81:19; PX128 at 1).

d. Instead, Ogbazion responded to this highly offensive e-mail that admitted to illegal conduct merely by writing "Hope you ready dude. Happy new year to you. What you doing tonight. Taxes hopefully. Tell NG I said what's up." Thus, Ogbazion and ITS not only knew about the fraudulent practice, they implicitly condoned it. (PX128).

110. Defendants effort to market non-existent ICLs in 2010 extended to ITS Financial's customer-service center. After the 2010 ICL was over, ITS Financial call center

employees were instructed: "do not tell the customers that the ICL is not being offered." They were also told to lie to customers and tell them, "Due to the overwhelming response to our Instant Cash Loan program, most locations have already run out of stock." In fact, ITS's Corporate ICL program was officially over for all locations nationwide, and the end of the program had nothing to do with particular locations running out of stock. Nor did locations ever have "stock" to run out of, because it was a Corporate-run program. (PX121). Also, for customers who called at that time only asking for a location, call center employees were told to, "just give the location. Sometimes less information is better!" (PX121; PX117).

111.    When franchisee Angela Thornton complained to ITS that its customer service employees were falsely telling customers that the ICL still available - which made Thornton look like she was lying when she told customers the truth that the ICL program was over - ITS gave her Corporate's rationale for lying to customers: ITS Financial employee Erin Hennigan told her, "We can't tell customers that the program has officially ended until all the ads have been switched." (PX123).

112.    Defendants' false loan advertisements for 2010 also extended to the company's website. Kyle Wade forwarded Ogbazion an email (PX119) on December 31, 2009. The forwarded email said: "Are you able to change the ICL ad that's currently running on our website?" It also said the online ICL advertisement is

still running, and is dated after the ICL program had already ended.  Wade asked Ogbazion in connection with the forwarded email, "What do you think?"

113.    Although the ICL program was over, the ICL continued to be touted on ITS Financial's website for multiple additional days, even after Ogbazion was expressly told that the ICL advertisement was still up on the website.  For example, the online ICL advertisement was still on ITS Financial's website on January 4, 2010, when a franchisee complained in an email (PX624 at 2) to ITS employees Amber Bennett and General Counsel Joe Roda about it.  Roda confirmed in his email response that the ICL advertisement was, in fact, still up on the ITS website at that time, but claimed that changes to the website would be "forthcoming."  Ogbazion admitted at trial that the ICL advertisement "absolutely" should have been off the website by January 4, 2010.  (Doc. 135 at 181:5-183:21; PX119; PX624).

114.    The ITS Financial website can be viewed by people nationwide.  Ogbazion admitted that ITS continued to keep the ICL ad up on its website in early 2010, even after the program was over. Ogbazion initially testified that the ICL ads were not taken down right away, and came down "a couple days later."  That testimony is not credible.  (Doc. 135 at 67:15-68:4).

115.    Defendants' practice of marketing fraudulent loan programs was not an isolated occurrence limited to 2010.  In 2007, Ogbazion operated  a similar "instant denial program" for a credit based loan offered through Republic Bank.  Because denials

were so high, Ogbazion instructed his employees to not even bother submitting customers' loan applications to the bank.  Rather, they were to collect applications, not submit them, and then just falsely tell the customers they had been denied.  (Doc. 113 at 69:8-70:21).

116.   Ogbazion was asked if he had ever joked with franchisees about how many applications he had for the 2006 or 2007 holiday loan, and if he had told franchisees that the company had 10,000 applications but only got 7 approvals. Ogbazion testified that he never said that.  That testimony is not credible because in a recorded audio call with franchisees, dated December 9, 2008, Ogbazion states on the audio:  "We gave them about 10,000 applications and they approved seven people."  Vice President, Kyle Wade then says, "Not 70, not 700, seven." Ogbazion can be heard laughing as he says this.  (Doc. 103 at 47:5-48:22).

## DEFENDANTS' FRAUDULENT RAL IN 2010

117.   Ogbazion knew by December 7th, 2009, that SBBT, Chase Bank and Republic Bank would not agree to provide ITS with a RAL for January 2010.  Advent, which initially had agreed to provide ITS with a RAL for January 2010, backed out of the agreement and was no longer an option as of December 29, 2009.  (Doc. 103 at 25:2-21; PX82).

118.   The fact that SBBT, Chase, and Republic Bank were not options for ITS is evidenced in an e-mail from Bill San Giacomo, a Vice President at ITS, that he sent out to all ITS franchisees on December 7th, 2009.  The email (PX82)

informed the franchisees that: "SBBT decided to no longer do business with Instant Tax.  Basically they told me 'we don't trust ITS Financial - ITS franchisees to do the right thing.'  I know that may be painful to hear, but that's what they said and how they feel."  The email also said that ITS "didn't bother having discussions with Chase, as they have constantly told us they will not take anyone with a loss ratio higher than 1 percent."  It also reported that Republic Bank was "not a realistic option."  Ogbazion claimed at trial that he wrote the email, not San Giacomo.  (Doc. 103 at 21:18-24:10; PX82).

119.  On December 30, 2009 - after Advent backed out - Ogbazion emailed John Sapp at Drake Software and told him that ITS Financial "officially" has no RAL bank. (Doc. 103 at 25:22-26:4; PX103).

120.  Despite the fact that SBBT said in December 2009 that they do not trust ITS Financial, and despite knowing ITS would be turned down again, ITS went back to SBBT and asked it again to provide a RAL for January 2010.  ITS Financial's renewed request was by email, on January 6, 2010 (PX660 at 2], from San Giacomo.  As expected, that same day SBBT responded that "the RAL isn't going to happen this year" for ITS, and that SBBT would only approve refund transfers (RTs) for ITS that year.  (Doc. 103 at 26:5-27:24; PX660 at 2).

121.  At trial, Ogbazion did not deny that on January 6, 2010, SBBT told ITS that it was not going to get a RAL product from SBBT.  (Doc. 103 at 38:1-11).

122. After being informed on January 6, 2010, at 1:22 p.m., that SBBT had turned down ITS for the RAL and would only provide RTs for 2010, Ogbazion lied to ITS franchisees that evening during a recorded audio conference call. (PX767). Ogbazion falsely told the franchisees during the call that SBBT was still considering giving ITS franchisees with low loss ratios a RAL. (Doc. 103 at 27:25-30:10, 30:19-31:13; PX767A-B (audio); PX660; PX534).

123. On January 11, 2010, Chris Bagg from SBBT told San Giacomo, "I'm getting calls from your [franchisees] that are saying that Fez told them on a conference call Wednesday that he had made an agreement with SBBT to have bank products. Two [franchisees] have called in saying that Fez told them that if they had a low loan loss that SBBT would allow them RALs." SBBT then asked, "Why is that being stated?" Ogbazion admitted that San Giacomo responded to SBBT's inquiry on January 11 by saying, "I have no idea." (Doc. 103 at 30:19-31:13, 31:14-32:9; PX534).

124. Before the January 6, 2010 conference call, Ogbazion knew that ITS would not be able to get a RAL product from anyone, let alone SBBT. Ogbazion admitted as much in an affidavit he signed under penalty of perjury and filed on May 24, 2011, in a civil case before this Court. Ogbazion stated: "ITS had also promised, long before December 26, 2009, to provide its franchisees with an ESL and RAL program to provide customers. By late December, ITS would not have been able to provide an ESL or RAL program during the 2010 tax season (which included

December of 2009) if Advent did not deliver said program pursuant to the agreement." (Doc. 103 at 32:20-34:20; PX652 at ¶ 18).

125. Even though ITS Financial knew it had no RAL-offering bank as of December 30, 2009, the company deliberately continued to advertise on its website that "Refund Anticipation Loans will be offered by an independent 3rd party lender." It continued to post this language even though it made other changes to its website on January 6, 2010. (PX625 at 3).

126. ITS also ran television and radio advertisements for Refund Anticipation Loans in 2010. For instance, ITS advertised RALs in Kansas City mid-January, even after it knew that SBBT was not going to provide ITS with a RAL product. One of Ogbazion's employees, Kameron Hurley, wrote on January 20 and 21 to a reporter, Linda Wagner, and admitted that ITS had been running RAL advertisements. (PX511). Wagner had received complaints from customers about ITS and its supposed RAL program. Hurley wrote back admitting that the RAL ads had been running in Kansas City, but said that ITS pulled them when "our RAL partner announced its inability to offer RALs on 1/14." SBBT, in fact, was never ITS's 2010 RAL partner. Hurley also stated, "Our media buyers notified all of our markets to run revised spots on 1/15. The revised spots began running on 1/18. As of 1/18, *stations in Kansas City* were running *our revised spot which does not include the RAL product language.*" (emphasis added) (Doc. 103 at 36:5-37:16; PX511).

38

127. Following Hurley's email to the reporter in Kansas City, ITS employee Monica Clouse again confirmed that RAL ads had been running in *all* markets, up through January 15. She paraphrased Hurley's earlier email and admitted that that "Our RAL (Refund Anticipation Loan) partner announce[d] its inability to offer RALs on 1/14. Our media buyers *notified all of our markets to run revised spots* on 1/15. The revised spots began running on 1/18. As of 1/18, *stations* were running *our revised spot which does not include the RAL product language*. (emphasis added) (Doc. 118 at 24:10-25:21; PX483).

128. Defendants nonetheless claim that ITS did not run any RAL ads in January 2010. Their only support is Ogbazion's self-serving testimony at trial, which was not credible, particularly in light of the lies Ogbazion told to others about the state of the January 2010 RAL. Furthermore, Ogbazion offered contradictory testimony about whether RAL advertisements ran after ITS pulled some of the ICL ads in January 2010. Ogbazion testified on direct, consistent with ITS Vice President Greg Woryk's testimony, that ICL advertisements were replaced with a cash back fast ad called the CB RAL ad. (The CB "RAL" ad mentions a RAL). When asked again by his counsel, Ogbazion said a second time, "Yeah, CBF, cash back fast, RAL ad." But when asked, a third time, by his lawyer whether RAL ads were running during January, Ogbazion said "no." In contrast, Exhibits PX 483 and PX 511 are contemporaneous records that establish that, in fact, RAL ads did run in

markets across the country through January 15, 2010.  (Doc. 103 at 36:5-37:16; Doc. 135 at 116:17-119:4).

129.  ITS and its executives know that it is illegal to run RAL ads for products that do not exist.  As ITS Financial's General Counsel, Todd Bryant, noted to an Instant Tax Service store owner who had no written franchise agreement and was in a dispute with ITS Financial:  "you advertise that you have a RAL up to $5000, but we are aware that you are signed up with SBTPG, which is not offering a RAL of any sort.  Your continued run of these ads would put you and ITS at risk of a lawsuit from one of our competitors, or even an action from the attorney general of your state."  Bryant further argued that "we are concerned that [such ads] violate the Lanham Act and other truth-in-lending laws."  (PX300).

130.  Ogbazion claimed on direct that after Advent dropped the ICL and RAL program in 2009, some franchisees obtained their own funding for a loan program.  Ogbazion's testimony was not credible and no record evidence corroborates it.  Ogbazion admitted that he took no part in helping franchisees obtain the purported funding for loans and did not know any details about any such efforts.  (Doc. 135 at 116:17-119:4).

131.  ITS Financial's leadership team met on January 13, 2010.  Ogbazion and Wade had known since January 6, 2010 that ITS had no RAL provider.  According to minutes from the meeting, general counsel Joe Roda asked "Why are we waiting to tell the Zee's [i.e., franchisees] we are not getting RAL's."  Other members of

the ITS Leadership Team falsely responded that the "bank has not said no." At the same meeting, one member of the leadership team explained that a RAL information sheet would still be provided to customers, but it would be "grayed out." General Counsel Roda advised that that "is boarder (sic) line fraud." (PX465 at 2).

132. Although ITS knew since at least January 6, 2010 that it would not have a RAL product from SBBT, Ogbazion admitted that he waited until January 14, 2010 to finally tell ITS franchisees that SBBT would not provide ITS with a RAL for 2010. (Doc. 103 at 37:17-25).

133. On January 14, when Ogbazion finally told franchisees that ITS would not be getting RALs from SBBT, Ogbazion and his close friend and franchisee, Emanuel Ghebremichael, held a conference call with ITS franchisees. During the call, Ogbazion asked Ghebremichael to give franchisees some tips about how to handle the fact that there was not going to be a RAL product that year. Ghebremichael then advised franchisees to lie by omission. He said: don't tell customers who call you don't have a RAL; instead try to get them in the store. He also said he had called Jackson Hewitt pretending to be a customer and asked them if they had RALs, and Jackson Hewitt truthfully said they don't have RALs. Ghebremichael said it was a mistake for Jackson Hewitt to say that it does not have RALs. Ogbazion admitted at trial that Ghebremichael told franchisees on the call, "don't

tell [customers] you don't have a RAL."  (Doc. 103 at 38:12-39:7; PX769

(audio)).

134.    Other ITS employees also encouraged franchisees to lie to customers who inquired

about RAL products.  On January 8, 2010, Anita Boynton instructed Stacy

Ragland, an Instant Tax Service franchisee in San Antonio, Texas, to mislead by

omission prospective customers seeking RALs when, as of January 8, 2010, ITS

Financial had no RAL product.  (Doc. 114 at 124:14-125:8; PX654 at 1).

135.    Consistent with Defendants' strategy to deceive the public, ITS Financial's

2009/2010 Marketing Strategy plan instructed that "[d]ue to a change in our bank

product offerings this year" (*i.e., no* RAL products and no ICLs in 2010), among

other things, Instant Tax Service employees should be "coach[ed] on how to

answer the phone with positive responses" to prospective customers.  This

included falsely telling customers that "we have a *variety of bank products*

*available*, and they should come down to your office to see which ones they

qualify for."  (emphasis added) (PX427).

136.    As with ICL programs, Defendants knew that franchisees were offering fake RAL

loan applications in 2010 to customers when no such loan product existed.  For

example, in early January 2010, ITS finance department employee Patricia

Honeck knew that an ITS store in Hamilton, Ohio was taking RAL applications

from customers - even though there was no RAL lender - and automatically

denying all of the applications.  Yet she did not object to or stop the practice.  ITS

stores in Akron, Ohio also engaged in this dishonest and illegal practice, which was known to ITS Vice President Kyle Wade. (Doc. 111 at 284:11-286:4; PX108; PX478 at 3; PX498; PX687).

137. On direct, when asked to testify as to his view of Advent's behavior and failure to fund Defendants' loan programs for 2009 and 2010, Ogbazion testified that he thought it was "incredibly dishonest" and "very underhanded" of Advent to represent to Defendants that it could provide funding for the loans and fail to do so. Ogbazion was asked on cross "Is advertising loans that Instant Tax Service doesn't have, is that dishonest?" Ogbazion admitted: "It is." (Doc. 134 at 108:4-109:12; Doc. 135 at 183:23-184:8).

### DEFENDANTS' FRAUDULENT RAL IN 2011

138. After the 2009-2010 failure of ITS to obtain a RAL provider, Defendants knew they had to offer *some* RAL program in future tax seasons, no matter how flimsy. At a Team Leadership Meeting on February 17, 2010, Ogbazion explained that "there are some Zee's who know they can buy Drake on their [o]wn and run it by themselves. We have to bring RALs to the party." Therefore, according to Ogbazion, the company needed a "Big initiative to get money for a RAL," even if the RAL would "be small and [have a] low approval rate." (PX643 at 3-4).

139. Ogbazion testified that there is no correlation between the amount of money given to customers as loans and the number of returns Instant Tax Service prepares. Referring to the 2008 tax season, before Defendants' controversy with Advent,

Ogbazion also told a franchisee in an email on December 29, 2009 (PX 92) that "our Vegas [franchisees] gave out 100 loans last year and did 3,300 bank products. Our Birmingham Zee gave out 19 loans and did 1,300 returns. There's no correlation between the amount of money given out and the number of returns produced.  Do you think you can buy our customers' loyalty by giving them a hundred dollars versus ten?"  (Doc. 103 at 49:4-24; PX92).

140.    Ogbazion established Defendant Tax Tree to use as a substitute for lenders used by ITS in prior years that would no longer operate Instant Tax Service loan programs.  Ogbazion is the sole owner of Tax Tree.  Defendants, including Ogbazion, falsely represented to others that Tax Tree was a bona fide third-party lender.  For example, ITS Financial worked to prevent Drake Software from learning that Ogbazion owned and operated Tax Tree.  When a senior executive from Drake Software requested that ITS provide contact information for Tax Tree, ITS Financial's CFO asked Ogbazion "who do you want this to be?"  Ogbazion proposed having his close friend and franchisee from Baltimore, Nirav ("Nick") Babu, falsely pose as an employee of Tax Tree.  (PX220; PX554; PX579 at 3, ¶ 3-4; Doc. 75-2 at 128:14-17; Doc. 77)).

141.    Defendants also misrepresented Tax Tree's status to the public.  Tax Tree's 2010-2011 "Bank Product Application," for instance, identified Tax Tree as the "lender" for Instant Tax Service loans, with a "principal office" in Miami, Florida. Defendants also falsely tell ITS customers that Tax Tree "is not affiliated with the

Tax Preparer." (PX220; PX554; PX579 at 3, ¶ 3-4); Doc. 75-2 at 128:14-17;
Doc. 77 at 3).

142. For the 2010 RAL season, Ogbazion expected Advent to come up with about $200
million to fund the RAL program for ITS. If Advent had come up with $200
million for the 2010 RAL program, Ogbazion was expecting a 50 percent approval
rate. For 2011, instead of $200 million, Ogbazion raised only $1.5 million for
RALs. (Doc. 103 at 45:6-17).

143. On direct and cross, Ogbazion testified that in tax year 2008, the third-party bank
ITS used provided $200 million in RAL funding. In tax year 2010 (calendar year
2011), Ogbazion ran his own loan programs through Tax Tree. However, he
raised only $1.5 million in RAL funding, but had ITS market the RAL program
anyway. Internal ITS documents show a 6 or 7 percent approval rate. Defendants
claimed at trial that the approval rate was really 14 percent that year, but that still
translates to an 86 percent denial rate. Ogbazion admits that when ITS customers
apply for the RAL, those customers are locked into having a tax return prepared
by Instant Tax Service, whether or not they are approved for a loan. ITS therefore
locked in the 86 percent of customers it denied the RAL to in 2011; consequently,
those customers could not go anywhere else, and had their tax returns filed by ITS,
after being lured in the door by false claims about a RAL product. (Doc. 135 at
187:15-189:5; PX722 at 3).

144. Tax Tree marketed a RAL program to ITS customers in January and February 2011. A "Tax Tree Lending Program" brochure (PX 364), prepared sometime in 2012, states that for the 2011 RAL program, the approval rate for all RAL applicants was just 7%. That means that 93% of all ITS customers who applied for the RAL were denied that year. Although the Tax Tree Lending Program brochure does not say anywhere that it is a draft, Ogbazion claimed at trial that the document was a "draft." He did not deny, however, that the document says that only 7% of RAL applicants were approved. Defendants, who were permitted to offer rebuttal exhibits at trial, did not offer a supposed final version of this document to contradict PX 364. (Doc. 103 at 39:12-40:17; PX364 at 4; PX722 at 3).

145. Similarly, a "Tax Tree Partner Proposal" (PX695), prepared sometime in 2012, states that for that 2011 RAL program, the approval rate for all RAL applicants was just 6%. That means that 94% of all ITS customers who applied for the RAL were denied that year. Ogbazion admitted at trial that the Partner Proposal was used to obtain financing from a third-party lender, and in fact was sent to third-party lenders, among others. Although the Partner Proposal does not say anywhere that it is a draft, Ogbazion initially claimed at trial that it too was a "draft." (Doc. 103 at 40:18-44:6; PX695 at 3).

146. Ogbazion's testimony regarding PX695 was not credible, however. Ogbazion was shown an email from his employee and Controller, Patrick Rasey. Attached to

46

that email, Rasey sent an identical version of the Partner Proposal--with the 6% RAL approval language--to David Billett and Elliot Weinberg of Downtown Capital Partners. Ogbazion confirmed that Rasey sent the Partner Proposal in connection with a business transaction and that Downtown Capital Partners is a third-party lender. Defendants, who were permitted to offer rebuttal exhibits at trial, also did not offer a supposed final version of this document. (*Id.*)

147. As of January 25, 2011, a contemporaneous record prepared by ITS Vice President Brook Wise showed that ITS Financial's RAL approval rate was only 4.3% as of that date. That means that 95.7% of all applicants had been denied. (Doc. 105 at 120:21-122:3; PX542).

148. In 2011, when the loans were funded through Tax Tree, ITS Financial ran false ads for loans. For example, Ogbazion sent false text messages to potential customers advertising an ICL even though that program was over, because of the number of calls the texts generated. Other false text messages advertised a RAL product in Texas that no one in Texas could qualify for. (PX266-68).

149. When Defendants deny a customer the RAL, they automatically flip them to a refund transfer (RT) product. Pursuant to the RT product, ITS electronically files the customer's tax return but does not provide the customer with a cash loan. Ogbazion admitted at trial that Defendants automatically flip denied customers to the RT product, even when Defendants deny over 80% of all RAL applicants. He also admitted that in that case, those 80% of denied applicants do not get the cash

loan they came into Instant Tax Service to obtain.  Nonetheless, in a classic bait-and-switch, ITS files their tax return and charges the customer very high fees - $500 on average -for preparing the tax return, even though the customers came in for a loan but were denied it.  Those denied customers are then stuck; they cannot go somewhere else to file their tax return, because a person can file only one electronic return per year.  (Doc. 103 at 49:25-51:3; Doc. 77 at 4).

150.  Defendants encourage their franchisees to engage in deceptive practices when marketing ICLs and RALs.  For example, in October 2011, Ogbazion was told by Las Vegas franchisee, Ben Tewolde, that one his secrets for success was calling former clients "under the guise of Toys for Tots," a charity, and letting "them know about ICL and how they could qualify for an interest free loan up to a $1,000.  Ogbazion did not tell Tewolde that it is illegal to call customers under the "guise" of a charity, when in fact you are calling to sell them a loan product.  Instead, Ogbazion told Tewolde "You always go above and beyond, thanks Ben."  The United States obtained an injunction in 2012 against Tewolde, permanently barring him from ever preparing tax returns again.  (PX354).

## DEFENDANTS' ILLEGAL TRAFFICKING IN EFINs

151.  An EFIN is an electronic filer's identification number issued by the IRS.  EFINs allow the IRS to monitor, track and regulate who is electronically filing tax returns (electronic return originators or "EROs").  (Doc. 101 at 11:17-24; Doc. 109 at 101:18-103:10; PX647).

152. The IRS conducts random performance checks of EFIN owners in order to maintain the integrity of the e-file program. If the IRS finds problems with a tax preparation office, it can issue sanctions against the EFIN owner. (Doc. 101 at 11:25-12:6; Doc. 106 at 223:24-224:19, 227:7-228:8, 225:21-226:19, 232:2-233:16).

153. IRS civil sanctions include suspension and termination of the EFIN. (Doc. 101 at 12:7-13:1; JX3 at 92).

154. Some people, like felons, are not allowed to get EFINs. (Doc. 101 at 13:5-7).

155. ITS knows that a unique EFIN is required for each location from which an ERO files returns. (Doc. 11 at 219:13-23).

156. The EFIN application is IRS Form 8633. The EFIN application requires every applicant to state, under penalty of perjury, that he has examined the application and read all accompanying information, and that the information being provided is true, correct and complete. (Doc. 101 at 15:1-11; PX647).

157. The EFIN application also says that acceptance for participation is not transferable, and that "I understand that if this firm is sold or its organization or structure changes, a new application must be filed. I further understand noncompliance will result in the firm and/or individuals listed on the application being suspended from participation in the IRS e-file program." Ogbazion admits that he signed EFIN applications with this language under penalty of perjury. (Doc. 101 at 15:12-25).

158.  Ogbazion knows that it is improper to transfer an EFIN to somebody who is not authorized on the EFIN application to actually use that EFIN.  (*Id.* at 13:8-13).

159.  After signing the EFIN application under penalty of perjury, Ogbazion transferred EFINs to people who were not listed on the EFIN applications that he signed.  (*Id.* at 16:16-22).

160.  Ogbazion admitted to loaning out over a hundred of his EFINs to ITS franchisees prior to 2008.  (*Id.* at 13:14-21; Doc. 80 at 16:24-17:8).

161.  Ultimately, ITS loaned out to franchisees three to four hundred EFINs registered to Ogbazion.  Between 50 and 75 franchisees have used one of Ogbazion's EFINs. (Doc. 11 at 223:9-22; PX441).

162.  The IRS has sent Ogbazion notices regarding tax return filing problems caused by franchisees who were using Ogbazion's EFIN.  For example, in 2009, the IRS notified Ogbazion that he had failed to comply with due diligence requirements in filing returns for the EITC.  The EITC is a refundable tax credit that low income individuals with qualifying income, including self-employment income from home businesses, are eligible to receive.  In 2007, the IRS notified Ogbazion that he had been filing returns without a required IRS form, Form 8453.  In both instances, Ogbazion had not actually prepared the returns.  The notices were directed to Ogbazion because franchisees were using EFINs Ogbazion had impermissibly loaned them.  (Doc. 11 at 223:23-226:21; PX549; PX563; PX564).

163. Ogbazion was not the only ITS executive who lent out EFINs to franchisees. For example, at the request of others at ITS, including Ogbazion, Brook Wise applied for and obtained EFINs for use as "backup" EFINs for franchisees. Wise had no valid need for an EFIN for his own use because he was not a tax return preparer and did not operate any tax preparation stores. (Doc. 105 at 112:2-113:18).

164. Ogbazion exchanged emails with another franchisee, Robel Tekeste, in December, 2010, that reveal Ogbazion knew the franchisee had used an ITS employee's EFIN in 2010. The email also shows that Ogbazion knew that the franchisee would be borrowing EFINs from at least two other people to use in 2011. (Doc. 101 at 17:17-19:17; PX484 at 3-4).

165. Another 2010 email with the subject "Audit" shows that Ogbazion knew one of his franchisees, Ashish Goel, was using an ITS employee's EFIN at the time, and that the franchisee was about to have an IRS audit. (Doc. 101 at 19:18-20:16; PX530).

166. The franchisee, Goel, told Ogbazion the audit is tomorrow, and that he is really concerned because the IRS agent, Sue Reeder, told him "the owner of the EFIN needs to be there." Since Goel was not using his own EFIN, he asked Ogbazion "who would I be then ? Just the manager?" Ogbazion's employee falsely responded that Goel will attend the audit as the "owner/operator," even though Goel is not the owner of the EFIN. Thus ITS told the franchisee to lie to an IRS agent. Ogbazion is copied on the email. (PX530; Doc. 105 at 113:24-115:4).

167.   ITS employees also encouraged franchisees to obtain additional EFINs from other franchisees, including as back-ups in case the IRS suspended the franchisee's EFIN as a result of a compliance visit.  For example, in 2011 one franchisee asked ITS employee Anita Boynton "how do I go by getting another EFIN from corporate" in case the EFIN was suspended due to an upcoming audit by the IRS.  Boynton directed him to other franchisees she knew who "had been through" IRS compliance visits because, as she explained to the franchisee, "[t]hey are probably your best option."  (PX261).

168.   Boynton has given similar advice to share EFINs to multiple Instant Tax Service franchisees seeking them in 2011, including to one who had no EFIN.  (Doc. 111 at 226:24-228:9; PX714; PX304).

169.   When an Instant Tax Service franchisee could not obtain an EFIN, ITS contractually required its area developers get an EFIN for the franchisee.  ("If a zee can't/doesn't get an EFIN, it is the AR's responsibility, as per their AR agreement").  (PX457 at 2).

170.   Ogbazion had personal knowledge that, as of 2011, numerous Instant Tax Service franchisees were still using EFINs that did not belong to them.  This includes ITS franchisees who borrowed EFINs from Dan Neal, a franchisee from Florida.  (Doc. 101 at 16:23-17:16; PX182).

171.   Other ITS officers knew of EFIN trafficking.  For example, franchisee David Franklin reminded CFO Pete Samborsky in June 30, 2008, "Don't forget you guys

are using 300 of my EFINs currently for all kinds of people.  If my efins get suspend it is not only going to affect me but you guys as well."  ITS knew that EFIN applications, including those submitted by Franklin to obtain hundreds of extra EFINs, reported fake addresses.  (PX16; PX436).

## DEFENDANTS' ENCOURAGEMENT OF FRANCHISEES TO LIE ON EFIN APPLICATIONS

172.    Page 2 of the IRS EFIN application form, signed under penalty of perjury, requires all applicants who will be operating a partnership to list all partners, including the name, home address, and social security number for each partner who has a 5 percent or more interest in the partnership.  The form also requires the names of all major officers in a corporation and the naming of a "responsible official" to serve as "the first point of contact with the IRS."  (Doc. 101 at 13:22-14:22; PX647 at 2).

173.    ITS told franchisees in partnerships to use only their own name, even though the IRS EFIN application, signed under penalty of perjury, expressly requires the names of *all* partners.  (Doc. 101 at 23:5-14).

174.    ITS Financial's Operation's Manual (given out to all franchisees) has a Quick Guide to Completing the IRS EFIN application.  That guide tells franchisees to "always choose sole proprietor even if you already have one, intend to create a corporation."  It also tells members of partnerships to "NEVER" fill out the section concerning partnerships and partners, and instructs spouses and partners to each file their own EFIN application.  Ogbazion testified those instructions are an

"error," but claimed he did not "know who would have" written that. (*Id.* at 23:15-25:7; JX3 at 99; PX647).

175. ITS Financial's operations manual also has various sections entitled "Fez says" (referring to Fesum Ogbazion's nickname "Fez"). One such "Fez says" section states that the reason why franchisees should fail to disclose to the IRS on the EFIN application that they are in a partnerships is that if any "applicant fails to pass the EFIN application process for any reason, they will not be able to reapply for two years. For this reason each owner may want to consider applying for an EFIN individually and not reference any partners, partnerships, or spouses on their application." (Doc. 101 at 25:8-26:8; JX3 at 90).

176. ITS Financial provides its Operations Manual to all franchisees. The Operations Manual is one of only two items developed by ITS that new franchisees receive. New franchisees first get a copy of the Operations Manual, and, second, get copies of practice tax returns. The Operations Manual comprehensively tells the franchisee, from soup to nuts, how to run and operate their franchise. (Doc. 101 at 26:19-27:9).

177. Because the EFIN application is signed under penalty of perjury, instructing franchisees via the Operations Manual to "not reference any partners, partnerships, or spouses on their application" when the EFIN application expressly requires that information, constitutes subornation of perjury and obstruction of the IRS. (JX3 at 90, 99; PX647; JX1 at 92, 102).

**DEFENDANTS' CIRCUMVENTION OF EFIN SUSPENSIONS**

178.  When the IRS discovers violations by a tax preparation franchisee, one of the tools
      the IRS has to combat those violations is to suspend or revoke the franchisee's
      EFIN to prevent the franchisee from filing more tax returns.  (Doc. 101 at 27:10-
      20; Doc. 109 at 29:18-37:10).

179.  ITS advised and assisted its franchisees to circumvent suspensions and revocations
      of EFINs by use of back up EFINs.  Replacing franchisee EFINs required the
      direct involvement of ITS, its employees, and use of ITS Financial's IT
      infrastructure.  (Doc. 75-2 at 161:12-162:4; Doc. 94 at 103:14-106:1, 148:5-
      149:22; PX518).

180.  ITS Financial instructed franchisees at Corporate training sessions to obtain
      multiple EFINs, so that if an original EFIN was shut down by the IRS, it could
      simply be replaced with a backup EFIN.  (Doc. 105 at 111:12-112:1, 149:7-13).

181.  In January 2010, Ogbazion and ITS helped franchisees in Texas illegally
      circumvent an IRS EFIN suspension using one of the franchisee's backup EFINs.
      Ogbazion and ITS did so even though violation of IRS rules or regulations,
      including suspension or revocation of an EFIN, supposedly is grounds for
      termination of a franchise under ITS franchise agreements.  (Doc. 101 at 28:5-
      29:15; Doc. 111 at 236:25-237:9, 237:10-238:19, 239:23-240:15, 248:4-23;
      PX514 at 5-6; PX474 at 1-2; JX10 at 28, ¶ 20(a), (g)).

182. The suspended ITS franchisees were Trent and Cheri Hotman. The Hotmans asked Ogbazion for another EFIN to help them circumvent the IRS suspension. They told Ogbazion: "We need an EFIN for the mother ship or we are sunk. We are just trying to survive and fight another day down here in Texas." (Doc. 101 at 29:18-31:22; Doc. 111 at 241:13-25; PX474 at 4-5; PX514 at 4-5).

183. Ogbazion's employee, Amber Bennett, told the Hotmans (cc'ing Ogbazion) to send her one of their "backup EFINs." With the backup EFIN, Bennett said she could get it "uploaded and going by tomorrow." (Doc. 101 at 32:10-22; PX474 at 3; Doc. 111 at 243:14-244:12, 245:19-246:4; PX514 at 3).

184. On January 22nd, the Hotmans responded back to Ogbazion and Bennett regarding the EFIN suspension. They said: "We back in business. No interruption. Whew." By illegally using a backup EFIN, and with ITS Financial's help, the Hotmans were able to continue e-filing and to circumvent the IRS suspension. (Doc. 101 at 33:9-17; PX474 at 1; Doc. 111 at 250:16-252:10; PX514 at 1).

185. Ogbazion personally helped facilitate the circumvention of the IRS's suspension of the Hotmans' EFIN by giving Amber Bennett specific instructions to set up a second company in the Drake tax-preparation software that ITS used. Setting it up as a second company allowed the Hotmans to continue filing tax returns from the suspended location. It deceived the IRS, as well as the bank, which had no idea the IRS had suspended the Hotmans' primary EFIN. (PX518 at 1; Doc. 111 at 248:4-23, 249:24-250:13).

186. ITS knew that other Instant Tax Service franchisees used backup EFINs to circumvent IRS EFIN suspensions and continue filing tax returns, including ITS franchisee Terry Barrett. (Doc. 105 at 136:15-19).

187. ITS Financial also advised other franchisees who were audited by the IRS and were facing EFIN suspensions how to circumvent those suspensions. Specifically, ITS encouraged franchisee Tom Calcaterra, who had his EFIN suspended by the IRS (although the suspension was stayed while he appealed), to get a backup EFINs in place. The backup EFINs would allow Calcaterra to keep filing tax returns even if the EFIN suspension became final. (PX506 at 1).

188. In an email dated August 31, 2010, with the subject line "IRS Suspension of EFINs," ITS Vice President, Kyle Wade, told Calcaterra to "work on getting some new EFINs under a different entity's name for back up." (PX506).

189. Ogbazion admitted at trial that Wade's advice to Calcaterra (in PX506), telling Calcaterra to get a backup EFIN because of the IRS EFIN suspension, was "irresponsible." Ogbazion also admitted that he was copied on that irresponsible advice. At trial, Wade pled the Fifth when he was asked questions about PX506. (Doc. 101 at 37:3-21; PX506 at 1; Doc. 113 at 16:15-17:5; PX476).

190. In addition, Ogbazion told Calcaterra to talk to Terry Barrett for "info as to what will happen next." Barrett's EFIN was also suspended, but Barrett used a backup EFIN to circumvent that suspension. Ogbazion referred Calcaterra to Barrett

because he knew Barrett "went thru something very similar last year." (Doc. 105 at 33:20-24; Doc. 101 at 37:3-21; PX506 at 1; Doc. 113 at 16:15-17:5; PX476).

191. Kyle Wade, an ITS Financial Vice President at the time of the conduct, pled the Fifth to questions regarding the following facts: (a) Wade and Ogbazion helped franchisees circumvent IRS suspensions using backup EFINs; (b) Wade assisted franchisees to circumvent IRS suspensions pursuant to Ogbazion's direct instructions, including with the Hotmans, as reflected in PX518 at 1 (*i.e.*, Ogbazion told his employee, Amber Bennett, to use a back-up EFIN and said, "I would have them set this up as firm Two. Do you know how to do that? Kyle can show you."); and (c) Wade trained franchisees to get backup EFINs (*i.e.*, as reflected in PX81, an e-mail from ITS employee Anita Boynton to franchisee Michael Kaufman in December 2009, which states that Wade "taught a bunch of people how to do backups."). PX81 also says, "We have nipped that process in the bud this year." ITS Financial, however, did not nip the process of using backups EFINs in the bud in 2009. (Doc. 113 at 14:11-16:14; PX81; PX518).

192. The evidence at trial reflects that ITS: (1) obstructed IRS attempts to monitor compliance and enforce regulations at Instant Tax Service stores through EFIN trafficking: (2) assisted franchisees to submit false applications for EFINs under penalty of perjury; and (3) actively aided franchisees with illegally circumventing EFIN suspensions. (Doc. 134 at 25:17-39:19).

**DEFENDANTS' ILLEGAL PAYSTUB FILING PRACTICES**

193. The practice of filing a tax return using information from a paystub, rather than the required employer-issued W-2 form, is called pay stub filing.  (Doc. 101 at 42:21-25).

194. Pay stubs do not have all of the same information that is on a genuine Form W-2, which information is typically not available until early or mid-January.  (*Id.* at 46:23-25; Doc. 109 at  78:14-17).

195. When using a pay stub to prepare a tax return, the income information is not always accurate, and it can be off for a variety of reasons.  In the aggregate, filing tax returns based on paystubs inevitably results in the understatement of customers' tax liabilities.  ITS Financial acknowledges that understatement of income inevitably results from paystub filing, which is why ITS Financial employees claim that company policy is to instruct customers that they are liable to the government for any understatement.  (Doc. 101 at 47:1-7; Doc. 109 at 81:16-83:22, 87:24-88:5; Doc. 111 at 263:13-20; PX343 at 1; PX430).

196. ITS Financial knows that tax returns prepared using paystubs are inaccurate more often than not.  (Doc. 11 at 213:13-214:2).

197. As paystub filing inevitably leads to inaccurate returns, by promoting paystub filing among franchisees, ITS also encouraged their franchisees to complete false Forms 8879.  Forms 8879 require taxpayers, under penalty of perjury, to verify that their tax returns "true, accurate, and complete."  Defendants know that returns

prepared with paystubs instead of W-2s will not meet these requirements. (Doc. 109 at 98:21-101:17; PX686).

198. Paystubs also do not have the taxpayer's employer's IRS employer-identification numbers, EINs, on them. Genuine W-2s do have EINs. Before a preparer can file a tax return, s/he must have the EIN of the company in order to transmit the tax return. The IRS will reject a return if it is filed without a valid EIN. (Doc. 101 at 47:8-20).

199. If a franchisee using paystubs to file returns looks up an employer's EIN online, there is a real risk of looking up a false EIN. (*Id.* at 50:17-25).

200. If a franchisee looks up a wrong EIN, and then transmits using a paystub without waiting for the W-2, they have transmitted to the IRS a false EIN number. (*Id.* at 51:16-24).

201. Once a franchisee has looked up an EIN, there is a tangible financial incentive for the franchisee to go ahead and transmit the return using the pay stub. (*Id.* at 52:15-20).

202. After a tax return for any particular tax year is filed using a paystub, the customer can no longer e-file another tax return, even with corrected information, for that particular tax year. This is because taxpayers can only e-file one return per year. (Doc. 109 at 97:8-11).

203. Tax return preparers can legally file paystub returns, but only after mid-February, and only if they meet certain conditions and comply with each of the following

steps in order:  (a) first the employer must have failed to send the employee the W-2 by mid-February; (b) second, the employee must have then contacted the employer and affirmatively attempted to obtain the W-2; (c) third, the employer must again have failed to send the requested W2; (d) fourth, the preparer must then complete an IRS Form 4852, which informs the IRS that a non-standard W2 was used to prepare the return; and (e) fifth, the Form 4852 must be maintained in the preparer's records.  (Doc. 109 at 97:12-98:6; PX686; PX685).

204.   In January 2006, Ogbazion personally instructed Jenny Moreland and Tina Davis, each of whom was a district director of operations for Corporate-owned stores in Ohio, to file paystub prepared returns.  The returns Ogbazion instructed Moreland and Davis to file were prepared using paystubs when customers came in for a holiday loan.  After customers were denied the loan, the returns were placed in "hold" status to be filed only if the customer returned with a W-2.  Ogbazion nevertheless instructed Moreland and Davis to submit these returns--which were prepared with paystubs ostensibly for the purpose of submitting a holiday loan application--to the IRS.  Moreland and Davis followed Ogbazion's instructions. (Doc. 113 at 50:1-53:6; Doc. 116 at 285:10-287:6).

205.   The motivation at ITS's Corporate-owned stores when filing with paystubs was to get the tax return filed to lock in the customer before he or she could go anywhere else.  From ITS Financial's standpoint, it did not matter whether the tax return was done correctly.  The point was just to get the tax return in.  (Doc. 116 at 297:5-13).

206. When Ogbazion told Davis and Moreland to file paystub tax returns, he said filing on paystubs is not illegal. "The IRS just frowns upon it.  They don't like it but it's not illegal."  (*Id.* at 285:14-287:9).

207. In 2008, however, Ogbazion expressly told ITS franchisees that pay stub filing *is illegal*.  (Doc. 101 at 43:1-3, 44:2-6).

208. Similarly, on January 23, 2008, Joe Roda, ITS's former general counsel, sent out a notice to all ITS employees and franchisees "to remind everyone that it is illegal to prepare an electronically filed tax returns for customers based upon their purported last pay stub."  The notice also stated that "IRS publication 1345 in pertinent part states, individual income tax returns must not be electronically filed prior to the ERO's receipt of forms W-2.  Additionally, you could be liable for bank fraud."  (*Id.* at 43:4-44:1; PX622).

209. ITS Financial's operations manual also says that if you paystub file, you can have your EFIN suspended.  In addition, under ITS franchise agreements, ITS has the power to terminate franchisees for violations of IRS rules and regulations, including paystub filing, but no record evidence was presented by Defendants that ITS ever did so.  (Doc. 101 at 44:7-10; JX10 at 28, ¶ 20(h)).

210. Kyle Wade did not file using paystubs in January 2008.  Wade later admitted in a June 7, 2008 email that because he did *not* file on pay stubs in January 2008, he did 800 *fewer* tax returns.  This necessarily means that Wade filed on paystubs in January of 2007.  Ogbazion was copied on the email.  (PX15).

211. Wade pled the Fifth to questions regarding the following facts:  (a) Wade filed on pay stubs in January of 2007; (b) Wade knew that filing on pay stubs was illegal at that time; (c) Wade did not file on pay stubs in January 2008 and, as a result, did 800 fewer tax returns; (d) as a consequence of not filing using paystubs and doing 800 fewer tax returns in 2008, it cost Wade well over a quarter-million dollars in gross revenue, and also cost Ogbazion revenue because Wade paid him less in royalties; (e) Wade went back to paystub filing in 2009 because paystub filing is so profitable; and (f) Ogbazion knew Wade went back to paystub filing and directly profited from Wade's paystub filing every year that Wade did it.  (Doc. 113 at 7:24-8:7, 10:3-17; PX15 at 1).

212. Because ITS told franchisees not to paystub file in January 2008, Defendants' revenue decreased.  By late 2008, ITS reversed course from the January 2008 policy against paystub filing and was aware that Instant Tax Service stores intended to paystub file going forward.  For example, Jerry Kelly, a franchisee and ITS area developer in the Arizona area, noted to Brook Wise, ITS Financial's Vice President of Franchise Recruitment, that part of the "2008 Plan of Action" includes that "[w]e have the pay stub tax return this year (No more estimates)."  (Doc. 104 at 96:22-100:15; PX19, JX3 at 2).

**DEFENDANTS' NOVEMBER 2008 "STUB SHOP" TRAINING**

213. In November 2008, ITS Financial held a paystub training session for Instant Tax Service franchisees and area developers. ITS called the training session the "Stub Shop." It was held at the main Instant Tax Service store of Kyle Wade, Vice President of Franchise Development for ITS. (Doc. 94 at 88:4-12, 94:19-22; Doc. 114 at 95:23-96:7, 98:8-21; Doc. 104 at 85:4-10, 87:20-89:5; PX430; JX3 at 2).

214. The Stub Shop invitation was sent on October 29, 2008 to over 50 ITS area developers and franchisees. Area developers recruit new franchisees on behalf of ITS. The date scheduled for the training was Friday November 14, 2008. The invitation says "Stub Shop" and the text below identifies the event as "our specialized training." (Doc. 101 at 54:3-55:7; PX430).

215. Among the 50 area developers and franchisees invited to the Stub Shop were some of Ogbazion's close friends and ITS Financial's most profitable franchisees, including David Franklin, Emanuel Ghebremichael, Ben Tewolde, and Nirav Babu. (Doc. 101 at 55:8-57:8).

216. Attendees at the "Stub Shop" training included senior officers of ITS, including Brook Wise, Kyle Wade, as well as other employees of ITS Financial. (Doc. 94 at 92:12-20, 93:13-94:5; Doc. 104 at 82:16-22, JX3 at 2).

217. The invitation to the "Stub Shop" training was sent by one of ITS Financial's vice presidents using his work e-mail address. The email was within the scope of what

ITS was required to produce to the government during discovery.  But, ITS did not produce the invitation in discovery.  (Doc. 118 at 50:24-51:15).

218.   The purpose of ITS Financial's "Stub Shop" training was to instruct Instant Tax Service franchisees and area developers how to both prepare as well as transmit tax returns to the IRS based on paystubs, instead of Forms W-2.  Attendees at the Stub Shop were also instructed how to avoid detection by the IRS.  (Doc. 94 at 91:5-16; 145:8-146:9; Doc. 104 at 84:4-21, 89:8-24, 92:16-93:4, 100:16-102:1, 106:22-107:14; Doc. 105 at 155:25-156:1, 140:8-13; 154:20-155:19).

219.   Two instructors at the "Stub Shop" training were Kyle Wade and Lance Dohm, with Brook Wise adding to the discussion among the instructors and attendees. (Doc. 104 at 145:8-146:9; Doc. 105 at 154:11-14; Doc. 104 at 86:22-87:15).

220.   Until the most recent tax season, Wade was in charge of training all new ITS franchisees.  (Doc. 118 at 52:3-12).

221.   Lance Dohm was an ITS store manager for Wade (his brother-in-law) and, at the invitation of Ogbazion, also became the franchisee for an ITS store in Akron, Ohio.  From 2008 through 2010, Dohm worked as a consultant for ITS, providing software training.  In that capacity, he reported to Wade and had a corporate e-mail address.  (Doc. 11 at 269:6-274:7).

222.   Participants at the "Stub Shop" discussed that one of the purposes of filing paystub tax returns was to capture customers who came to Instant Tax Service stores to obtain loan products and to increase the chances that the Instant Tax Service store

would recoup the loan by filing the customers' tax returns. (Doc. 105 at 158:18-159:25).

223. ITS instructed attendees at the "Stub Shop" that filing paystub tax returns was "frowned upon" by the IRS, but were told "it's not illegal," and if an Instant Tax Service franchisee wanted to survive as a tax return preparer, it had to file paystub tax returns. (Doc. 94 at 99:5-20; Doc. 105 at 165:8-166:22).

224. As part of the "Stub Shop" training, attendees were taught with practice paystubs how to use information appearing on paystubs, including gross wages, Social Security year-to-date withholdings, Medicare withholdings, federal tax withholdings, and state withholdings, to prepare and file paystub tax returns. (Doc. 94 at 96:16-97:10; Doc. 104 at 91:9-92:15; PX430).

225. Wade asked Dohm to create a Power Point presentation for the "Stub Shop" training and to take part in the training session, which he did. The training consisted of teaching franchisees how to file tax returns using only paystubs. Dohm sent the "Stub Shop" training materials to Wise at his request. (Doc. 111 at 274:8-278:8; PX20).

226. A portion of the "Stub Shop" training and the PowerPoint presentation told attendees how to determine the gross wages to report on a tax return prepared and filed using a paystub. (Doc. 104 at 93:5-15).

227. A portion of the "Stub Shop" training and the PowerPoint presentation also instructed attendees to "Find the EIN" (Employee Identification Number) for

customers' employers. The EIN typically is not included on customers' paystubs, but it is needed to transmit a tax return to the IRS. The trainers at the "Stub Shop" informed attendees that EINs can be looked up online at KnowX.com. (Doc. 94 at 141:24-143:1; Doc. 105 at 156:2-14; Doc. 104 at 93:16-94:19; PX430).

228. A tax preparer would need to look up an EIN only if s/he were going to file a return based on a paystub, since W-2 forms have the EIN on the form. Although paystubs can be used to determine refund *estimates* for customers before W-2s become available, an EIN serves no purpose for determining a refund estimate. The only purpose of looking up an EIN is to be able to file the tax return using a paystub, instead of a W-2. (Doc. 111 at 294:24-295:14; Doc. 122 at 31:4-20; Doc. 94 at 143:2-20; Doc. 105 at 156:2-14).

229. The "Stub Shop" training and a PowerPoint slide presented at that training with the heading "Warning Sign," also cautioned attendees that if an Instant Tax Service store filed a high volume of paystub returns that were automatically rejected by the IRS for reporting an improper EIN, known as Reject Code No. 502, the IRS might investigate that Instant Tax Service store. (Doc. 94 at 143:21-145:7; PX430; Doc. 105 at 157:1-20; Doc. 104 at 94:21-95:11).

230. The "Stub Shop" training and a PowerPoint slide presented and discussed at that training noted that if a paystub tax return was "Filed on the NET" income reported on a paystub instead of "the GROSS! [income]," there would be "Potential Problems." (emphasis original) (Doc. 104 at 95:13-96:1; PX430).

231.  An additional PowerPoint slide presented at the "Stub Shop" warned attendees that errors which occur when preparing and filing tax returns with paystubs instead of W-2s result in miscalculations, including understatement of tax liability, amounts owed by the Instant Tax Service customer, and resulting action by the IRS to recover money owed by the Instant Tax Service customer.  (Doc. 104 at 96:2-21; PX430).

232.  Ogbazion admitted that the PowerPoint slides that accompanied the Stub Shop training:  (a) told attendees how to look up EINs; (b) listed warning signs that if you submit a false EIN number when filing using paystubs, it may trigger a red flag or actually cause the return to be rejected at the IRS; (c) showed potential problems resulting from someone preparing and actually filing a paystub return on the net income amount, instead of the gross; and (d) showed that if you use or calculate the wrong income amounts when filing with paystubs, you can cause the customer to owe money to the IRS.  Ogbazion also testified at his deposition that the PowerPoint presentation is leading and enticing people to pay stub file.  (Doc. 101 at 58:15-61:11; PX430).

233.  During the "Stub Shop" training, David Franklin, an Instant Tax Service franchisee from Indianapolis and Ogbazion's close friend, instructed attendees that any Instant Tax Service store caught paystub filing might have its EFIN suspended during the tax filing season by the IRS or by the bank providing ITS Financial loan products.  Franklin instructed attendees that they should have backup EFINs

that, with ITS Financial's assistance, can be "turn[ed] [] on" to replace suspended EFINs and allow the store to keep filing tax returns electronically.  (Doc. 94 at 103:14-104:18).

234.  After Franklin helped teach the Stub Shop class, ITS Financial awarded him Most Valuable Franchisee award (for 2009).  (PX577 at 8-9).

235.  "Stub Shop" attendees were taught the process of setting up backup EFINs, including:  (a) instructions to give backup EFINs to ITS and provide ITS with a copy of the IRS approval letter issuing EFINs that would be used as backups; and (b) how to register these backup EFINs through ITS Financial's web portal. Attendees were also informed that ITS would assist with the activation of backup EFINs, including to ensure that any EFIN used to replace a suspended EFIN would work properly in the Drake tax preparation software system used by Instant Tax Service.  (Doc. 94 at 104:25-106:1, 148:5-149:11, 152:10-153:12; Doc. 99 at 98:4-99:19; PX560).

236.  ITS Financial employees Brook Wise, Kyle Wade, and Lance Dohm were present during Franklin's instructions regarding the use of backup EFINs and participated in discussions with "Stub Shop" attendees on this topic to encourage this practice. (Doc. 94 at 104:19-24, 155:16-24).

237.  Franklin also provided additional assistance to ITS to promote paystub filing.  ITS hosted on its website a document prepared by Franklin in 2008 explaining reject codes preparers would encounter when the IRS rejects an electronically filed

return.  Franklin explained Reject Code No. 502 as follows: "This code means that the EIN # on the W-2 was incorrect or just plain made up.  We should enter the correct one off the W-2 (if available), If using a paystub, attempt to use our EIN database within Drake Software."  (PX594 at 4).

238.   After the "Stub Shop" training, ITS employees took part in collecting information from Instant Tax Service franchisees that was needed to make backup EFINs ready for use.  For example, ITS employee Brian Hodgson contacted Instant Tax Service franchisee Chris Vecchio, who also attended the "Stub Shop" training, to obtain paperwork in order to have back EFINs available before the commencement of the tax season.  (Doc. 94 at 148:5-149:22, 92:12-22; Doc. 105 at 106:22-107:14; PX20).

239.   Attendees at the "Stub Shop" training were also instructed to discard or return to customers the paystubs used to prepare and file paystub tax returns in order to keep the paystubs out of the office files and conceal the paystub-filing practice in case the IRS audited the Instant Tax Service store.  (Doc. 105 at 157:21-158:6.).

240.   Ogbazion testified that he did not know anything about the November 2008 stub shop training at the time.  Ogbazion's denial is not credible.  (Doc. 101 at 52:23-53:17).

241.   In fact, the November 2008 Stub Shop training was Ogbazion's idea.  He instructed Kyle Wade to encourage Instant Tax Service area developers to

promote paystub filing and to make it appear that the "Stub Shop" training session was a "grass roots effort" within Instant Tax Service.  (Doc. 104 at 90:12-91:8).

242.    The "Stub Shop" training was also openly discussed at ITS Financial's corporate headquarters prior to its occurrence.  At least one Instant Tax Service franchisee, Lloyd Dissinger, learned that the "Stub Shop" training was planned while he was present at ITS Financial's corporate headquarters.  (Doc. 105 at 150:25-152:5).

243.    After Dissinger learned of the planned "Stub Shop" training while at Corporate headquarters, he approached Ogbazion in the office hallway to obtain more information about the training.  (*Id.* at 152:6-14, 153:6-8).

244.    In response to Dissinger's inquiry, Ogbazion instructed Dissinger to speak with Wade to obtain more information about the "Stub Shop" training.  Ogbazion told Dissinger that he (Ogbazion) "wasn't part of it and didn't want to or couldn't know anything about it."  (Doc. 105 at 152:15-21).

245.    Following his conversation with Ogbazion, Dissinger spoke to Wade at Wade's office at ITS Financial to obtain details about the "Stub Shop" training.  Wade asked Dissinger how he found out about the training and provided information about the event.  Although Dissinger assumed that the "Stub Shop" training would be held at Corporate, like other training sessions, Wade informed Dissinger that the training "could not be held there" and would instead occur at one of Wade's nearby Instant Tax Service stores.  (*Id.* at 153:9-25).

246.    Based on Stub Shop attendee Chris Vecchio's experience as an Instant Tax

Service franchisee, Ogbazion "was the brains of the operation," "would make his

decisions, and then Kyle Wade would be the one who would then take that

information from Fez and present it to the franchisees."  "Kyle Wade never went

off on his own and did anything without having Fez's okay" and "everybody just

knew that Fez was in control at - pretty much at all times."  (Doc. 94 at 146:10-

147:21, 166:25-168:24).

247.    Kyle Wade, an ITS Financial Vice President at the time of the conduct, pled the

Fifth to questions regarding the following facts:  (a) in November of 2008, Wade

held a training program called the Stub Shop to teach franchisees and area

developers how to file tax returns with paystubs; (b) Ogbazion told Wade to hold

the paystub training; (c) although the training was not a secret, Ogbazion told

Wade to keep it a low profile; (d) PX430 is the invitation announcing the Stub

Shop training at Wade's store; (e) Wade's store address is shown on the invitation,

and the invitation says "This is for our specialized training"; (f) Ogbazion told

Wade to hold the paystub training at Wade's office and was, in fact, was held at

Wade's office; (g) about twenty franchisees and area developers actually attended

the paystub training; (h) Ogbazion had a motive to teach more franchisees and

area developers to paystub file because it's profitable; and (i) Wade had no motive

to do the paystub training, apart from his position as Vice President at ITS

Financial.  (Doc. 113 at 10:18-11:22; PX430).

## DEFENDANTS' PAYSTUB POLICY AFTER 2009

248.  ITS held a Zee Advisory Council (ZAC) meeting in April of 2009.  The Zee

Advisory Counsel was established by ITS for representatives of the franchisees

(referred to as "Zees") to:  (a) meet with ITS Financial's "Leadership Team at the

end of each quarter to represent you and your interests as Instant Tax Service

franchisees;" and (b) hold meetings where ITS Financial's "Leadership Team will

share with and consult the ZAC on financial, marketing, and future growth plans

and initiatives."  The April 2009 ZAC was held in the Corporate boardroom, at

ITS Financial's Corporate headquarters.  Ogbazion testified at his deposition that

he did not attend the ZAC.  In fact, Ogbazion was on the agenda for the ZAC.  At

trial, Ogbazion also admitted attending at least the first day of the ZAC.  (Doc. 102

at 166:12-167:13; PX600).

249.  Ogbazion also testified at his deposition that the only person from Corporate who

attended the ZAC was Kyle Wade (Vice President of Franchise Development).  In

fact, most of the ITS leadership team attended the ZAC, including Ogbazion

himself, James Mowrey (President), Greg Woryk (Vice President of Marketing),

Bill San Giacomo (Vice President of Financial Services), Pete Samborsky (CFO),

and Brook Wise (Vice President of Franchise Recruitment) - in addition to Wade.

These members of the ITS leadership team are all also listed on the ZAC agenda.

(Doc. 102 at 167:14-170:2; PX620; JX3 at 2-3).

250. The ZAC minutes were recorded by Wade. He typed-up the ZAC minutes, saved

them, and they were then maintained on ITS Financial's computer system. The

ZAC minutes were produced to Plaintiff during discovery in this litigation. (Doc.

102 at 171:7-20; PX644).

251. PX644 are the minutes from the 2009 ZAC meeting. (Doc. 102 at 170:3-9;

PX644).

252. The ZAC minutes state that area developers "should not recommend preparing

taxes illegally. Don't use last pay stub, et cetera." But the next bullet says:

"Different areas do different things. In major cities other tax places are doing
check stub loans. If you're in that area and you are not doing check stub, you will
not survive compete. There would be no business."

The next bullet continues:

It's frowned upon, but is not illegal. Won't pull EFIN unless making up
numbers." And the next bullet says: "No one wants to do it, but some people
can't survive without doing it, depending on the environment. It's a local
decision."

The last bullet in the ZAC minutes records that:

"It's a don't ask, don't tell policy now. When we told Zees not to do it, they lost a
lot of business, because the other tax preparation locations near them were using
check stubs. Now business has picked back up because the Zee can compete with
local tax companies. It's a survival means . . . . calculated risk."
(Doc. 102 at 172:24-173:22; PX644 at 3).

253. Wade, an ITS Vice President at the time of the conduct, pled the Fifth to questions

regarding the following facts: (a) Wade attended a ZAC meeting in April of 2009;

(b) Wade attended that meeting as a Corporate representative; (c) Wade and

Ogbazion gave introductory and closing remarks at the April 2009 ZAC meeting;

(d) the April 2009 ZAC meeting was held at the Corporate headquarters; (e) Wade kept minutes for the company at the April 2009 ZAC meeting; (f) PX619 is a copy of the minutes that Wade took on behalf of the company at the April 2009 ZAC meeting; (g) the April 2009 ZAC minutes state, "[i]f you are in that area and you are not doing check stubs, you will not survive/compete.  There would be no business.  It's frowned upon, but it is not illegal.  Won't pull EFIN unless making up numbers.  No one wants to do it, some people can't survive without doing it depending on the environment.  It's a local decision. It's a don't ask, don't tell policy now.  When we told Zees not to do, they lost a lot of business because the other tax preparation locations near them were using check stubs.  Now business has picked back up because the Zees can compete with local tax companies.  It's a survival means, calculated risk"; (h) Wade recorded in the minutes for the April 2009 ZAC what is expressed as a don't ask, don't tell policy regarding paystubs for the company.  However, the company was actually training franchisees to do pay stub filing; (i) Ogbazion knew that Wade was training franchisees to file on paystubs; (j) after the April 2009 ZAC meeting, ITS franchisees continued to file on pay stubs; and (k) Ogbazion and Defendants continued to profit from franchisees filing on pay stubs.  (Doc. 113 at 11:23-14:10).

254.  Ogbazion had actual knowledge over the years that his ITS franchisees file tax returns using paystubs.  (Doc. 102 at 174:4-16).

255.    For example, on January 21, 2011, ITS franchisee Yonathan Michael told
        Ogbazion that he had filed returns using paystubs.  Michael admits to Ogbazion,
        "Numbers are good.  People are still coming in, and we have 453 accepted.  I wish
        I could have found Haben computer.  I would have had more accepted.  I have
        close to 90 reject.  I just couldn't found their EIN."  What the franchisee was
        telling Ogbazion was that he had just filed using paystubs, that he had prepared 90
        more tax returns with paystubs, and that he would have filed those 90 paystub
        returns too if he could have found the employer identification numbers (EINs) for
        those customers' paystub returns.  (Doc. 102 at 174:17-175:19; PX303).

256.    Likewise, on January 12, 2011, franchisee Ermias Abraham emailed Ogbazion and
        admitted the he was going to file paystub returns with the IRS.  Abraham discloses
        that:  "We did our best to find EIN#, so far we think we found most of them.  Now
        for the 14th we have around 400 folders ready to be sent.  How u want us to do
        it?"  What Abraham was saying to Ogbazion is that he has prepared tax returns
        with paystubs, has looked up the EIN numbers for his customers' employers, and
        is going to transmit the paystub returns to the IRS on January 14 - which is the
        first day that year to electronically file tax returns with the IRS.  (Doc. 102 at
        175:20-177:21; PX284).

257.    After Abraham told Ogbazion of his plans to file 400 paystub returns with the IRS,
        Ogbazion responded - but he did not tell Abraham that paystub filing is illegal or

76

try to dissuade him from filing paystub tax returns.  Instead, Ogbazion gave

Abraham detailed job advice.  (PX286).

258.   ITS Financial's encouragement of franchisee paystub filing is exemplified by a

December 29, 2011 email.  It in, Ogbazion personally instructed Matiyas Welde, a

franchisee who had done hundreds of paystub loans, to convert those "to returns

when you all slow down this weekend."  Because it was December, it was not

possible for any of those customers to have received W-2s yet.  (Doc. 102 at

177:22-178:13; PX418).

259.   Later that morning of December 29, 2011, Welde told Ogbazion "most of my

returns are done.  I am just waiting on last pay stub from about 30% of the people.

The others are all done I have everything I need and I will see them on the 25th.

When we did each loan we finished the return.  Got all my paper work signed and

ready to *transmit*."  (emphasis original)  Ogbazion admitted at trial that Welde was

telling him that he was going to file paystub returns, and that those customers were

going to come back to Welde's Instant Tax Service stores and get their refund

checks on January 25th.  (Doc. 102 at 180:21-180:10; PX418).

260.   The IRS's 2012 E-file Refund Cycle Chart confirms that the first projected date

for the IRS to transmit tax refunds to customers was January 25, 2012.  (Doc. 102

at 180:4-20; DX46).

261.    Ogbazion admitted at trial that he did not need CrossLink, a new tax preparation
software, to detect that Welde was paystub filing, because Welde told him in the
email that he was going to paystub file.  (Doc. 102 at 181:11-20; PX418).

262.    Nor did Ogbazion need Crosslink to know that his franchisees Abraham (PX284)
and Michael (PX303) were filing tax returns using paystubs in January 2011.
Those franchisees also directly told Ogbazion that they were filing tax returns
using paystubs.  Ogbazion did not object to his franchisees filing paystub tax
returns, because paystub filing is profitable for both the franchisees and ITS
Financial, which charges its franchisees royalties of 18%.

263.    Similarly, franchisee Gary Boggs told Ogbazion in December 2012:  "We are
sharing EIN databases, W-2 calc sheets, and working on operating in the same
fashion, trying to unitize Cincinnati."  Ogbazion admitted that Boggs was telling
him that he was sharing EIN databases, and that the only reason one needs to look
up EINs is to paystub file.  Ogbazion responded to Boggs' email, and said he
would call Boggs later.  Boggs replied "And I have to keep all your cousins
employed."  To which Ogbazion wrote back:  "And keep them out of prison."
(Doc. 102 at 181:22-182:24; PX380 at 1-2).

264.    To further assist franchisees with paystub filing, Wade distributed and exchanged
paystub "calculators" to prepare and file tax returns using paystubs.  (PX385;
PX386).

265. Ogbazion also participated in conversations among Habesha franchisees about submitting paystub tax returns to the IRS without sending out "too many," which might "flag" the franchisee to federal authorities.  (Doc. 80 at 45:11-46:3).

266. Ogbazion refers to people from Ethiopia and Eritrea as Habesha. About half of ITS's franchises are Habesha.  (Doc. 101 at 3:16-23; PX592).

267. From time to time ITS has conference calls where Ogbazion talks to franchisees and provides them with training.  On the general conference calls, which are recorded and put on ITS Financial's intranet system for access by franchisees, everybody is invited to attend, including Habesha and non-Habesha.  ITS also holds invitation-only calls with just Habesha and with some of ITS's top producing franchisees.  Those invitation-only calls are referred to as Habesha calls and are not recorded.  The invitation-only Habesha calls are more candid than the general calls that ITS has with all franchisees.  (Doc. 101 at 3:24-4:12; 4:13-6:4; 6:5-20; PX89).

268. While encouraging paystub filing among franchisees in good standing, in 2010 ITS used its knowledge that its franchises routinely paystub file as leverage in a legal dispute against a franchisee. When ITS became embroiled in litigation over the failure of its largest franchisee, the Plover Group, to pay royalties, ITS sent a letter to Plover telling them paystub filing is illegal, to cease paystub filing, and not to create fake W-2s.  (Doc. 119 at 83:22-86:7; Doc. 101 at 44:16-45:25; PX431; PX711).

269. ITS sometimes attempts to excuse the paystub filing by claiming that the franchisee obtained a W-2 by downloading it from ADP, a payroll services firm. But, as of 2010, only about 10% of ITS customers' W-2s could be downloaded from ADP.  (PX693 at 2).

270. Customers who had returns prepared at Instant Tax Service regularly complained to ITS that their returns were filed using only paystubs, often requiring the later filing of an amended return.  Despite the constant complaints, ITS neither investigated whether the franchisees had in fact filed returns using paystubs, nor whether the franchisees violated other laws.  (Doc. 11 at 205:13-213:11, 204:19-205:8; PX134; PX314; PX327; PX332; PX337; PX419; PX425).

271. ITS Financial's acceptance and encouragement of franchisee paystub filing is further demonstrated by a September 2011 e-mail from an Instant Tax Service franchisee to ITS employee Amber Bennett.  (PX343).

    a. In the September 2011 email, a franchisee indignantly complains about one of his customers who is upset, and writes to Bennett that:

    The customer is angry about owing money to the IRS solely because the franchisee prepared her return using a paystub, not her W-2, which then resulted in the customer receiving a larger refund than she was entitled to: I spoke with the client today, and she seems to think that numbers were entered incorrectly into the system, which they were NOT. Her paystub was used initially to file her taxes, and the numbers on the paystub match what was entered into the system. The reason for her owing money to the IRS is not data entry error, but the fact that her W2 numbers were different than the numbers on her pay stub. She feels its our error and thus we should help her pay the amount to the IRS. She got more money back in Feb 2011 than she was supposed to. I am having my manager meet with her at the Lima office to go over her paystub and what was entered into the system. Irregardless, even if a

data entry error was made (which it was not) she still needs to understand that she owes that money due to her getting more money earlier.

(Doc. 111 at 262:3-264:21; PX343).

b.   In response, Bennett acknowledges that paystub filing is illegal, but does

nothing to discipline the franchisee for violating the law.  Rather, she

recommends lying to the customer and that the franchisee not mention the

paystub issue because "paycheck filing is illegal though so that argument is not

one that I would voice too terribly much. More so that there was an error made

and you will fix it would be a bit better."  (*Id.*)

c.   Bennett also acknowledges that paystub filing inevitably results in

understatement of income, explaining to the franchisee that ITS Financial's

position is that customers are liable to the IRS for understatements of income

from paystub filing and the company "always require[s] clients to pay back

monies they were given that they should not have."  (Doc. 111 at 262:3-

264:21; PX343).

272.   ITS Financial also coaches its franchisees to prevaricate to the IRS during audits

about the Corporate policy permitting paystub filing.  It does so through its "IRS

Audit Guide" that it issues to all franchisees as part of its Operations Manual.  The

Audit Guide provides recommended answers to IRS questions, including the

following false statements: "Do you file a tax return without a W-2? a. NO.  The

IRS prohibits the filing of tax returns without W-2s.  It is Instant Tax Service

Corporate policy to ONLY file tax returns when all W-2s are present." (JX1 at 104; JX3 at 101).

## DEFENDANTS' TRAINING TO ALTER DATES IN FRANCHISEE COMPUTERS TO BACKDATE FORMS AND CONCEAL PAYSTUB FILING

273. At Corporate training sessions held for new Instant Tax Service franchisees, including training during the summers of 2007 and 2008 conducted by Kyle Wade, ITS taught attendees how to alter the dates in computers they used to prepare tax returns. The purpose of altering the computer's date was to change the dates that would appear on tax forms and other related documents used to prepare tax returns. The altered dates were backdated (or postdated) so that forms completed before commencement of the tax season (*i.e.*, December) would falsely appear to be properly completed during the tax season (*i.e.*, mid or late January). (Doc. 114 at 98:22-100:14).

274. Fesum Ogbazion was present during the portion of the summer 2008 ITS training on how to backdate tax forms by altering the computer dates. When an attendee at this training asked whether doing so was legal, Ogbazion responded that it is not illegal. (*Id.* at 100:18-101:1).

275. Wade, an ITS Vice President at the time of the conduct, pled the Fifth to questions regarding the following facts: (a) Wade trained franchisees how to change the dates in their computers; (b) the purpose of changing the dates in the computers is to backdate or postdate documents in advance of an IRS visit or audit; (c) Wade

did this training at ITS Financial's headquarters; and (d) Ogbazion knew that

Wade was conducting this training. (Doc. 113 at 17:17-18:2).

276. ITS area developers also instructed franchisees to backdate (or postdate)

documents by altering the dates in Instant Tax Service computers. To avoid the

"obvious red flag" of dating documents before the tax season commenced in order

to prepare paystub tax returns (*i.e.*, before W-2s are issued), Todd Kirby, an ITS

area developer covering the San Antonio, Texas area, instructed franchisees during

a conference call to postdate documents by changing the dates in computers used

to prepare returns and related tax forms. (Doc. 114 at 116:23-117:25).

## DEFENDANTS' INVOLVEMENT IN CREATING FAKE W-2s TO CONCEAL PAYSTUB FILING

277. The IRS requires tax preparers to have original W-2s in their customer files.

When an IRS agent does a compliance visit, they have a checklist of things they

are looking for. One of the things the IRS looks for is original W-2s in the file.

(Doc. 102 at 183:20-184:3; Doc. 109 at 90:1-91:11).

278. Ogbazion knows that IRS rules require preparers to keep and maintain customer

files, including for inspection by the IRS during audits or compliance visits.

(Doc. 102 at 186:7-12).

279. If a franchisee doesn't have an original W-2 in the file, the IRS might suspend the

franchisee's EFIN. If the franchisee has his or her EFIN suspended, they cannot e-

file tax returns from that location during the suspension. (*Id.* at 184:4-11).

280.    From 2002 up to the 2010 tax season, ITS contracted with Drake Software to provide software for Instant Tax Service stores to use to prepare and e-file tax returns, as well as to facilitate the exchange of information among ITS, Instant Tax Service stores, the IRS, and financial institutions involved in loan products offered by Instant Tax Service.  (Doc. 122 at 9:13-10:17).

281.    Ogbazion admitted that if somebody files a tax return with a paystub, it would be improper for them to:  (a) print a Drake W-2, or non-standard W-2, for the customer file; (b) print-out W-2s using W-2 generating software and then put them in the customer file in order to pass them off as valid employer-issued W-2s; and (c) try and pass off a Drake W-2, or non-standard W-2, as an original employer-issued W-2 to the IRS.  (Doc. 102 at 183:8-19).

282.    If a preparer files using paystub information, prints a fake W-2, and puts it in the customer file for the IRS to see, that could help keep the IRS from discovering the paystub filing and thus help an Instant Tax Service franchisee improperly avoid an EFIN suspension.  (*Id.* at 184:12-15).

283.    IRS investigators assigned to check for W-2s in tax preparation stores cannot always determine if a W-2 is fake, or it is very difficult to do so.  (Doc. 109 at 89:11-16).

284.    Ogbazion and ITS know that it is a "major violation of federal law" to fabricate false W-2s.  (Doc. 102 at 184:16-25; PX431).

285.  Ogbazion also knows that if a tax preparer uses a substitute W-2, the IRS requires a Form 4852 to accompany that substitute W-2.  Ogbazion admitted that a substitute W-2 without a Form 4852 in the file would be a warning sign that the tax return was done with a paystub.  ITS Financial's Operations Manual also instructs franchisees that a "substitute W-2," without a Form 4852 in the file, is a "warning sign of fraud."  (Doc. 102 at 185:1-186:5; JX3 at 260).

### FAKE W-2s, PAYSTUB FILING, AND FORGING CUSTOMER SIGNATURES ON TAX FORMS AT DEFENDANTS' CORPORATE-OWNED STORES

286.  In February 2006, the IRS conducted a compliance visit of two Corporate owned stores in Cincinnati.  (Doc. 113 at 56:7-15).

287.  During a compliance visit of the two Corporate owned stores, an IRS agent reviewed a random sample of files for returns that had been submitted.  She noticed that some of the files were missing W-2s and others did not have the proper signature date on IRS Form 8879.  The IRS issued a written reprimand as a result of these findings.  (*Id.* at 57:3-20).

288.  Jenny Moreland was the District Director of Operations for Corporate owned stores in Columbus and Cincinnati in 2006 and 2007.  She reported directly to Ogbazion.  (*Id.* at 48:17-49:25).

289.  When Moreland, who was the District Director of Operations for the stores that were visited by the IRS, shared the results with Ogbazion, Ogbazion asked why she had not printed W-2s from the Drake software to add to the customer files.  He then instructed her to print off Drake W-2s and cut off the bottom of the print outs,

which contained verbiage indicating that the W-2 had been printed from Drake.
(*Id.* at 58:8-59:11).

290.    Ogbazion also told Tina Davis to print out fake W-2s from Drake software.  Davis
and Moreland told Ogbazion that the Drake W-2 print outs would have language
stating that it was printed from Drake software.  Ogbazion said, "You just cut it
off.  You cut off the bottom of it, and then you just staple that to the 8879."  Davis
did as Ogbazion instructed.  (Doc. 116 at 287:7-288:4).

291.    Ogbazion expressed to Moreland that he was concerned the IRS would ~~make~~
conduct compliance visits to his other Corporate-owned stores in Ohio.  He
instructed Moreland to visit the other Corporate-owned stores and search files for
missing W-2s.  In the event she found files without W-2s, Ogbazion instructed her
to print a fake W-2 from Drake, cut off the disclaimer at the bottom (which
indicated that the W-2 was printed from Drake software rather than issued by the
employer), and stick it into the customer file.  Moreland followed Ogbazion's
instructions.  (Doc. 113 at 59:12-61:4).

292.    Ogbazion admitted during his deposition that he told Tina Davis and Jenny
Moreland to print Drake fake W-2s.  But he claimed he did so only for the purpose
cleaning up their files.  (Doc. 102 at 186:17-187:7).

293.    On direct Ogbazion claimed he did not recall ever instructing Moreland or Davis
to put Drake W-2s in the files.  That contradicts his deposition testimony, which
he was shown at trial.  Ogbazion's self-serving testimony at trial was also

contradicted by both Moreland and Davis, who were more credible.  Ogbazion also claimed that there was a water mark on Drake W-2s during the timeframe that Moreland and Davis worked there.  No witness or trial exhibit corroborated Ogbazion's self-serving story.  Ogbazion further testified that his testimony was consistent with Phil Drake's testimony, but Drake could not remember when W-2s printed from Drake Software last had a water mark on them.  (PX684 at 26-27) (clearly showing 2009 Drake W-2s *without* watermarks). The disclaimers on the bottom of both pages 26 and 27 of PX684 also have been cut off, consistent with Moreland's and Davis' testimony.  PX684 at 36 is another 2009 Drake W-2, but the disclaimer on the bottom has not been cut off.  (Doc. 135 at 22:19-24:13; PX684 at 26-27).

294. Because the IRS also identified problems with the dates on which customers signed the required Forms 8879 authorizing the company to e-file their returns, Ogbazion further instructed Moreland to also check the files for 8879s that did not have the proper signature date.  If she found them, Ogbazion told her to print off a new 8879 with the correct date and "scribble" the customer's name on the new form in order to forge the customers' signatures.  Moreland was then to place the new, fraudulent 8879 in the customer's file and discard the form actually signed by the customer.  Moreland followed Ogbazion's instruction.  (Doc. 113 at 61:5-63:10).

295. Following the compliance visit in 2006, Moreland confronted Ogbazion about paystub filing and the resulting problems, saying, "We're not going to do this again, right?" Ogbazion responded, "there are some things that you do in business that you look back and think, wow, I'll never do that again. And this is one of those things." But Ogbazion instructed his employees to do it again in 2007. (Doc. 113 at 72:15-73:15).

**DEFENDANTS' KNOWLEDGE OF FAKE W-2s AMONG FRANCHISEES AND INSTRUCTIONS TO FRANCHISEES TO CREATE FAKE W-2s**

296. In 2010, ITS was involved in litigation against the Plover Group, a franchisee that had stopped paying royalties to ITS. To bolster its litigation position, ITS sent a "cease and desist letter" to Plover. In the letter, ITS asked the franchisee to ensure against "transmitting federal tax returns using paycheck stubs and/or generating fake W-2's." The letter declared that generating fake W-2s is "a major violation of federal law." (Doc. 119 at 83:16-87:19; PX431; PX711).

297. On November 14, 2010, Ogbazion exchanged a very candid series of emails with his franchisee Nirav Babu. Babu is Ogbazion's close friend and former in-house counsel for ITS. The e-mail concerned, in part, an audit by the Maryland taxing authority of Babu's Instant Tax Service franchise. (Doc. 102 at 192:9-193:4; PX490).

298. In the November 2010 email exchange, Babu expressed concern about the Maryland audit, and that there was insufficient documentation in the file to

support certain Schedule A mileage deductions. Ogbazion told Babu "No one is going to jail for mileage. Jeesh." Babu responded:

"Yeah, I feel you. Plus, it's a he said, she said thing. My bro will say they told me to do it, and I am just the preparer. The customer will say the preparer did it without me knowing. I mean, word could have passed around the street that you can tell this Indian [*****] anything and he will enter it in for you cause he ain't checkin receipts or anything. Brother is not required to check receipts or anything so he put the info in. That's what I will say for now, I guess."

Ogbazion admitted at trial that what Babu said in the above paragraph "sounds bad." Babu had outlined his plan to lie to government agents and obstruct justice. But Ogbazion did not object, or tell Babu that what he had said "sounds bad." Instead, Ogbazion asked Babu for money. (Doc. 102 at 193:5-194:9; PX490).

299.  Earlier in the November 2010 email chain, Babu forwarded Ogbazion a spreadsheet regarding the files under audit, and said:

Babu: Just ignore the orange color of the box on some of them. This is just a reminder for me to print W-2s for that file.
Ogbazion responded: Okay so the ones highlighted in burnt orange are definitely the ones with errors, right?
Babu replied: Burnt orange actually means I just need to go back *and print the W-2 from Drake cause only the stub is in there*. I didn't really see errors per se.
Ogbazion subsequently told Babu that he needed to do some things better in the coming year, including, "*Print W-2s from Drake* if you don't have them."

(emphasis added). (Doc. 102 at 194:10-195:19; PX490 at 2-3).

300.  On February 22, 2010, Ogbazion emailed another ITS franchisee, Hannibal Demoz. Ogbazion told Demoz: "While things are slow, make sure your employees go through all the accepted returns and make sure everything has been signed and all W-2s are in the folder, even if they're printed from Drake. I'm sure

you'll have an IRS visit soon."  Ogbazion admitted at trial that he instructed Demoz to print Drake W-2s because Demoz would probably have an IRS audit soon.  (Doc. 102 at 195:20-196:16; PX523).

301.   Demoz is Ogbazion's good friend.  Demoz bought the Corporate stores in Dayton from Ogbazion and lived with Ogbazion at Ogbazion's house during the tax filing season in 2013.  (Doc. 102 at 196:17-197:1).

302.   When Ogbazion told Demoz on February 22, 2010 to print out Drake W-2s for the file, IRS compliance visits were occurring at that time.  (*Id.* at 198:17-22; PX523).

303.   Ogbazion admitted at trial that the two sentences he wrote to Demoz - where Ogbazion told Demoz, first, to print Drake W-2s for the file; and, second, that Ogbazion was sure Demoz would have an IRS visit soon -  "together don't look good."  (Doc. 102 at 199:5-11; PX523).

304.   When Ogbazion told Demoz to print Drake W-2s for the file, he knew that his ITS franchisees, the Hotmans, had their EFIN suspended for not having W-2s in the file.  The Hotmans' IRS suspension was in January 2010, just one month earlier.  (Doc. 102 at 199:12-21, 197:2-7; PX474; PX523).

305.   Franchisees can use a variety of software programs to print fake W-2s to include in customer files.  Ogbazion admitted that creating fake W-2s for customer files would be one way to avoid getting an EFIN suspended for paystub filing.  Ogbazion admitted he told Nirav Babu in a very candid e-mail to print W-2s from

Drake and put them in the file. Ogbazion also admitted he told Hannibal Demoz to print Drake W-2s and put them in the file. (Doc. 102 at 197:20-198:16).

306. Other ITS Habesha franchisees also received specific training to prepare and file paystub tax returns, including how to create fake W-2s through the Drake tax preparation software. (Doc. 80 at 32:24-33:21, 84:10-85:11, 94:8-96:5).

307. Ogbazion testified that when he first began operating a tax return preparation business, some of his friends asked him if he would teach them the tax business. One those friends was David Franklin in Indianapolis. Ogbazion testified that he heard the testimony of IRS Agent Clint West, saw a summary chart of fake W-2s, and saw that there were a very large number of fake W-2s that were discovered in the files of Franklin, including fake Drake W-2s. (Doc. 135 at 171:20-172:19).

308. Consistent with Ogbazion's knowledge of paystub filing among franchisees and advice to them to promote the practice, in January 2010, ITS employee Erin Hennigan advised franchisee Lance Dohm and his Akron, Ohio store manager to take several actions in preparation for an upcoming IRS audit of that store. Based on her experience with IRS visits to other ITS stores, Hennigan advised Dohm and his manager to: (a) destroy evidence of paystubs in the customer files; and (b) print fake Forms W-2 using Drake software and put them in customer files that lacked Forms W-2. These actions were designed to conceal from the IRS that tax preparers at the Akron store had been filing tax returns using only paystubs rather than W-2 Forms. (Doc. 111 at 280:22-284:9; PX497; PX687).

309.    Kyle Wade, an ITS Vice President at the time of the conduct, pled the Fifth to

questions regarding the following facts:  (a) Wade trained franchisees to create

fake W-2s with Drake software and other software (b) Ogbazion knew Wade was

training franchisees to create fake W-2s; and (c) the purpose of creating fake W-2s

is to cover up paystub filing and trick the IRS during an IRS visit or audit.  (Doc.

113 at 17:6-16).

### EVIDENCE OF WIDESPREAD USE OF FAKE W-2s AMONG ITS FINANCIAL'S TOP FRANCHISEES

310.    From a random sample of over 1,100 tax returns prepared by ITS franchisees in 5

cities in the 2011 tax filing season, the IRS determined that the franchisees'

customer files contained a falsified Form W-2 in over 17% of the files examined.

Forged W-2s were found in all 5 cities.  (Doc. 120 at 122:14-127:12; PX 755).

311.    In addition, from that random sample of over 1,100 tax returns prepared by ITS

franchisees in 5 cities in the 2011 tax filing season, the IRS also determined that

the franchisee's customer files contained a falsified Form W-2 with a unique code

("EEA") identifying the form as having been printed from Drake software (rather

than being legitimate employer-issued W-2s) in over 6% of the files examined.

Some of those fake Forms W-2 with the Drake code lacked the software-printed

text at the bottom indicating that the form was printed at an Instant Tax Service

location.  Given the irregular, slanted bottom lines on many of these Forms W-2, it

appears that the software-printed text was cut off from the bottom of the Form W-

2, although the EEA code remained.  (Doc. 120 at 127:13-132:22; Doc. 122 at
21:17-25:8; PX 755; PX 684).

### OGBAZION'S INSTRUCTIONS TO OTHERS TO LIE TO THE IRS

312.    Ogbazion instructed Instant Tax Service franchisees to lie to IRS investigators

during audits of franchisee stores.  In 2011, Ogbazion instructed Wade to falsely

inform an IRS investigator that Instant Tax Service did not have the ability to

provide the IRS with "audit trails" from its tax preparation software.  "Audit

trails" track if and when any customer files have been altered after the tax return

was filed, and the tax preparation software, in fact, had that capability.  Ogbazion

instructed Wade that ITS Financial's policy, "company-wide," was for Instant Tax

Service stores to lie to the IRS regarding their ability to provide audit trials in

order to obstruct IRS investigations.  (Doc. 114 at 101:2-102:21).

313.    Wade, an ITS Vice President at the time of the conduct, pled the Fifth to questions

about the following facts at trial:  (a) Wade's tax preparation offices were visited

by the IRS in 2011; (b) Wade had advance notice of at least one of those IRS

visits; (c) Wade spoke to Ogbazion before that IRS visit; and (d)  Ogbazion

advised Wade to lie to the IRS in connection with that IRS visit.  (Doc. 113 at

18:3-12).

### FILING WITHOUT AUTHORIZATION

314.    When Defendants operated Corporate stores, they filed tax returns without

customer authorization to file.  For example, at Ogbazion's direct instruction,

Moreland and Davis filed paystub returns in 2006 and 2007 without customer authorization. Because Moreland and Davis filed with paystubs, and without W-2s, they subsequently attempted to obtain W-2s for the customer files after the paystub returns were filed. Moreland and Davis called customers to pick up their checks and instructed them to bring in their actual W-2s at that time. Some of the customers were surprised to receive the call because they did not know that their tax returns had even been filed - and had not given ITS permission to file. (Doc. 113 at 55:18-56:6, 53:9-55:17).

315. Defendants also promoted filing without authorization by franchisees. For example, Ogbazion told Habesha franchisees to send paystub tax returns, with or without authorization from the customers, because that is Instant Tax Service's "business plan." Habesha franchisees received specific training to prepare and file paystub tax returns, including how to create fake W-2s through the Drake tax preparation software. (Doc. 80 at 32:24-33:21, 84:10-85:11, 94:8-96:5).

316. Defendants also received notice on numerous occasions that franchisees were filing without customer authorization . For example, Ogbazion lied to a reporter in 2012 about Ogbazion's name and position at the company. The reporter was calling Ogbazion on behalf of upset Instant Tax Service customers, and about a franchisee who customers claimed had filed their tax returns without their authorization. Ogbazion admits that he knows filing without customer authorization, in fact, occurs at his franchisees' offices. (Doc. 99 at 77:17-78:12).

317. Similarly, in response to complaints about two franchisees filing returns without customer authorization in 2011, ITS requested to see IRS Forms 8879 from the franchisees, which all customers must sign to authorize filing. Neither franchisee provided a signed 8879 in response. One responded that he did not think he had one. Both franchisees continue to operate Instant Tax Service stores. (Doc. 11 at 215:22-219:12; PX 146; PX 151).

318. Consistent with ITS Financial's business plan, many ITS customers from Ohio had their tax returns filed without authorization, including:

<u>CORNELIA JACKSON</u>

a. Cornelia Jackson is an Ohio Instant Tax Service customer who testified at trial. Instant Tax Service filed her 2010 tax return without her authorization. Jackson lives in Cleveland, with her husband and two grandsons. Her grandsons have lived with Jackson since her daughter died. She is a retired federal employee. (Doc. 107 at 49:17-51:8).

b. Prior to going to Instant Tax Service, Jackson was experiencing financial problems because her daughter had died unexpectedly, and she was providing for her two grandchildren. Jackson learned that Instant Tax Service was offering a loan and went to Instant Tax Service in Cleveland, Ohio to apply for it to help furnish her grandchildren's bedroom. (*Id.* at 51:9-52:14).

c. Jackson went into Instant Tax Service with only her last paystub and driver's license. She did not take a Form W-2 with her and did not, at any point, give Instant Tax Service a Form W-2 to preparer her tax return. (*Id.* at 52:22-53:3).

d. An Instant Tax Service employee took Jackson's last paystub information and then told Jackson that she did not qualify for the loan. However, the Instant Tax Service employee offered Jackson a $10 gift card. Jackson refused the gift card and left the Instant Tax Service store. Subsequently, Jackson went to H&R Block to have her tax return prepared. H&R Block told Jackson that it could not file her return because it had already been filed. (*Id.* at 53:4-54:5).

e. Jackson later learned that Instant Tax Service had filed her return when she received a phone call from Instant Tax Service explaining that she had a "check waiting at their office." Subsequently, Jackson returned to the Instant Tax Service office and asked how they could have filed her return without her Form W-2. The ITS employee told Jackson, "do you want the check or not?" Jackson needed the money and, therefore, took the $5,555 refund check. (*Id.* at 54:6-55:1).

f. Jackson never gave Instant Tax Service permission to file her tax return and did not sign a document giving Instant Tax Service permission to file her tax return. Nor did Instant Tax Service inform Jackson that it would file her tax return. (*Id.* at 55:4-56:5).

g. After Instant Tax Service filed her tax return, Jackson attempted to contact Instant Tax Service to obtain the forms she supposedly signed to authorize Instant Tax

Service to file her return, but no one ever returned her phone calls and she eventually gave up.  Jackson reported Instant Tax Service to the Ohio Attorney General's office.  (*Id.* at 56:6-57:11).

## TIESHETTA PRICE

h. Tieshetta Price is an Ohio Instant Tax Service customer who testified at trial. Instant Tax Service filed her return without her permission.  (*Id.* at 27:24-30:6).

i. Price is a single mother who applied for a $1000 Christmas Loan but turned the loan down after she was approved for only $100.  She declined the loan because, if she filed through Instant Tax Service, she would be charged $700--more than she had ever paid to get her taxes done.  After she left the store, Instant Tax Service filed her return without her authorization.  Price learned of the unauthorized filing only when she tried to file on her own, and the IRS informed her that her tax return had already been filed by Instant Tax Service.  (*Id.* at 27:24-30:6).

j. The IRS refund check that Price received had nearly $800 in fees deducted from it. Price never signed anything acknowledging or agreeing to these fees.  (*Id.* at 31:7-23).

## SHARON CHERRY

k. Sharon Cherry is an Ohio Instant Tax Service customer who testified at trial.  She went to an Instant Tax Service franchise in Toledo in December 2011 because she

heard a radio advertisement for a loan. She wanted the loan to buy Christmas presents for her children. (*Id.* at 61:14-62:24).

l.  When Sharon Cherry applied for a loan in December, she did not authorize Instant Tax Service to file her return. She did not sign anything stating that her return would be filed. (*Id.* at 66:16-23).

m.  Instant Tax Service filed Cherry's tax return without her authorization. The unauthorized return also understated her income tax liability. It did so because the return was prepared in December based only on the paystub from one of Cherry's jobs, rather than the W-2s from the two jobs she held during the tax year. (*Id.* at 66:24-67:24).

<u>STEPHANIE SHELTON</u>

n.  Stephanie Shelton is an Ohio Instant Tax Service customer who testified at trial. Instant Tax Service filed her 2011 tax return without her authorization. Shelton is a single mother, lives in Cleveland, with her son and nephew, and is the primary provider in her home. (*Id.* at 35:6-22).

o.  In December 2011, Stephanie Shelton was experiencing financial problems. She heard an Instant Tax Service radio advertisement offering a Rapid Anticipation Loan and went to an Instant Tax Service store in Euclid, Ohio to apply for a loan. She took a paystub, photo identification, and her son's social security card with her to Instant Tax Service. She did not take a Form W-2, her education documents, or her nephew's social security card. (*Id.* at 36:21-39:4).

p.  Stephanie Shelton applied for Instant Tax Service's Rapid Anticipation Loan and received $100.  Shelton then left the Instant Tax Service store.  She did not instruct the Instant Tax Service preparer to file her tax return and did not give the preparer permission to file her tax return. Shelton told the Instant Tax Service preparer that she wanted to gather all of her missing documents before filing.  (*Id.* at 39:19-41:2).

q.  In April of 2012, Shelton returned to the ITS store to file her tax return because she had gathered all of her documents.  When she arrived, a male employee of that Instant Tax Service franchisee explained that Shelton had an income tax refund check there waiting for her.  Shelton was shocked.  She had not given Instant Tax Service all of her documentation, including her Form W-2.  Shelton took her check and left the store.  (*Id.* at 41:22-43:9).

r.  Approximately a week after Stephanie Shelton received her refund check, she returned to the Euclid Instant Tax Service office to file an amended return, but the office was closed.  She located a phone number on the office door, called it, but received a busy signal.  She then contacted the Instant Tax Service Corporate office in Dayton and requested the documents she signed for the Rapid Anticipation Loan.  Instant Tax Service never sent her these documents.  (*Id.* at 43:18-44:19; 47:21-48:17).

s. For preparing and filing Stephanie Shelton's 2011 tax return without her permission, Instant Tax Service charged her approximately $500. (*Id.* at 44:20-45:16).

## DEFENDANTS' TARGET CUSTOMERS

319. Instant Tax Service's customer base is essentially the working poor. (Doc. 102 at 204:9-11; Doc. 109 at 76:8-12).

320. Instant Tax Service preys upon those who need money and are living from paycheck to paycheck. (Doc. 118 at 6:5-15).

321. ITS Financial's preferred customer is a low-income, single parent. (*Id.* at 4:20-6:1; PX651).

322. Instant Tax Service encourages franchisees to target African-Americans in particular. This is exemplified by an Ogbazion email, dated October 25, 2009, to his close friend and top franchisee Emanuel Ghebremichael, and franchisees Ben Tewolde and Yorda Kidane, boasting about how many African-American markets Instant Tax Service had already entered and how many remained. Ogbazion also attached a spreadsheet detailing market penetration into African-American communities. In reference to these African-American markets, Ogbazion said: "Sometimes I wish this country was as big as China." (Doc. 102 at 202:9-203:13; PX67; PX47; PX48; PX352 at 1; PX356 at 1).

323. Instant Tax Service specifically targets African-American single mothers. (Doc. 102 at 203:14-204:11).

324. Instant Tax Service's busy season is from the first day the IRS begins accepting returns and lasts about three weeks. Most years, the first day the IRS begins accepting tax returns is approximately January 15. Historically, when ITS offered an Instant Cash Loan, Instant Tax Service also prepared a substantial number of tax returns in late December and early January. (*Id.* at 204:12-20).

325. Ninety percent of Instant Tax Service's tax returns are prepared by early February. Ogbazion testified that he is in the office during Christmas, and that Instant Tax Service franchisees also work "just crazy hours" during the tax season. They spend "a lot of nights on the couch in the lobby, a lot of nights are spent in the office during that time period." (Doc. 134 at 88:20-89:15).

326. Because ITS franchisees are so busy right after Christmas through New Year's Day preparing taxes, ITS often celebrates with a big trip later in the year. ITS calls this Christmas in March. In the past, ITS has paid for an extravagant trip for 50 to 60 franchisees to go to vacation destinations, like Las Vegas, in March. (Doc. 102 at 204:21-205:5).

327. Ogbazion considers Instant Tax Service's peak season customers to be early filers (*i.e.*, historically, approximately 90 percent of ITS customers). (*Id.* at 205:6-15).

328. According to ITS Financial's Operations Manual, "early filers" usually have "simple returns that can be completed by an experienced tax preparer in as little as 15 minutes." The Operations Manual also confirms that the company defines its "peak season customers as early filers. Historically, approximately 90 percent of

our customers have been early filers. These customers generally need their money quickly for urgent needs like rent, electricity, or outstanding bills and balances with other companies. Due to this urgent need, these customers are more likely to take advantage of our advanced refund loan options." (*Id.* at 205:25-206:15; JX3 at 13; JX1 at 15).

329. Witnesses who testified at trial confirm the veracity of statements in the ITS Operations Manual that typical Instant Tax Service tax returns take "as little as 15 minutes" to complete, including:

   a. Brook Wise, a former Vice President at ITS, who testified that many tax returns took only 10 to 15 minutes to prepare. (Doc. 105 at 107:23-108:6).

   b. Jenny Moreland, a District Director for Ogbazion's corporate owned ITS stores, who testified that it takes about 10 minutes to prepare a 1040 tax return. She also testified that if the return has an additional earned income tax credit, it still takes about 10 to 15 minutes. (Doc. 113 at 68:1-13).

330. Ogbazion claimed on direct examination at trial that it usually takes longer than 15 minutes for an ITS franchisee to prepare a tax return. Ogbazion's testimony was self-serving and uncorroborated by any trial exhibit or witness. His testimony was contradicted by multiple versions of ITS Financial's own Operations Manual, which is given to all franchisees, as well as Moreland's and Wise's testimony. (Doc. 134 at 96:25-97:11; JX1 at 15; JX3 at 13).

331.   Defendants' target customer population, the concentrated timing of their peak tax season, and the limited amount of time Instant Tax Service takes to prepare returns are central to their business model.  The testimony of Michael Cragg, the Government's economics expert, was entirely credible:  he explained how Instant Tax Service makes money by targeting low-income customers with the promise of loans, requiring those customers to use ITS to file their tax returns as part of the loan application process, denying many of those loan applications, and then saddling these customers with large fees because they are then unable to have their returns prepared elsewhere.  (Doc. 126 at 40:12-42:10).

## DEFENDANTS' EXORBITANT FEES

332.   ITS closely monitors franchisee fees and maintains spreadsheets containing records of the fees its franchisees charge customers.  (Doc. 77 at 3).

333.   ITS recommends a range of high, medium, and low tax preparation prices for its franchisees to charge customers.  (Doc. 118 at 53:15-54:4).

334.   100 percent of Instant Tax Service's customers could get their taxes done more cheaply elsewhere.  (Doc. 102 at 207:4-7).

335.   In addition, because Instant Tax Service's customers are the working poor, the Volunteer Income Tax Assistance (VITA) program, provides for free return preparation and filing for most of them.  (*Id.* at 207:8-11).

336.   The VITA program is sponsored by the IRS, but is run by community volunteers. These "Trained volunteers can help . . . with special credits such as Earned Income

Tax Credit (EITC)."  "In addition to free tax return preparation assistance, many

VITA sites offer free electronic filing (e-file).  Individuals taking advantage of the

e-file program will receive their refunds in half the time compared to returns filed

on paper[.]"  (See http://www.irs.gov/taxtopics/tc101.html).

337.  ITS charges a variety of fees.  Ogbazion testified that he refers to some of these

fees as "junk fees" and "revenue generators."  (Doc. 102 at 207:12-19).

338.  The "junk fees" Instant Tax Service charges its customers include fees for "service

bureau," "document preparation," "refund estimate," "technology software,"

"account setup," "check printing," "and e-file, electronic transmission."  (*Id.* at

207:20-208:12).

339.  On top of the junk fees, taxpayers are also charged tax preparation fees.  (*Id.* at

208:13-15).

340.  Even though ITS Financial's operations manual says it takes only 15 minutes to

prepare most customer's tax returns, Instant Tax Service charges the junk fees

described above, in addition to tax preparation fees.  (*Id.* at 208:16-18; JX3 at 13;

JX1 at 15).

341.  Ogbazion's company, Defendant Tax Tree, charges Instant Tax Service customers

a $57 processing fee and a $2 account setup fee.  Those two fees are Tax Tree's

fees, which go directly to Tax Tree and Tax Tree keeps.  They are not fees that the

franchisees keep.  (*Id.* at 208:19-209:1; 209:19-23).

342.   ITS charges Instant Tax Service customers a $17 transmission fee, and a $24.95 technology fee.  When customers walk into an Instant Tax Service office and get a bank product, they are charged those two junk fees, in addition to tax preparation fees and other junk fees.  But the transmission and technology fee go directly to ITS.  Ogbazion testified that he keeps those fees "to pay for our expenses."  (*Id.* at 209:2-20).

343.   Ogbazion admits that in 2013, ITS and Tax Tree charged customers about a hundred dollars in junk fees.  Although Ogbazion claimed those fees were "paying for something," he admitted "those are the junk fees that we charge."  (*Id.* at 209:24-210:3).

344.   Transmission and technology fees charged to customers were directed to ITS in Tax Year 2010 and 2011 and Tax Tree in Tax Year 2012, while account set-up and check-print fees were directed to Tax Tree.  (Doc. 77 at 4).

345.   ITS also gets, on average, about 18 percent of the tax preparation fees charged by its franchisees.  Those fees are royalties that the franchisees pay ITS.  (Doc. 102 at 210:12-15).

346.   All of Defendants' revenue comes from charges to Instant Tax Service customers.  Defendants get royalties from franchisees who charge customers fees for having their tax returns prepared.  Ogbazion testified that, on average, those royalties are 17%.  In addition, Tax Tree and ITS charge customers additional fees that totaled

about $100 in 2013.  Ogbazion admitted that was additional revenue that came into his companies that he could use.  (Doc. 104 at 59:12-61:1).

347.  Defendants prepared PX655 for purposes of this litigation.  PX655 purports to calculate the average tax prep and related fees for each of the past five years.  It does not include, however, ITS Financial's or Tax Tree's fees.  Instead, it shows average tax preparation fees, along with any other junk fees charged and kept by the franchisees. Junk fees kept by the franchisees include the e-filing fee and bank document preparation fee.  The 2012 tax year fees shown on PX655 are $371.  In addition to those fees, Ogbazion admitted that an additional $100 in fees go to ITS and Tax Tree for that year (calendar year 2013).  (Doc. 102 at 210:16-211:7; PX655).

348.  Defendants admit that their average fees for the 2009 tax year, as shown on PX655, were $279.  In addition to those fees, still more fees were paid to Santa Barbara Bank, among others.  Santa Barbara capped the total fees charged by franchisees at around $400.  (Doc. 102 at 211:8-15; PX-655; PX606; PX608).

349.  Based on a data sample from the court-appointed monitor in this action, Brady Ware & Schoenfeld ("Brady Ware"), the average total fee for bank products and tax-preparation services charged to ITS customers in January 2013 was $566.18. As the government's expert, Marc West, testified at trial, that was more than double the total fees that competitors H&R Block, Jackson Hewitt, and Liberty Tax charged their customers in recent years, based on publicly available data from

those companies.  The reliability of that publicly announced data is high given that those companies are publicly traded and thus regulated by the U.S. Securities and Exchange Commission.  (Doc. 123 at 45-48; PX742 at 28; Doc. 124 at 29-30).

350.  Patrick Rasey, ITS Financial's Controller, testified on direct that H&R Block's published average tax preparation fees of $175.49 did not include "bank product fees."  Rasey did not testify whether he had personal knowledge of that supposed fact, and, unlike Mark West, he never worked at H&R Block.  Rasey claimed that he subtracted all of ITS Financial's "bank product fees" and came up with an average for ITS's tax preparation fees, which he said totaled $194.  Rasey's testimony is not credible and contradicts Defendants' prior admissions.  PX655 is a document prepared by Defendants in response to a government interrogatory.  It summarizes all "TOTAL ZEE FEES" and shows that for 2013 (TY 2012), the total for franchisee fees (*i.e.*, excluding bank fees), was $371.00, not $194.  Moreover, Ogbazion further testified that the $371 figure did not include the fees that ITS and Tax Tree charged customers (*i.e.*, bank fees), which totaled an additional $100 for 2013.  No record evidence supports Rasey's new, and self-serving fee calculation.  Nor did Rasey disclose what fees he included and excluded, and whether he used Defendants' lower fee calculations (from PX655) or used the more accurate information from Brady Ware (PX743) as a starting point.  The testimony and reports of Dr. Mike Cragg (PX662 at 13) and Marc West (PX742 at 25) on this

topic, and the information found in the Brady Ware report, are credible.  (Doc. 132 at 131:11-132:22; PX 655; PX 743; PX 662; PX 742).

351.   ITS Financial's 2009 Operations Manual instructs Instant Tax Service franchisees to tell IRS auditors that their tax preparation fees "range anywhere from free to $140."  Franchisees are also told to say that those fees include the e-file fee.  Ogbazion admitted at trial that "the $140" part of that statement "probably is" false.  (Doc. 102 at 211:16-212:24; JX3 at 100, 101).

352.   ITS Financial's instructions to make false statements to IRS agents regarding fees were repeated in the company's 2010 or 2011 Operations Manual.  (Doc. 102 at 212:25-213:11; JX1 at 104).

353.   Ogbazion testified at trial that the $140 figure probably is false, but later claimed that it merely had not been "updated."  But Ogbazion admitted that the Operations Manual was updated in either 2010 or 2011, and that the updated version (JX1) contains the same false statements.  Ogbazion also admitted that the $140 figure was not true in 2008 either.  (Doc. 102 at 50:26-51:25; JX1 at 104; JX3 at 101; JX 655.

354.   ITS Financial's instruction to tell IRS agents that their tax preparation fees "range anywhere from free to $140" was never true.  Defendants admit in PX655 that average fees in 2008 and 2009 were far higher than $140.  Nor does any record evidence support  ITS ever having an average fee as low as $140.  The section of the Operations Manual where ITS instructed  franchisees to tell IRS agents that

their tax preparation fees "range anywhere from free to $140" is called

the "IRS Audit Guide."  It reads:

"Sooner or later, most tax offices will be audited.  This guide addresses many of the questions you will be asked when the IRS performs an audit at your location. The answers provided here are based on the *operational standards* of our Instant Tax Service locations.  As an Instant Tax Service franchisee, we recommend that your store use the following procedures."

(*Compare* JX3 (updated in at least 2009) and JX1 (updated in at least 2010); Doc.

102 at  211:16-212:4; JX3 at 100-101; JX1 at 104, PX621).

355.   ITS knew that the "operational standards of [its] Instant Tax Service locations"

never had average, maximum fees as low as $140.  Thus the manual's instructions

about telling IRS auditors about fees are patently false.  Because the false

statements are in the Company's Operations Manuals, given to all ITS franchisee,

and are contained in the "IRS Audit Guide," they constitute instructions to lie to

IRS agents who are conducting an investigation.  The instructions to lie appear in

multiple, updated versions of the Company's Operations Manual.  (*Compare* JX3

(updated in at least 2009) and JX1 (updated in at least 2010); *compare* JX3

(updated in at least 2009) and JX1 (updated in at least 2010);   Doc. 102 at 211:16-

212:4; JX3 at 100-101; JX1 at 104; PX621).

356.   Kyle Wade, who served as Vice President of Franchise Development at ITS

Financial beginning in the mid-2000s and through early 2013, asserted the Fifth

Amendment in response to questions regarding the following fact:  Ogbazion

reviewed and approved the content of the Operations Manual.  (Doc. 113 at 6:18-7:21).

**DEFENDANTS' "JUNK" "SERVICE BUREAU FEE"**

357.   One of the junk fees ITS charges customers is the "Service Bureau" fee. Ogbazion admitted at his 2012 interview that it was a "mistake" for ITS Financial to charge customers a "Service Bureau" fee.  (Doc. 102 at 217:16-219:20).

358.   Service bureau fees were originally charged by tax preparation firms in the 1980s and 1990s to recover the costs of outsourcing computerized tasks like electronic return filing to third parties.  After approximately 2000, there was no longer any reason to charge such fees to customers because the tax preparation companies handled such tasks with their own software.  (Doc. 123 at 79:13-81:4).

359.   When John Sapp of Drake Software, which provided Instant Tax Service franchisees with tax preparation software, first met with ITS, he was "amazed at their ability to charge the service bureau fee they were able to charge and still grow their business."  Sapp has no personal knowledge whether ITS even qualified to be considered a service bureau.  However, he was amazed "[h]ow high it was."  (Doc. 75-6 at 44:4-15, 76:23-77:4).

360.   Drake's software gave Instant Tax Service the ability to include "add-on" fees instead of labeling them "Service Bureau" fees.  (*Id.* at 39:7-11, 75:21-76:9, 39:23-40:2, 76:1-9).

361.   ITS franchisees did not have to charge anything for Service Bureau, since there was in fact no Service Bureau.  Instead they could have just increased the tax-preparation fees.  (Doc. 102 at 219:21-221:7; PX768; PX545).

362.   In an audio recording, Ogbazion told ITS franchisees on January 12, 2010, that the intent of the Service Bureau fee is to break up the tax prep fees, and make the tax prep fees look "lower."  (Doc. 102 at 221:8-24; PX768).

363.   Ogbazion also admitted that having Instant Tax Service offices charge a Service Bureau fee allowed Instant Tax Service franchisees to tell customers that the Service Bureau fees were actually third-party fees.  (Doc. 102 at 221:25-222:4).

364.   But, the Service Bureau fees were never third party fees.  Ogbazion admitted at trial and in the January 2010 audio that the Service Bureau fees are just tax-preparation fees that ITS told the franchisees to rename.  No third party gets 100% of the Service Bureau fees; not even ITS Financial, which in any event is not a third party.  Instead, ITS gets the same average 18% royalty from all Instant Tax Service fees combined, and the franchisees keep the remainder.  (*Id.* at 219:21-221:7; 221:8-24; PX768).

365.   Ultimately, the Service Bureau fee income belonged to and would go to the franchisee, or would be used to pay expenses franchisees owed to ITS.  (Doc. 94 at 129:19-130:15; PX545).

366.   At Corporate-owned stores, ITS Financial charged customers a Service Bureau fee of $100.  (Doc. 113 at 63:23-64:8).

111

367. Ogbazion instructed his employees at the Corporate-owned stores to misrepresent the "Service Bureau Fee" as a fee paid to securely transmit a tax return to the IRS. (*Id.* at 64:9-67:25).

368. A district director of operations for Corporate owned stores did not even know the basis for the Service Bureau fee. She said she felt uncomfortable charging the fee to customers, in addition to the discomfort she felt charging excessive fees in general. (*Id.* at 63:11-22).

369. In February 2009, ITS Financial's lender at the time, Santa Barbara Bank and Trust, was so frustrated with allegations that ITS franchisees were misrepresenting the Service Bureau fee, that it wrote to reprimand the company. A representative of Santa Barbara Bank and Trust wrote: "Please put out a notice out to all your users that states the electronic filing fees and service bureau fees are not bank fees but are amounts paid to the tax preparer." (PX739).

## DEFENDANTS' ENCOURAGEMENT OF FRANCHISEES TO CHARGE EXCESSIVE FEES

370. Instant Tax Service franchisees have been reprimanded by third party banks over the years for charging excessive fees. In January 2011, for example, one ITS franchisee, Nirav Babu, was warned by a third party bank, Santa Barbara, that his fees were excessive, and he was told to stop charging excessive fees or risk disqualification from offering bank products. In response, Babu told Ogbazion that he would continue until "they say I can't or they block me. Then I will just get another efin on my own and my own worst case." In response to Babu's

statement that he was going to continue charging excessive fees, and then if the bank suspends him, just get another EFIN to circumvent the bank's suspension, Ogbazion wrote: "That's a good plan."  (PX278).

371.   Ogbazion was asked at trial about his comment to Babu confirming that Babu's plan to circumvent the bank's fee caps by using another EFIN was a "good plan." Ogbazion stood by his written answer, and contended further that: "Well, I mean, if it's cutting into his revenue, yeah."  (Doc. 102 at 225:8-227:10; PX278).

372.   Although William San Giacomo was included on earlier messages in the e-mail string with Ogbazion and Babu and purportedly had compliance responsibilities over ITS Financial loan programs, Ogbazion did not include San Giacomo in the reply to Babu.  Upon learning of Ogbazion and Babu's plan during this litigation, San Giacomo agreed that it was "not [a good plan] from a corporate perspective." (Doc. 75-5 at 38:15-39:10; 58:24-59:19; 60:6-61:2; 61:7-13; PX278).

373.   Ogbazion and ITS also knew that multiple franchisees were charging exorbitant fees, well-above the$400 fee caps set ITS bank lenders.  For example, Ben Tewolde, a franchisee in Las Vegas who has since been permanently enjoined by the U.S. District Court for Nevada from operating any tax-preparation business, obtained Ogbazion's approval when reporting to Ogbazion that "we're sending 20% of our files all above $600.  I think that is a safe bet, what do you think." (Doc. 111 at 5:16-24; PX 289).

374.    The banks that ITS worked with sometimes required Instant Tax Service
        franchisees to take an exam to test their knowledge of lending laws and
        regulations.  In another example of evading lenders' compliance controls, ITS
        Financial employees would take bank products compliance examinations for
        Instant Tax Service franchisees.  For instance, ITS employee Anita Boyton took a
        required bank compliance exam for franchisee Brent Kutchback.  After she had
        done so, she emailed Kutchback and told him, "I just took this test for you . . . so
        you should be good to go soon."  PX 190.  San Giacomo admitted that it was not
        proper for the franchisor to take the test for a franchisee.  (Doc. 75-5 at 63:25-
        64:1; 65:11-67:6; PX 190).

375.    Similarly, in 2011, a third party used by some ITS franchisees to collect fees
        required ITS to strictly monitor franchisee David Franklin's behavior because of
        past complaints to ensure, among other things, that he (a) did not charge fees over
        $400, (b) did not represent that he offers loans, and (c) did not misrepresent any
        product offerings.  (PX555 at 1-2).

376.    In February 2011, Ogbazion berated a franchisee - not for charging high fees - but
        for giving some of his customers partial refunds because they had complained
        about high fees.  Ogbazion exclaimed, "Damn [expletive] you gonna give it all
        back?"  (PX215).

377.    Even when Ogbazion knew one of his franchisees had illegally filed a customer's
        tax return using a paystub, Ogbazion's response to the franchisee who proposed a

partial refund (PX 34) was that he did not like refunding the customers' fees. (Doc. 102 at 223:11-225:7; PX34).

378.  Senior executives of ITS, including Brook Wise, Vice President of Franchise Recruitment, were uncomfortable with the amount of fees Instant Tax Service charged its customers because "it just didn't seem real appropriate with the time that was spent [preparing the return]" (*i.e.*, "ten or 15 minutes") and "the actual work that went into preparing the tax return." (Doc. 105 at 107:23-108:18; JX3 at 2).

379.  William San Giacomo, a former Vice President at ITS Financial, testified during his deposition that fees in excess of $500 to $700 for preparation of a basic 1040 tax return are excessive. (Doc. 75-5 at 53:2-4, 55:2-14).

### DEFENDANTS' EFFORTS TO DOWNPLAY FEES WITH CUSTOMERS

380.  When ITS still owned Corporate stores, Ogbazion instructed employees to focus customers' attention on their net refund amount, rather than the fees that would actually be taken out.  This was done by turning a computer monitor toward customers and pointing straight at the bottom, where the net refund was reflected. (Doc. 113 at 70:22-72:13).

381.  ITS also taught franchisees at its Corporate training sessions to downplay or conceal fees Instant Tax Service charged customers by, among other things, focusing the customer on the refund amounts on fee disclosure sheets and being as vague as possible about the fees.  At ITS Corporate training conducted by Lance

Dohm in 2008, this process was called the "screen turn."  Specifically, as

Ogbazion instructed at his Corporate stores, Dohm instructed Instant Tax Service

franchisees to turn their computer screens, which showed the fees and the refund

amount, toward customers, and to "breeze over" the listed fees and focus

customers on the refund amount.  Kyle Wade, ITS Financial's Vice President of

Franchising, conducted this same training in a similar manner.  (Doc. 105 at

108:19-111:9, 149:20-150:18; Doc. 114 at 115:20-116:19).

382.    Similarly, based on an "ICL Application Process" webinar presented by ITS

Financial in December of 2009, one franchisee recommended to his employees

that "WE DON'T WANT TO GIVE THE CUSTOMER THEIR 'TOP LINE'

REFUND AMOUNT ONLY THEIR NET REFUND AMOUNT (VERBALLY)

AT THIS POINT."  (PX698 at 6-7).

### FEES AND DEFENDANTS' BANK PRODUCTS

383.    ITS charges customers who apply for a bank product an account fee, a processing

fee, a technology fee, and a transmission fee.  These are all Tax Tree fees; they are

all paid to Tax Tree.  (Doc. 133 at 162:7-163:14).

384.    Unlike with customers who apply for a bank product, Tax Tree does not charge its

"e-file" customers--those who do not receive a bank product--an account fee, a

processing fee, a technology fee, or a transmission fee.  (*Id.* at 162:15-163:25).

385.    ITS customers who use one of ITS Financial's bank products--an ICL, RAL, or

refund transfer--have all of their fees deducted directly from their federal tax

refund. Consequently, they do not pay for any services at the time of the service. (Doc. 118 at 57:10-58:7).

386. A large majority of ITS customers receive a bank product, and, therefore, do not pay up front for their tax return preparation. (*Id.* at 58:12-16).

387. Customers who pay cash for services up front pay lower fees than those who delay payment and have fees taken out of their refund. For example, for tax years 2009, 2010, and 2011, customers who did not use a bank product paid $171.53, $173.06, and $201.43, respectively. (*Id.* at 58:20-60:3; PX721).

388. Similarly, from 2009 to 2013, an Instant Tax Service franchisee with stores in Baltimore, Maryland and Philadelphia, Pennsylvania charged, "on average," approximately $150 for customers who paid cash, up front, to have a tax return prepared. (Doc. 75-2 at 62:15-63:5; 136:20-138:4; 143:12-20).

## DEFENDANTS' WILLFUL BLINDNESS TO MISCONDUCT

389. Defendants' willful blindness to misconduct at Instant Tax Service has a long history. For example, prior to 2007 or 2008, Ogbazion and ITS did not conduct background checks of their employees. (Doc. 99 at 98:1-3).

390. Ogbazion did not conduct background checks because he did not want to know if any of his employees had criminal records. Ogbazion explained to a franchisee in PX560 that "people with misdemeanors and felonies relate to our customers better than you and I. No, we've never done background checks but, if I did, I would

find stuff that I would not want to know." Ogbazion admits that that was a "stupid thing to say." (Doc. 99 at 98:4-99:19).

391.   The franchisee interpreted Ogbazion's comments as follows: "Don't ask, don't tell is the name of the game, right?  That's what I thought." (*Id.* at 98:4-99:19; PX560).

392.   When ITS finally first began conducting background checks in 2008, it learned that one of its employees, Leslie Baker, had a 2004 conviction for Felony Theft. Baker also had convictions for multiple misdemeanors.  ITS also determined that financially, Baker was "high risk."  Despite having actual knowledge that Baker had a recent Felony Theft conviction and was high risk, ITS sold Baker an ITS tax preparation franchise. In doing so ITS knew that unsuspecting customers would necessarily provide Baker with their most private financial and personal information.  ITS also knew that as a felon, Baker was ineligible to legally obtain an EFIN.  (PX572; PX573 at 3, 5, 10).

393.   Ogbazion also encouraged franchisees to hire employees who would prepare a large volume of returns, even if those employees engaged in improper conduct, in order "to get to" that high volume of filed returns.  (Doc. 80 at 64:7-65:5).

394.   Ogbazion's general policy regarding illegal conduct among Instant Tax Service franchisees was "to look the other way."  (*Id.* at 82:2-7).

395.   For certain franchise owners, and in particular many of those with Eritrean backgrounds (*i.e.*, Habesha), Ogbazion provided direct guidance about how to

increase profits by engaging in illegal conduct. For instance, Ogbazion directed Habesha franchisees to follow the example of specific franchisees known to engage in illegal conduct, including filing paystub tax returns. Although the general conference calls with all franchisees were recorded, conference calls with Habesha franchisees were not. (*Id.* at 20:16-17, 26:17-30:12, 31:1-11, 46:21-47:17, 52:17-53:10).

396. In connection with statutory Earned Income Tax Credit due-diligence requirements, Ogbazion fostered an environment among franchisees where due-diligence "was a laughable matter," according to one former Habesha franchisee. Ogbazion had "no interest" ("Zero, zilch") in ensuring that tax returns were "done the right way" at Instant Tax Service stores, and he, instead, created a "culture" that encouraged franchisees to "go out there and do whatever you can to create as much revenue as you can, regardless of ethics." (*Id.* at 61:5-63:9).

397. Ogbazion has shown no interest in investigating allegations of illegal conduct among Instant Tax Service franchisees. For example, a Habesha franchisee from Virginia witnessed how after Instant Tax Service franchisee from Kentucky was raided by law enforcement, it was "almost as if [Ogbazion] knew what was going on" at the franchisee. Ogbazion took a "cover-up mode" approach "versus, hey, I got to distance myself from this, investigate what's going on and try to help out the authorities." (*Id.* at 131:3-133:19, 134:19-23).

398.    Similarly, when complaints of fraudulent activity arose, Ogbazion wanted them to
        be handled by franchisees, without ITS Financial's involvement.  For example, in
        January 2010, a consumer reporter from a television station in Cincinnati
        contacted ITS regarding complaints about denying customers loans and filing
        returns based on paystubs.  When ITS Financial's media relations professional
        sent a proposed company response to Ogbazion, Ogbazion responded:  "I
        completely disagree responding to [the reporter].  This is a franchisees office . . .
        he should respond."  (PX629 at 2).

399.    Overall, Instant Tax Service's reputation in the tax preparation industry has not
        only been as having "high fees" and "aggressive marketing," but also "loose
        controls."  (Doc. 75-6 at 45:1-11, 45:20-25).

**DEFENDANTS' FAILURE TO OBTAIN DATA TO MONITOR FRANCHISEES**

400.    Defendants have consistently failed to pursue readily available methods to monitor
        their franchisees to prevent fraud, including obtaining red flag reports.  A red flag
        report is a report that tax preparation companies can run to help detect fraud and
        wrongdoing by tax preparers.  In 2009, an ITS Vice President, Bill San Giacomo,
        informed Ogbazion about red flag reports that his former employer, Jackson-
        Hewitt, created.  San Giacomo stressed to Ogbazion that red flag reports are
        "critical" and that ITS had to have them.  (Doc. 103 at 2:25-3:15; Doc. 75-5 at
        17:13-18:10, 48:18-49:4, 49:8-12, 52:1-7).

401.  ITS, however, did not implement a system to obtain red flag reports.  Ogbazion already had actual knowledge that ITS franchisees were engaged in illegal practices, including filing without authorization and paystub filing - and, like the background checks, Ogbazion did not want to find out about additional illegal but profitable activity.  (Doc. 103 at 2:25-3:15; Doc. 75-5 at 17:13-18:10; 48:18-49:4; 49:8-12, 52:1-7).

402.  Ogbazion never personally asked Drake for the data to get red flag reports.  (Doc. 103 at 3:16-19).

403.  Ogbazion admits that ITS did not try to get data "specifically for red flag reports." Ogbazion offered vague testimony at trial that his employees tried to get "data" from Drake, and claimed that Drake was not able to provide it.  However, when asked if the employees tried to get data, in general, from Drake, Ogbazion evasively testified, "Just data."  (*Id.* at 3:19-5:8; Doc. 75-6 at 20:9-24; 25:17-26:8; 26:12-27:1).

404.  Ogbazion admitted at trial that ITS, in fact, obtained certain types of data from Drake for non-compliance purposes.  This data included "header data" that ITS had specifically requested.  ITS received header data through a process called "data replication."  The data replication function, which Drake provided to ITS, was unique to ITS.  Previously, Drake had not provided the data replication function to any other customer before ITS asked for it.  The data provided through data replication included certain types of taxpayer information.  ITS also had

access to a data portal at Drake, which allowed ITS to review certain types of reports and certain types of ITS taxpayer data directly from Drake.  (Doc. 103 at 3:19-5:8; Doc. 75-6 at 20:9-24; 25:17-26:8; 26:12-27:1).

405. Defendants' witnesses who testified at trial repeatedly asserted that Crosslink software, ITS Financial's replacement for Drake, is far superior to Drake and will allow for more effective compliance monitoring of franchisees.  But even before it switched to Crosslink, ITS had the capability to monitor tax return preparation activities among its franchisees using Drake's online database, Multi-Office Manager ("MOM") function, and through data replication.  These data sources gave ITS the capability to review, among other things:  (a) whether returns had been accepted or rejected by the IRS; (b) whether, according to MOM reports, tax returns had been deleted or changed by franchisees, and if so, when this occurred; and (c) data straight from Instant Tax Service customer tax returns, including all data in customer tax returns stored on Drake's database (*i.e.*, data replication). (Doc. 122 at 11:23-12:25; 13:1-16:13; 16:20-17:25; 21:7-15; 39:8-17; DX16).

406. Drake provided data, for non-compliance purposes, to ITS via its MOM function as far back as September 2009.  Drake provided upwards of 75 lines of taxpayer data at that time, and followed up with ITS to insure that ITS had all the data it wanted.  (PX58 at 1-2).

407. ITS, however, never specifically requested information from Drake regarding its franchisees' compliance with tax laws, including Schedule C filings and claims for

education credits, although that is something ITS now would purportedly like to view to monitor franchisees' compliance.  ITS, however, actively sought and received Drake data for non-compliance purposes: namely for commercial purposes and internal financial projections.  (Doc. 118 at 56:24-57:7; Doc. 119 at 96:1-97:11; 102:24-103:11; Doc. 75-6 at 71:13-73:5, 69:7-71:7, 73:21-75:11; Doc. 122 at 19:8-23; 20:4-22).

408.  While ITS had a contract with Drake, ITS threatened to breach the contract if Drake did not lower its price.  During this incident, however, ITS did not demand greater visibility into taxpayer information for compliance purposes.  It was only interested in lowering its software costs.  (Doc. 122 at 29:6-23).

409.  When ITS asked Drake for major technology platform improvements in December 2008, Drake quickly responded and provided the requested technological changes. Drake noted in correspondence discussing an ITS data request for non-compliance purposes that Drake did "a year's worth of development" in "a few weeks." (PX23).

410.  A major purported benefit of Crosslink, to provide the ability for preparers to scan supporting tax documents, is not exclusive to that software.  Drake also has a scanning capability.  ITS did not inquire about that capability with Drake until spring 2011.  ITS and Drake, however, never pursued the scanning capability option because ITS did not renew its contract with Drake.  (Doc. 75-6 at 57:11:14; Doc. 122 at 35:19-36:18; 48:11-49:5).

411.    Even before ITS switched to the Crosslink software in 2011, the company could

have implemented industry-standard software controls that would have allowed

the franchisor to remotely view tax-preparation documents (*e.g.*, Forms W-2) that

its franchisees had scanned into a file-server system to ensure those documents

were present before the franchisees' tax preparers filed the returns.  Moreover, ITS

Financial could have done so without licensing such a system from H&R Block.

(Doc. 123 at 36-40; Doc. 124 at 30-31).

412.    According to Marc West, the Government's expert on the tax-preparation industry,

ITS Financial is unlikely to meet industry standards going forward because its

management team has proven unwilling and/or unable to make the necessary

changes.  (Doc. 123 at 53-57).  West testified credibly that the adoption of the

Crosslink software by ITS Financial was insufficient, as much more than simply

buying new software would be required to solve all of the problems at this

company.  (Doc. 123 at 43-44; Doc. 124 at 34-35).

### DEFENDANTS' FAILURE TO CONDUCT INTERNAL REVIEWS OF FRANCHISEES FOR COMPLIANCE

413.    Ogbazion said at his 2012 interview that he consciously chose not to run Google

Alerts for Instant Tax Service.  Ogbazion testified that:

"I would hear about it from our franchisees, but I have Google Alerts for H&R
Block, Jackson-Hewitt, Liberty, Republic, and a couple other companies.  I don't
have one on Instant Tax Service because if I saw one, I wouldn't be able to sleep.
It would piss me off that much.  So I decided not to have a Google Alert for
Instant Tax Service."

(Doc. 103 at 5:21-6:25).

414.  ITS has always had the right to inspect its franchisee's offices to check for compliance with federal law, pursuant to the terms of its franchise agreements. ITS also has the right to terminate franchisees for failure to comply with federal law.  Nevertheless, ITS has never conducted field audits of its franchisees, nor required its franchisees to provide data to ITS for compliance purposes.  (Doc. 118 at 54:19-56:3; Doc. 75-5 at 51:17-21; JX10 at 22, 28).

415.  Most tax preparation franchisors will perform compliance measures, such as office visits, including surprise visits to preparation offices to verify that W-2's actually exist in customer files.  (Doc. 75-6 at 60:18-61:6).

416.  Even former ITS executives admit that a tax preparation franchisor who finds out that, or receives an allegation that a franchisee is filing off of paystubs, should investigate through internal audits, external audits, and following up with the franchise for documentation to disprove paystub filing, such as by obtaining the W-2s and tax returns.  And if the franchisee cannot produce these materials, "then they could be shut off, suspended from processing [tax returns]."  (Doc. 75-5 at 36:6-15).

417.  Defendants' failure to adequately monitor its franchisees is particularly striking given who Defendants target as prospective franchisees.  Franchisees do not need to have any tax preparation experience and ITS offers only 7 hours of tax preparation training.  Potential new franchisees were told, among other things, that

"[n]o tax experience [is] necessary!  We provide all the training you need."  (Doc. 118 at 52:16-21; Doc. 77 at 3).

418.    For example, among former Instant Tax Service franchisees who testified at trial, many stated that they had no accounting or tax-related education or tax preparation experience prior to becoming a franchisee.  They became franchisees, in part, because ITS advertised that no tax preparation experience was needed, and Defendants promised that ITS would provide all necessary tax training.  (Doc. 105 at 145:10-19; Doc. 114 at 111:7-112:6).

## THE SUBSTANTIAL NUMBER OF COMPLAINTS AGAINST DEFENDANTS, WHICH THEY FAILED TO ADDRESS

419.    Between March 1, 2009 and March 31, 2012, consumers filed 985 complaints with the Better Business Bureau ("BBB") against Instant Tax Service.  Of those complaints:  47 were unpursuable, which means that the BBB was unable to locate the Instant Tax Service store that the customer claimed to have used; 26 complaints were unresolved, which means that the BBB was able to locate the correct Instant Tax Service location but Instant Tax Service elected not to respond, either denying that they did anything wrong or blaming the customer; and 138 complaints were unanswered, which means that the BBB was able to locate the correct Instant Tax Service location but Instant Tax Service decided not to answer the complaint.  (Doc. 113 at 27:11-29:7; 29:8-30:23; 41:7-42:16; PX754).

420. During this same period, H&R Block had 2,744 complaints filed against it by its customers, of which 3 were unpursuable, 0 complaints were unresolved, and 3 were unanswered. (PX754).

421. Customers have complained directly to ITS that their tax returns were filed without authorization. (Doc. 11 at 214:9-11).

422. During the March 1, 2009 to March 31, 2012 period, H&R Block filed well over 100 times as many tax returns as Instant Tax Service. Even though H&R Block filed 100 times more returns, it had only 3 times as many BBB complaints filed against it when compared to Instant Tax Service. (Doc. 113 at 31:14-19; Doc. 124 at 120:9-12; PX754).

423. According to the BBB, the most common complaints filed against Instant Tax Service alleged that Instant Tax Service engaged in various acts, *all* without customer authorization, including: (a) use of paystubs to prepare and file tax returns, instead of W-2s; (b) enrollment in Instant Tax Service bank products; and (c) filing tax returns. (Doc. 113 at 32:3-13; 33:12-34:16; PX754).

424. The BBB employs quality control procedures to guard against duplicate complaints against businesses and to ensure that complaints are properly associated with the correct businesses. (Doc. 113 at 23:15-26:7).

425. The nature of consumer complaints also affects the BBB's ratings. Instant Tax Service currently has an **F** rating from the BBB, primarily due to the number of unanswered and unresolved consumer complaints filed against Instant Tax

Service.  The government's injunction action filed against Defendants is also now considered by BBB, but Instant Tax Service had an F rating before the United States' injunction action commenced.  (*Id.* at  21:17-22:8; 26:22-27:10; 31:20-32:2).

426.   As of 2011, ITS informed the BBB that it no longer wished to receive consumer complaints regarding Instant Tax Service stores.  Instead, ITS requested that the BBB contact individual Instant Tax Service stores directly.  (*Id.* at 26:8-21; 34:17-35:12).

427.   H&R Block headquarters has a separate, central unit to deal with any customer complaints, whether or not the complaints are received via the BBB or directly from consumers.  H&R Block works with the BBB in Kansas City, Missouri to address customer complaints from across the country, coordinates responses to those complaints with H&R Block stores, and works with the Kansas City BBB until a resolution is reached to each complaint.  (*Id.* at 35:13-23).

428.   ITS employees, including Amber Bennett, received notice of BBB complaints, including complaints alleging improper conduct by Instant Tax Service preparers, such as paystub filing.  Bennett did not advise franchisees to cease paystub filing in e-mails with franchisees regarding these complaints.  (Doc. 111 at Testimony of A. Bennett, 256:22-262:2; PX189, PX240, PX371).

**DEFENDANTS' USE OF SECRET ACCOUNTS TO EVADE CREDITORS AND PAYMENT OF FEDERAL EMPLOYMENT TAXES**

429.   Nirav Babu is currently an Instant Tax Service franchisee with stores in or around Baltimore, Maryland and Philadelphia, Pennsylvania.  Babu is a close friend of Ogbazion and has had a relationship with Ogbazion for over a decade.  Babu became an employee for Instant Tax Service Corporate in approximately 2000 or 2001, opened his own Instant Tax Service stores with personal assistance from Ogbazion, and served as a Corporate counsel for ITS Financial from 2005 to 2008 or 2009.  (Doc. 75-2 at 9:1-13:22; 18:14-19:2; 20:7-13; 22:15-23:3; 62:15-63:5; 128:3-17; 212:2-215:8; PX707).

430.   In 2011, ITS transferred $2 million of corporate funds to Babu.  Babu held that $2 million for ITS Financial's use.  Ogbazion testified that over the course of 2011, ITS directed Babu to transfer those corporate funds back to the company to use on payroll and other expenses. Babu, in fact, transferred to ITS Financial its own money, as it was requested.  For example, Babu wired ITS $100,000 on June 20, 2011.  PX141 (Doc. 102 at 229:6-230:1; PX141; Doc. 75-2 at 35:17-39:17; 39:22-41:4; 41:14-21; 43:16; 45:6-46:9; 46:21-48:11; 212:2-215:8; 227:19-229:11; PX707).

431.   In 2012, ITS transferred another $2.5 million belonging to the company to Babu.  Once again, over the course of 2012, ITS directed Babu to transfer money back to ITS for payroll, rent, or whatever expenses ITS decided needed to be paid.  And Babu, in fact, sent the money to ITS.  (Doc. 102 at 230:19-231:2; Doc. 75-2 at

35:17-39:17; 39:22-41:4; 41:14-21; 43:16; 45:6-46:9; 46:21-48:11; 212:2-215:8; 227:19-229:11; PX707).

432. The accounts into which ITS transferred its own money in 2011 and 2012 were in Babu's name.  Neither Ogbazion nor anyone at the company were signatories on those accounts.  ITS had no written agreement with Babu regarding the transferred funds.  (Doc. 102 at 231:3-12).

433. At the time ITS transferred $2 million to Babu in 2011, ITS owed the IRS approximately 1 million dollars in unpaid employment taxes.  ITS still owed the IRS over a million dollars in unpaid employment taxes in 2012, when it transferred another $2.5 million to Babu.  (*Id.* at 230:15-18).

434. ITS General Counsel, Todd Bryant, who was negotiating with ITS Financial creditors at that time, had no knowledge of the money the company had stashed with Babu in 2011 and 2012.  Bryant only learned about that money through this litigation with the United States.  (Doc. 119 at 82:20-83:11).

435. Ogbazion admitted that Bryant did not know anything about the $2 million that ITS transferred to Babu in 2011, or the $2.5 million ITS sent to Babu in 2012.  (Doc. 102 at 231:13-18).

436. Bryant, in fact, successfully negotiated down certain judgments that creditors had obtained against ITS.  As a result of those negotiations, creditors agreed to accept less money from ITS.  That occurred in 2011 and 2012.  (*Id.* at 232:1-8).

437.  Ogbazion admitted that he knew that Bryant was negotiating with hundreds of ITS creditors in 2011 when ITS sent $2 million to Babu.  Ogbazion also knew that Bryant, during negotiations with creditors, would say (falsely) that 'ITS Financial does not have any money, but a third party can pay you something if you take less.'  (*Id.* at 231:19-25).

438.  Although Ogbazion did not tell his general counsel about the $4.5 million he sent to the Babu accounts, and even though his general counsel was representing to creditors that the company had no money, Ogbazion testified that he had "no reason to go to my general counsel and say, hey, we have a couple million dollars somewhere else."  (*Id.* at 232:9-233:19).

439.  Ogbazion testified that the reason why he did not tell his general counsel about the money in the secret Babu account was because Ogbazion had unilaterally earmarked those funds for future operations - despite the fact that the company had outstanding judgments against it, as well as other past due expenses. Ogbazion conceded that he "should have, I guess, filed for bankruptcy, because there was no way I was going to get out of that hole when 2010 happened." Instead of filing for bankruptcy, Ogbazion admitted that if he had a bill from 2010 "and I no longer had a need for that vendor, yes, I had my general counsel negotiate that, because there's no way I would have had the money to pay everybody."  Ogbazion characterized ITS Financial's actions as, "creatively we paid off people."  (*Id.* at 71:9-72:20).

440. In 2011 and 2012, when Babu was holding ITS Financial's money, the company did not have its financial statements audited. (Doc. 133 at 154:6-15).

441. Nothing in ITS Financial's financial statements would indicate to creditors that ITS had money stored in an account under Babu's name. (*Id.* at 153:21-154:5).

442. Ogbazion was asked to agree that, "you can't lie to creditors and tell them you don't have any money when, in fact, you've stashed it in a secret account, can you?" Ogbazion answered evasively: "We don't have money." (Doc. 102 at 235:15-18).

443. On April 4, 2011, Ogbazion sent an email to Richard Azikiwe, who at the time was an in-house lawyer for ITS. The email, which copies Babu, addresses a media bill from WPSG-TV. In the attached email, Azikiwe tells Ogbazion that an attorney, Rick Thomas from Thomas and Thomas, wants to know when the company intends "to send over the credit card for the media creditors that have agreed to the 20 cents payoff. Please let me know and the credit card info of the owner that will be used." Azikiwe, like Bryant, did not know about the secret Babu account, even though he legally represented ITS. Ogbazion admitted that the email shows that Azikiwe had negotiated with the media creditor to accept a settlement of 20 cents on the dollar. (*Id.* at 235:19-237:10; PX707 at 10).

444. On April 14, 2011, Ogbazion directed Babu to wire ITS Financial's own money held in Babu's account to pay for a settlement of a judgment entered against ITS. The judgment had been obtained by Aribtron, in the case of *Aribtron v. ITS*

*Financial*. Ogbazion also admitted that the email reflected the wiring of his "own funds, ITS' funds out of Mr. Babu's account to pay for the settlement." (Doc. 102 at 237:11-238:18; PX707 at 13).

445. On April 27, 2011, Ogbazion told Babu to wire $50,000 to one of Ogbazion's bank accounts at Fifth Third Bank to increase Ogbazion's existing personal certificate of deposit from $50,000 to $100,000. Ogbazion also instructed Babu to send another $20,000 to Ogbazion's personal bank account. Ogbazion admitted that in the email, he was telling Babu "to take some of the money that you transferred to that secret account and go ahead and send some of it to [Ogbazion] and send some to Fifth Third." (Doc. 102 at 238:19-239:12; PX707 at 18; PX209).

446. Cheryl Glancy was one creditor who would not accept 20 cents on the dollar. Glancy is a widow who lent ITS nearly $400,000 in December 2008. After she lent Defendants the $400,000, they did not pay her back for almost four years. (Doc. 102 at 243:14-244:20; PX391; PX738, PX740).

447. Glancy had to sue ITS to get paid after she obtained a judgment against ITS Financial in 2010. Ogbazion admitted that: "We had no defense. We owed the money." The company still did not pay her until 2012. (Doc. 102 at 243:14-244:20, 244:21-245:10; PX391; PX738, PX740).

448. A year after Glancy obtained a judgment against ITS, she sent the CFO, Pete Samborsky, an email dated April 3, 2011. Ogbazion admitted that on that date, the

company had approximately $2 million sitting in an account with Babu. Glancy

addressed the email to "Fez and Pete." She wrote:

I've had another set back. My son's leather safety harness belt broke and he fell 30
feet, crushing his ankle and leg, and requiring major surgery. Thank God he is
going to live, but he has no insurance. He will be out of commission for some
time, and his wife, 6 kids and me will try to keep things going here. I know I
don't need to keep reminding you. I NEED MY MONEY BACK, PLEASE. You
said you would do it last month. I lived up to what I was supposed to do for you.
Please do the right thing for me. You got my hopes up and you said you weren't
playing me. Why did you tell me that? Don't you think I've suffered enough?
Please respond.

Ogbazion admitted that Glancy is imploring to be paid in the email. (Doc. 102 at

245:20-246:22; PX187).

449. Glancy sent another email to Samborsky a few weeks later, on April 22, 2011.

She wrote:

Fez and Pete, it's almost Easter. . . . You said you had the money to send a
payment. You said you wouldn't lie. You said you wouldn't play me. So what's
going on that you won't at least make a payment, since you already said you had
the money to send me? Pity me because I'm old. Pity me because I'm a widow.
Pity me because I was just stupid enough to try to help you guys out to begin with.
I don't care. Just do what you said you would.

Ogbazion admitted that ITS promised to pay Glancy's judgment at the time of the

email, but then did not pay her anything until 2012. (Doc. 102 at 246:23-248:21;

PX206).

450. ITS Financial practiced what Ogbazion calls "legal maneuvering." As part of the

company's legal maneuvering, when ITS would settle with judgment creditors,

ITS would tell the creditor not to record the satisfaction of judgment with the

134

Court.  ITS did that so other creditors would not get excited and try to reach for dollars.  (Doc. 102 at 239:13-240:4).

451.  Although ITS owed creditors, such as the IRS and Glancy, significant sums of money, Babu continued to wire funds from the secret account to Ogbazion's personal bank account.  He did so again in June 2011, when Babu sent Ogbazion an additional $10,000.  Babu also allowed Ogbazion to use an American Express card to pay for Ogbazion's personal expenses, such as for gifts and vacation travel, which Babu paid off using ITS Financial's corporate funds in the secret account.  (PX135; PX133; Doc. 75-2 at 206:8-210:11).

452.  In May of 2011, ITS held a huge franchisee trip at a resort in Aruba.  At the time of the trip, ITS still owed the government over one million dollars in unpaid employment taxes and had dozens of outstanding judgments against it.  The trip occurred one month after the emails at PX707, where ITS negotiated creditors down to 20 cents on the dollar and did not tell them ITS had millions of dollars in a secret account.  Notwithstanding, ITS contracted to pay for everything at the all-inclusive resort, the Aruba Marriott, for over a hundred franchisees.  Ogbazion called the trip Instant Tax Service's "spring break."  Ogbazion and over 100 franchisees went on the trip and ran up a bill exceeding $160,000 for the all-inclusive resort, including the costs for lodging, food, and alcohol.  (Doc. 102 at 240:5-241:2; PX199).

453.   At trial Ogbazion was asked if he refused to pay the Aruba Marriott bill when he returned home.  Ogbazion testified that Babu gave him the credit card information and the Marriott never charged it.  Ogbazion then falsely testified that the Marriott "realized later in the month that they didn't charge it, and so we asked them if they wouldn't mind waiting till February for us to pay it, and we paid all $160,000 in February of 2012."  (Doc. 102 at 241:6-243:13; PX136 at 14-16).

454.   In fact, Ogbazion eventually admitted at trial that the Aruba Marriott pursued ITS for "multiple months, months after months, and were seeking payment."  For example, in an email on June 14, 2011, the Aruba Marriott informed ITS that they sent a final bill on May 30, but have not heard anything from ITS and so are resending the bill.  (PX136 at 14).  Ogbazion testified that ITS had not yet negotiated any deal to delay payment as of that date.  Likewise, on July 18, 2011, the Aruba Marriott inquired again, asking: "Want to know if you have any update regarding the payment."  (PX136 at 15).  On July 27, 2011, the Aruba Marriott again asked:  "Any update since I need to have an answer before the end of this month."  (PX136 at 14). The Aruba Marriott inquired again on October 20, 2011, at which time ITS still had not yet negotiated any deal to delay payment.  (PX709 at 21).  Instead, ITS had simply refused to pay the huge bill and had ignored the Marriott up until that point.  (Doc. 102 at 241:6-243:13; PX136 at 14-16).

455.   Also, contrary to Ogbazion's testimony, the Marriott did not discover that Babu's credit card was not charged.  It was ITS that discovered the credit card had not

been charged an initial deposit, and therefore the Marriott had been paid nothing as of June 22, 2011. ITS then took advantage of that fact and simply refused to pay anything at all. (PX709 at 15). Babu even asked Ogbazion directly if he could pay the full bill on June 21, 2011, using the credit card he lent to Ogbazion, but Ogbazion did not give him permission to do so. (PX709 at 7). Ogbazion admitted at trial that he did not pay the Marriott anything until February 2012. (Doc. 102 at 241:6-243:13; PX136 at 14-16).

456. Prior to January 2010, ITS frequently received services and goods and then simply refused to pay. For example, ITS incurred a $54,000 bill from an event it held at the Renaissance Hotel in late 2008 and simply refused to pay it. (PX46). As of March 11, 2009, that bill was over 100 days past due. (PX46).

457. An ITS franchisee, to whom ITS had not paid revenue that the franchisee was due from the 2008 tax season, accurately characterized ITS Financial's *modes operandi* to CFO Pete Samborsky as follows:

I'm starting to get the feeling that I'm in a Ponzi scheme. It looks like the only way ITS is keeping its head a float is robbing peter to pay paul and simply paying out just enough to keep everyone on board and, while taking the rest for their own kiddie without any regard to their responsibilities to their Zees.

(PX78).

458. Contrary to Ogbazion's testimony, the supposed financial crisis that ITS experienced in January 2010 was not an anomalous event for the company. For one, Ogbazion testified that the company was always out of money in late December/early January, just before the start of tax season. This is consistent with

the HSBC check fraud incident in January 2007, and the company's desperate need for the cash from those fraudulent checks at that time. In addition, ITS incurred expenses in years other than January 2010 and simply refused to pay for them. For example, the year before, ITS incurred a $54,000 bill from an event it held at the Renaissance Hotel in late 2008 and simply refused to pay. (PX46). As of March 11, 2009, that bill was over 100 days past due. ITS Financial also did so with Cheryl Glancy, the widow from whom the company borrowed over $400,000, again in 2008 - and then Ogbazion simply refused to pay her back for years, even though she obtained a judgment against ITS. Similarly in 2011, ITS contracted to pay for over 100 franchisees to attend the all-inclusive Aruba Marriott resort, racked up a bill for food, alcohol and lodging of over $160,000, and then Ogbazion refused to pay the bill for nearly a year.

**OTHER IMPROPER AND DECEPTIVE CONDUCT BY OGBAZION**

459.  As noted by John Sapp of Drake, "I would say my impression of Fez is he is an entrepreneur that is a very aggressive marketer and someone who is not above stretching the truth to further his means," including "examples in my dealings with him where I would probably use the word lie." (Doc. 75-6 at 46:8-25).

460.  In 2012, Ogbazion lied to a reporter about his name and his position with company. Ogbazion falsely told the reporter he was Frank Owens, Vice President of marketing. (Doc. 99 at 75:6-77:19).

461.  In another example of improper conduct, Ogbazion directed others to send mass text messages to potential customers without proper authorization from those prospective customers, despite warnings that legally ITS Financial needed "written proof" that "these people did in fact opt in for text messages."  Ogbazion was also told that "Due to carrier and FCC guidelines, you may only text people that have given you explicit permission to do so.  (PX254 at 5-6, 3; PX266).

462.  ITS illegally sent "text[s] to people who call us and hang up because we have their number."  Ogbazion admitted that doing so is illegal.  (PX517; PX522).

463.  Notwithstanding, Ogbazion and ITS Financial texted half a million people without receiving their permission.  (PX254 at 5-6, 3).  Worse, those texts falsely advertised a loan program ITS did not have.  (PX266).

464.  Ogbazion's involvement in this action, at times, has also been improper.  For example, shortly before the deposition of Bill San Giacomo, a witness in this case, Ogbazion admitted that he told San Giacomo certain facts that he did not think San Giacomo previously knew.  One of those facts was the reason why Ogbazion had hired San Giacomo.  At his deposition, San Giacomo then testified on direct about the reason why Ogbazion hired him.  (Doc. 101 at 40:20-42:20; Doc. 75-5 at 10:11-21).

465.  After talking to Ogbazion, San Giacomo falsely testified during his deposition on direct that he "remember[ed] asking [Drake] for specific data to build [Red Flag] reports, and they would not give me access to that information.  They said it was

tax information that was not available to us because of 7216." (Doc. 75-5 at 21:17-22:4).

466. On cross, San Giacomo admitted that he had talked to Ogbazion about Red Flag reports before his deposition. When asked whether Ogbazion suggested to San Giacomo that there was a problem getting data from Drake, San Giacomo admitted, "I don't know if I remembered it or he suggested it. He may have." San Giacomo also said Ogbazion, "may have mentioned it to help my memory, yes." (*Id.* at 43:8-44:25).

467. San Giacomo further admitted on cross that, personally, he never had any discussions with anyone at Drake about getting information for a Red Flag report. He did, however recall two supposedly relevant emails. Both emails recently had been provided to him by ITS, after he had talked to Ogbazion before his deposition. (*Id.* at 50:4-17).

468. During a break, San Giacomo forwarded to Plaintiff's counsel two emails that ITS had sent him before his deposition, and which purportedly concerned getting data for Red Flag reports. After the break, San Giacomo admitted that he had only "glanced at" the emails. Only one of them concerned Drake, and San Giacomo further admitted that one purpose of the email was to get data for Advent, a third party. San Giacomo could not remember if the email also discussed getting data for ITS for Red Flag reports. His admission that he did not remember what the email said - even though earlier he testified that the email was the source of his

knowledge about getting data for Red Flag Reports - coupled with his prior admission that he never talked to Drake personally about getting data for Red Flag reports, means that San Giacomo has no personal knowledge of whether ITS ever asked Drake for data for Red Flag reports.  Therefore, San Giacomo's testimony on direct - in which he said that he talked to Drake about getting data for Red Flag reports - necessarily had been coached, since he admittedly lacks personal knowledge.  Moreover, that testimony was also not credible.  Phil Drake, of Drake Software, testified credibly at trial that ITS never asked for data for Red Flag reports, but if it had, Drake would have provided it to ITS.  John Sapp, also of Drake Software, likewise testified at his deposition that ITS never asked for data for Red Flag reports, but if it had, Drake would have provided it.  No record evidence corroborates San Giacomo's coached testimony - not even Ogbazion's testimony.  (*Id.* at 55:22-57:9).

**COMMINGLING OF CUSTOMERS' FUNDS WITH DEFENDANTS' FUNDS**

469.  Ogbazion testified that the seizure of $4.3 million in funds in 2012 was "in connection with the Toledo franchisee," who is under criminal investigation.  At the time that money was seized, it was held in a general Tax Tree PNC account.  Ogbazion admitted that Tax Tree had "commingled" those funds, which previously were held in individual taxpayer specific accounts.  (Doc. 135 at 163:21-167:13).

470. Ogbazion testified that the IRS will not electronically transmit a customer's tax refund, unless an individual, taxpayer-specific account is first set up.  Only after the IRS sees that an individual taxpayer-specific account with the customer's name on it has been established, does the IRS then transmit the customer's refund. As soon as the IRS transmits the customer's money, the Defendants immediately take those funds and aggregate and commingle that money in a general account belonging to the company.  (*Id.* at 163:21-167:13).

471. Tax Tree also commingled customer refunds prior to 2013, even though ITS Financial's own general counsel from 2010, Joe Roda, recognized that commingling customer funds was not lawful.  (PX384; PX432; PX364 at 6).

472. Ogbazion admitted that the money in the Tax Tree PNC account consisted of aggregated and commingled funds from 4,000 Instant Tax Service customers. Those funds were once briefly held in individual, taxpayer-specific accounts. Defendants then immediately told National Bank and Trust to aggregate all of the money from the 4,000 accounts into a single, general account at National Bank and Trust.  Defendants then commingled and aggregated those same funds a second time in Tax Tree's general PNC account.  Because Defendants had commingled all those funds, any third party looking at the account would just see millions of dollars, and would not be able to tell to whom the money belonged.  If Defendants, as required by the internal revenue laws, had left all customer funds in

the individual, taxpayer specific accounts, it would have been clear whose money was in each account. (Doc. 135 at 166:17-169:10).

473. Ogbazion was unaware of whether Defendants' practice of taking money out of the required individual, taxpayer-specific accounts, and aggregating and commingling those funds in Defendants' general account violated a specific statute of the Internal Revenue Code, 6695(f). (*Id.* at 53:17-56:10).

474. Although Ogbazion owns Tax Tree, a nationwide company that sets up bank accounts for customers and negotiates checks on behalf of customers throughout the country, he testified that he was unfamiliar with the text of the statute, I.R.C. Section 6695(f). (*Id.* at 169:17-171:19).

475. Ogbazion also claimed that DOJ gave Defendants permission to commingle customer funds into a general account. In fact, the preliminary injunction expressly states in Section VIII. B that Defendants are enjoined from "Violating 6695(f) and applicable regulations." In addition, as Ogbazion admitted at trial, the injunction expressly requires that Defendants must follow all applicable laws. (*Id.* at 169:17-171:19).

**DEFENDANTS' FAILURE TO OBTAIN REQUIRED LENDING LICENSES**

476. Ogbazion knew the Preliminary Injunction required Defendants to use a third-party lender if it wanted to market RALs to ITS customers, and that the third-party lender had to be licensed in every state that requires licensing. (Doc. 104 at 66:22-69:5).

143

477. The state of Indiana told Defendants' lender, GTP, that it must get a lender's license to offer RALs in Indiana this year.  Despite being told by Indiana that GTP needed a lender's license, GTP did not get a lender's license.  GTP determined, unilaterally and without approval from Indiana, that it did not need a lender's license.  GTP provided RALs to ITS customers in Indiana this year.  ITS did not ask the Department of Justice if GTP's unilateral interpretation of Indiana law was correct, or whether it would be permissible for ITS to market RALs in Indiana, despite Indiana's instruction.  ITS did not ask this Court whether GTP's unilateral interpretation was correct or whether Instant Tax Service could go ahead and market RALs in Indiana, despite Indiana's statement that GTP needed to be licensed.  (*Id.* at 66:22-69:5).

478. GTP filed a license application in California.  That application was delayed and was not approved until March.  March was after the bulk of Instant Tax Service's season was over.  Even though GTP's application was delayed, ITS decided to run a loan program on its own.  (*Id.* at 69:6-70:3; PX725).

479. ITS Financial called its California program a "rebate program."  Pursuant to ITS Financial's rebate program, ITS gave each customer $100 for coming in and getting their tax return prepared.  ITS actually ran the rebate program itself in California in 2013 and issued the "rebate" checks.  (Doc. 104 at 69:6-70:3; PX725).

480. Ogbazion claimed at trial that the rebate program was "vastly different" from Defendants' old ICL program because "rebates" were only available in increments of $100.  In addition, Ogbazion said it was different because the payee on the check was blank and was filled out at the store, there were fewer digits on the checks, the check was pre-printed at ITS Corporate and overnighted to California franchisees, and the customer had to bring in a W-2, instead of a paystub.  (Doc. 104 at 70:4-73:23).

481. Ogbazion acknowledged that the following features of the rebate program were the same as his old ICL program, which Defendants were enjoined from offering this year -- customers who received the rebate check could spend the $100 any way they chose; the customers who received the rebate checks did not pay any money upfront, and the rebate money was nonrecourse; and  $100 was one denomination that Defendants previously offered under their old ICL program. Most importantly, the money was given to customers for coming in and getting their tax return prepared – just as with Defendants' old ICL.  (*Id.* at 70:4-73:23).

482. Also material is the face of the "rebate" check (PX725), which shows "Instant Tax Service" in the top right corner, and lists the Corporate address for ITS Financial, in Beavercreek, OH.  The check signatory is Pete Samborsky, the CFO of ITS. (*Id.* at 70:4-73:23).

483. Ogbazion knew that under the preliminary injunction, Defendants were expressly enjoined from offering a loan program, except through a third party.  He also knew

145

that Defendants were enjoined from offering any refund "loan" or "advance" or similar product that is not a RAL, as defined in Section E of the preliminary injunction.  (*Id.* at 73:24-74:13).

484.   Ogbazion admitted at trial it was "possible" that some of his California franchisees treated the rebate program like a loan program.  When asked if some California franchisees, in fact, treated the rebate program like a loan program, Ogbazion said, "Not that I know of."  That testimony is not credible.  Ogbazion was shown a 2013 email exchange involving himself and a California franchisee. The franchisee told one of Ogbazion's employees:  "I need at least 1,000 rebate checks overnighted to my office.  I have about 500 prior clients coming in this week.  My average loan is two hundred to three hundred dollars per client."  The email was forwarded to Ogbazion.  Ogbazion admitted that he forwarded that email to another franchisee, and said in the forwarding email: "Hey, Buddy, can I have a few checks. One of my Zees in LA is out."  (*Id.* at 74:14-77:20).

485.   Ogbazion did not ask the Department of Justice whether ITS Financial's rebate program complied with the injunction.  Ogbazion did not tell the Department of Justice about the existence of ITS's rebate program until it was over, nor did he tell the Court.  (*Id.* at 78:2-15).

## DEFENDANTS' 2013 FAILURES ACCORDING
## TO THE BRADY WARE REPORT

486.  During the 2013 tax season, ITS was subject to a preliminary injunction order issued by this Court.  The preliminary injunction required ITS to retain an independent, third party to monitor ITS franchisees' compliance.  (Doc. 37 at 9).

487.  Brady Ware was retained to serve as the independent, third party monitor under the preliminary injunction.  (Doc. 116 at 242:2-9).

488.  Brady Ware is a public accounting firm that provides professional tax and audit accounting compliance services and advisory services to businesses.  (*Id.* at 240:14-16).

489.  Jim Kaiser, an accountant and director at Brady Ware, was the engagement partner for monitoring activities under the preliminary injunction.  As such, he had final responsibility for everything the firm did as part of its engagement as the third party monitor under the preliminary injunction.  (*Id.* at 242:10-22).

490.  Beginning on January 13, 2013, Brady Ware randomly selected Instant Tax Service customers who applied for Refund Anticipation Loans throughout the country.  It then examined the franchisees' records for those customers, looking for documents the franchisee was required to have before filing a tax return.  Brady Ware repeated this process on a weekly basis.  (PX743 at 1-2).

491.  Beginning on January 25, 2013, Brady Ware randomly selected ITS customers who did not apply for a Refund Anticipation Loan, but still had their returns filed by an ITS franchisee.  It then examined the franchisees' records for those

customers, looking for documents the franchisee was required to have before filing a tax return. Brady Ware repeated this process on a weekly basis. (*Id.*)

492. For each customer selected, Brady Ware looked for the following tax return data: (a) the existence of W-2 or Schedule C income or loss; (b) a copy of a W-2 for the customer if he or she had W-2 income, (c) supporting documentation for any income or loss reported on a Schedule C (d) a signed Form 8879, (e) a signed Authorization to File Form, (f) a signed Fee Disclosure Form, and (g) a TILA disclosure form if the customer applied for a Refund Anticipation Loan. (*Id.* at 2).

493. As required by the preliminary injunction, Brady Ware prepared a report reflecting its findings for each week in January that it performed this review. (Doc. 116 at 244:24-245:7).

494. These reports show, on a customer-by-customer basis for each week that was sampled, whether or not the required documents were present on the company's Crosslink software--the software used to transmit the customers' tax returns. (*Id.* at 251:8-13).

495. <u>Of those franchisees who were monitored by Brady Ware in January 2013, over 75 percent of them were non-compliant in some respect with the preliminary injunction's requirements for customers who applied for the RAL</u>. More than half of the franchisees were less than 90 percent compliant with the requirements regarding RAL customers. (*Id.* at 254:18-255:11; PX743 at 4).

496.  During that same period, nearly 70 percent failed to comply in some respect with the preliminary injunction's requirements regarding customers who did not apply for the RAL.  More than 60 percent of the franchisees were less than 90 percent compliant with the requirements regarding non-RAL customers.  (Doc. 116 at 255:12-15; PX743 at 4).

497.  Two franchisees had problems uploading documents to the Crosslink software in January in order for Brady Ware to monitor them.  Nevertheless, Brady Ware was able to examine the franchisees' compliance by having them e-mail the required documents to them.  Consequently, these franchisees were included in Brady Ware's report.  (Doc. 116 at 255:19-256:9).

498.  As required by the preliminary injunction, Brady Ware also prepared a report showing the results of its weekly monitoring from February 2013.  (*Id.* at 256:10-24; PX657).

499.  For those franchisees monitored in February, over 57 percent failed to comply with at least one of the preliminary injunction's requirements when a customer applied for a RAL.  For customers who did not apply for a RAL, more than 62 percent failed.  (Doc. 116 at 257:3-15; PX657 at 3).

500.  At trial, ITS Financial offered a report prepared by Patrick Rasey, the company's controller, which altered the findings from Brady Ware's reports.  To prepare this report, ITS "performed a second look at the [franchisees'] files in April and May of 2013."  (Doc. 133 at 142:18-143:14; DX95).

501. The "second look" report prepared by Rasey, unlike the reports prepared by Brady Ware, was not required by the preliminary injunction and was prepared by Defendants for purposes of litigation. (Doc. 133 at 141:12-142:17).

502. As the company's controller, Rasey had never before prepared a report such as the "second look" report. (*Id.* at 140:23-141:4).

503. The "second look" analysis, unlike the Brady Ware monitoring, was performed exclusively by ITS Financial employees - Anita Boynton and Amber Bennett. (*Id.* at 146:20-148:9).

504. Unlike the Brady Ware reports, the "second look" reports do not capture which documents the franchisees had at the time they filed a customer's tax return. Rather, Rasey's report purports to capture which documents the franchisees had in April or May - months after the returns were filed in January or February. (*Id.* at 143:15-144:8).

505. According to a company document, ITS was unable to keep "pace" with franchisees' paystub filing because, "[b]y the time we heard about situations where pay stub transmissions were made and were able to get out to do an audit, a W-2 may have since been attached to the return." Similarly, the "second look" report prepared by Rasey allowed franchisees time to find or create the necessary documents after filing. (*Id.* at 144:13-145:10; PX589 at 2).

506. Even according to the "second look" analysis, <u>less than half of franchisees fully complied with the preliminary injunction</u>. (Doc. 133 at 152:4-153:2).

507.    According to ITS, it was unsuccessful at monitoring its franchisees for two years

in a row - 2011 and 2012 - due to supposed problems with Crosslink.  In 2011,

ITS retained Brady Ware to examine franchisees' records using Crosslink.  Brady

Ware supposedly could not perform the work due to problems with Crosslink.  For

2012, ITS claimed the monitoring performed by Brady Ware under the

preliminary injunction was inaccurate, again supposedly due to problems with

Crosslink.  Defendants' assertions seeking to blame others for ITS Financial's

problems are simply not credible.  The Court finds that the results of the

unvarnished report by the independent third-party monitor, Brady Ware, which

was prepared contemporaneously with the filing of the tax returns that were being

reviewed, accurately reflects the conduct of ITS Financial's franchisees and

Defendants' inability or unwillingness to ensure compliance with the preliminary

injunction.  Defendants' "second look" report, prepared by ITS Financial

employees long after the filing of the tax returns that were being reviewed, and

after which the franchises would have had time to gather or fabricate the

documentation being monitored, does not accurately reflect the conduct of ITS

Financial's franchisees.  (*Id.* at 145:19-146:19).

508.    The results of the Brady Ware audits in January and February 2013 demonstrate

that Instant Tax Service remained incapable of meeting industry standards for tax-

return completeness - a very basic and fundamental compliance measure - despite

operating under a preliminary injunction and despite ITS Financial's use of the

Crosslink software. (Doc. 123 at 48-53; PX661 at 1-4; DX13 at 3; DX14 at 3)

### OTHER INSTANT TAX SERVICE FRANCHISEE INJUNCTIONS

509. An Instant Tax Service franchisee located in Chicago operates pursuant to the

terms of an injunction order tailored to that business and enforceable in the U.S.

District Court for the Northern District of Illinois. (DX87).

510. The monitor engaged to monitor the Chicago Instant Tax Service franchisee's

compliance with its permanent injunction conducted a very limited review of

customer files to determine the presence of supporting documentation. That

monitor's review did not involve monitoring any activities of Defendants in this

action. (Doc. 133 at 195:19-25; 201:21-202:5; 200:9-201:6).

511. Other Instant Tax Service franchisees have been fully enjoined. As a result of

injunction actions brought by the United States against Instant Tax Service

franchisees, the co-owner of a Las Vegas franchisee has been permanently barred

from having any involvement in the tax preparation business pursuant to an

injunction order in the U.S. District Court for Nevada. Another franchisee, David

Franklin and his company, Instant Refund Tax Service, are fully enjoined from

involvement in the tax preparation business under the terms of a preliminary

injunction in the U.S. District Court for Kansas. (Doc. 111 at 199:16-201:1;

DX89).

## DEFENDANTS' LOAN APPROVAL CRITERA (ECOA)

512. During the 2011 and 2012 tax filing seasons (for tax years 2010 and 2011, respectively), corporate officials at ITS Financial and Tax Tree maintained and applied a policy of automatically pre-denying all applicants for their ICL and RAL products (or similar products dubbed "advances") who were single males using a "head-of-household" tax filing status. These single male applicants automatically received only $10 or $50 and were ineligible to receive the higher loan amounts available to other customers. (*Compare* Doc. 1 at ¶ 52 *with* Doc. 11 at ¶ 52 (admitting existence of pre-denial policy); *see* Doc. 77 at 4 (same); PX241 (2011 filing season); PX382 at 1-4 (2012 filing season); PX402 at 1 (Ogbazion explaining that a law firm advised him to start calling the products "advances" rather than "loans"); PX404 (Ogbazion explaining the product name change to franchisees as resulting from "increased scrutiny" from "federal regulating authorities"); PX408 at 1 (Ogbazion explaining that a male head-of-household could not be given zero dollars because "[t]he commercial says everyone gets a check so I would be violating the Lanham Act for false advertising"); *see also* Doc. 103 at 8-9 (loans re-named "advances")).

513. There is no record evidence indicating that ITS Financial, Tax Tree, or any Instant Tax Service franchisees, disclosed this automatic, pre-denial policy to their male customers before they applied for the ICL or RAL. (PX579 at 3 (failing to mention not being a male head-of-household as a loan eligibility requirement)).

153

514.   Ogbazion admitted in his answer to the Government's complaint that Tax Tree "automatically pre-denies single males who file head-of-household" and that he personally participated in designing the pre-denial criteria.  (*Compare* Doc. 1 at ¶ 52 *with* Doc. 11 at ¶ 52).  Contemporaneous documents accord with that admission.  (PX241 (per Ogbazion, the corporate underwriting policy in the 2011 tax filing season was to give only $10 to "male HOH"); PX408 at 1).

515.   Similarly, in the Final Pretrial Order, Ogbazion admitted as uncontroverted facts that Tax Tree "automatically pre-denied single males who file head-of-household" and that Ogbazion "personally participated in the design of Tax Tree's pre-denial criteria."  (Doc. 77 at 4).

516.   Nevertheless, during his trial testimony, Ogbazion was evasive about whether the automatic pre-denials were actually denials and about his role in designing and implementing the pre-denial criteria.  (Doc. 104 at 3-5).

517.   In light of his prior admissions and the documentary evidence, Ogbazion's testimony regarding the pre-denial policy is not credible and is further evidence of his lack of candor with the Court.

518.   Patrick Rasey, the current Controller at ITS Financial, knew of and helped to implement the pre-denial policy for the ICL in December 2011.  (PX382 at 1-4 (distributing document stating that "[c]ustomers who have a filing status of head of household and are male are automatically declined[.] […] Declined customers receive a $50 ICL."); PX403 (changing a computer setting to ensure that a "male

HOH" received a "$50 denial" on an ICL application); PX407 at 1 (stating that "[a]ll denials will be for $50")).

519.  Since at least 2009, corporate officials at ITS Financial and Tax Tree maintained and applied a policy of preventing all active-duty members of the U.S. military and their dependents from receiving RALs.  (JX3 at 248; JX2 at 248, 284).

520.  During the 2013 tax filing season, Defendants and their RAL lender (GTP Financial LLC) maintained and applied a policy that prevented all active duty members of the U.S. military and their dependents from being eligible to apply for or receive RALs.  (DX4 at 4; Doc. 132 at 86-87).

521.  The RAL application form for the 2013 tax filing season includes a request for the applicant to identify whether he or she is an active-duty member of the U.S. Armed Forces or a dependent of a member.  The language in the notice preceding this request is taken from 32 C.F.R. § 232.5, which was promulgated by the Department of Defense to implement 10 U.S.C. § 987.  (DX4 at 4 ("Federal law provides important protections to active duty members of the Armed Forces and their dependents.  To ensure that these protections are provided to eligible applicants, we require that you indicate which one of the following statements is applicable.")).

522.  However, the remainder of this notice in the RAL application form contains language that is not from 32 C.F.R. § 232.5.  Specifically, the form states:  "In the case of a joint tax return, if either taxpayer is a member or dependent, check one of

the "I AM" boxes below, in which case neither filer is eligible to apply for or receive a Refund Anticipation Loan, regardless of whether either one or both are applying for a Refund Anticipation Loan." (*Id.*)

523. The use of language from 32 C.F.R. § 232.5 in the RAL application form suggests that Defendants and GTP Financial designed and offered a RAL product that excluded military members from eligibility in order to avoid the application of 10 U.S.C. § 987. That statute prohibits creditors from charging annual percentage rates (APRs) of interest greater than 36% on consumer credit extended to military members and their dependents. *See* 10 U.S.C. § 987(b); 32 C.F.R. § 232.3(b)(1) (applying statute to RALs); 72 Fed. Reg. 50580-01, 50582 (Aug. 31, 2007) (including RALs within definition of consumer credit upon finding that they "cost Service members and their families high fees" and that "the APR for this credit can be triple digit").

524. The use of language from 32 C.F.R. § 232.5 in the RAL application form, coupled with the exclusion of military members from RAL eligibility, together suggest that Defendants and GTP Financial knew that the APR for their RAL product was much higher than zero, even though Ogbazion and Rasey testified that the APR was zero for all customers in 2013. (Doc. 104 at 10-11; 14; Doc. 132 at 85-87).

525. During the 2011 and 2012 tax filing seasons, ITS Financial and Tax Tree had knowledge of the Ohio statute prohibiting discrimination against applicants for

credit because they notified their bank-product customers about that statute. (PX579 at 4).

526. During the 2013 tax filing season, ITS Financial, Tax Tree, and GTP Financial had knowledge of the Ohio statute prohibiting discrimination against applicants for credit because they notified their RAL customers about that statute.  (DX4 at 2; Doc. 132 at 86-87).

## DEFENDANTS' LOAN DISCLOSURES (TILA)

527. In the 2013 tax filing season (for tax year 2012), Instant Tax Service offered three "bank products" to their customers: a Refund Anticipation Loan (RAL), an Instant Refund Anticipation Loan (IRAL), and a Refund Transfer (RT).  (Doc. 132 at 72-73, 78).

528. A RAL is a loan that is provided to customers by a lender after their federal tax returns have been filed with and accepted by the IRS.  Customers can apply for RALs as soon as they receive their Forms W-2.  The loans are secured by the customers' tax refunds.  (Doc. 103 at 8; Doc. 132 at 76).

529. An IRAL is similar to a RAL except that the loan is provided to customers by a lender after they have received their Forms W-2 and had their tax returns completely prepared, but before they have filed their returns with the IRS.  (Doc. 132 at 77).

530. An RT is a product that allows customers to defer payment of their tax-preparation fees until they receive their tax refunds from the IRS.  As the RT processor, Tax

Tree: (a) provides RT customers with temporary bank accounts to receive their refunds; (b) disburses IRAL and RAL repayments, tax-preparation fees, and other fees from those accounts to the appropriate recipients; and (c) then remits the remainder to the customers. (Doc. 103 at 9; Doc. 132 at 68-69, 77-78, 84; Doc. 135 at 51-52).

531. The estimated length of the fee deferral from using an RT is 21 days. DX 3 at 1.

532. Only customers who choose to use an RT through Tax Tree can receive an IRAL or RAL because the repayment of the IRAL or RAL occurs through the Tax Tree processing system. (Doc. 132 at 78; Doc. 133 at 23, 28).

533. Any customers whose applications for RALs or IRALs were denied were automatically "flipped" into an RT and did not then have the choice to have their tax returns prepared elsewhere. (Doc. 103 at 49-50; Doc. 133 at 23-24; DX3 at 2; DX40 at 3).

534. Historically, and in the 2013 tax filing season, Instant Tax Service offered its bank products to individuals for personal, family, or household purposes. (Doc. 134 at 94 (ITS stores generally prepare tax returns for natural persons, not business entities); Doc. 103 at 9-10 (purpose of bank products is to get tax-preparation customers into stores); Doc. 102 at 40-43 (target customers are "working poor" who need money quickly for urgent personal needs and are thus more likely to apply for loans); JX2 at 13 (2011 Operations Manual stating that 90% of customers are early filers who need money quickly for urgent personal needs and

are thus more likely to apply for loans); Doc. 107 at 16-18, 36-40, 51-52, 61-62

(examples of customers who applied for loans or advances for personal, family, or

household purposes)).

535.    In terms of its economic substance, the RT is a loan (or an extension of credit)

because it involves an ITS franchisee allowing a customer to defer payment for

services rendered by the franchisee's employees (namely, tax-return preparation

and filing) until the time that the customer receives his or her tax refund.  The

amount of the loan (credit) is the fair market value of those services.  (Doc. 126 at

11-14; PX662 at 4-7).  The Court credits the expert testimony of Dr. Michael

Cragg, a professional economist who testified for the Government, with regard to

this issue.  Defendants offered no expert witness testimony on this issue.

536.    In terms of their economic substance, the IRAL and RAL are loans because they

involve two extensions of credit: (a) the lender allowing a customer to incur a debt

in the amount of the RAL or IRAL and defer its payment until the time that the

customer receives his or her tax refund, and (b) an ITS franchisee allowing a

customer to defer payment for services rendered by the franchisee's employees

(namely, tax return preparation and filing) until the time that the customer receives

his or her tax refund.  (Doc. 126 at 11-12; PX662 at 7-8).  The second extension of

credit stems from the fact that every IRAL or RAL transaction also involves an

RT.  (Doc. 132 at 77-78).  The Court credits the expert testimony of Dr. Cragg

with regard to why the IRAL and RAL are loans in terms of their economic

substance. Defendants offered no expert witness testimony on this issue.

537. GTP Financial LLC was the RAL and IRAL lender to ITS customers during the

2013 tax filing season. (*Id.* at 78). According to Rasey, GTP Financial approved

over 38,000 RAL applications in 2013. (*Id.* at 79-80; 133 at 21-23). Repayments

of RALs and IRALs were initially payable to GTP Financial. (DX 3 at 1 ("Your

[RAL or IRAL] will be deducted from the tax refund and paid to the third party

lender [...]"); DX4 at 1 ("If you are approved for a IRAL/RAL, you promise to

pay to GTP Financial the Amount Financed. . . .")).

538. In the 2013 tax filing season, all ITS customers paid tax-preparation, document-

preparation, and/or e-filing fees to the ITS franchisees at whose stores their returns

were prepared. (DX1 (fee disclosure form for bank-product customers listing

these fee types as "preparer fees"); DX2 (fee disclosure form for "e-file only"

customers listing these fee types as "preparer fees")). In turn, the franchisees paid,

on average, approximately 18% of those fees to ITS Financial as royalties. (Doc.

102 at 47).

539. In the 2013 tax filing season, Tax Tree charged ITS customers receiving any bank

products an "account" fee of $2 and a "processing" fee of $57. (*Id.* at 45-46; Doc.

133 at 27-28; DX1 (listing these as "other third party fees"); DX40 at 3).

540. In the 2013 tax filing season, ITS customers receiving any bank products also paid

a "technology" fee of $24.95 and a "transmission" fee of $17. (DX1 (listing these

as "other third party fees"); DX40 at 3).  Rasey claimed that those two fees were paid to Tax Tree.  (Doc. 132 at 85; Doc. 133 at 27).  But Ogbazion testified that those fees went to ITS Financial, the corporate franchisor.  (Doc. 102 at 46-48).

541.  Neither ITS Financial nor Tax Tree charged the account, processing, technology, or transmission fees to ITS customers who did not receive any bank products-that is, the so-called "e-file only" customers.  (Doc. 133 at 28; *compare* DX1 (fee list for bank-product customers) *with* DX2 (fee list for "e-file only" customers)).

542.  Therefore, "e-file only" customers only paid tax-preparation and/or e-filing fees to the ITS franchisees at whose stores their returns were prepared.  They paid those fees at the time that their returns were prepared and filed with the IRS because they did not use an RT to defer the payment of those fees to the franchisees.  (Doc. 133 at 28; Doc. 126 at 28-29; DX2; DX3 at 1-2; PX663 at 9).

543.  "E-file only" customers received their tax refunds via checks from the IRS or by direct deposits from the IRS into their pre-existing personal bank accounts.  Tax Tree did not establish temporary bank accounts or provide any services for "e-file only" customers.  (Doc. 132 at 84; Doc. 133 at 28; DX2; DX3 at 1).

544.  "E-file only" customers constituted only 2.9% of Instant Tax Service's total customers in the 2012 tax filing season (for tax year 2011), the last year for which Defendants provided such data.  (PX721).

545.  GTP Financial required ITS customers to use Tax Tree to process their tax refund, loan, and fee disbursals in order to obtain RALs or IRALs.  (DX40 at 1

("Processor will offer RTs to Participant's Customers, and Lender will offer IRALs and RALs to Participant's Customers that will be processed within Processor's RT Program."); DX40 at 3 ("Products and tax refunds shall be disbursed to Customers in accordance with the terms set forth in the bank product agreements executed by Customers. […] Upon receipt of the Customer's IRS tax refund, Processor will collect the aforementioned fees prior to disbursement to Participant, along with the amounts of any IRALs or RALs, and will disburse the appropriate payments to the appropriate party."); DX40 at 4 (exclusivity clause); DX3 (bank-product agreement to be executed by ITS customer); Doc. 132 at 78; Doc. 133 at 23, 28 (only Tax Tree RT customers can obtain RALs or IRALs from GTP Financial)).

546.    ITS franchisees required their customers who wished to use an RT to defer paying tax-preparation and e-filing fees to use Tax Tree to deduct those fees from their tax refunds and pay them to the franchisees.  (DX3 at 1-2).

547.    Upon receipt of a customer's tax refund, Tax Tree deducted from the refund the fees payable to the ITS franchisee for services rendered by the franchisee (*i.e.*, tax preparation and e-filing) and ensured that they were paid to the franchisee.  (Doc. 132 at 77-78; DX40 at 3 ("Participant's Tax Preparation fees and other fees set by Participant may vary.  Upon receipt of the Customer's IRS tax refund, Processor will collect the aforementioned fees prior to disbursement to Participant, along

with the amounts of any IRALs or RALs, and will disburse the appropriate payments to the appropriate party.")).

548. In the 2013 tax filing season, GTP Financial obtained the funds to provide RALs and IRALs to ITS customers by borrowing $22 million from an entity called Downtown Capital Partners. GTP Financial paid Downtown Capital $2.1 million in interest on this loan, and that interest was GTP Financial's largest expense. (Doc. 104 at 6-7).

549. In 2013, ITS Financial paid $2.85 million to GTP Financial in order to have a RAL program. ITS Financial obtained those funds from fees charged directly to ITS customers (*i.e.*, account, processing, technology, and/or transmission fees) and/or from royalties paid by ITS franchisees. Those royalties were a percentage of the tax-preparation fees that franchisees charged to ITS customers. (*Id.* at 7-9; Doc. 132 at 79).

550. The $2.85 million that ITS Financial paid to GTP Financial covered all of GTP Financial's expenses-including the $2.1 million in interest it paid to Downtown Capital-and also provided a profit to GTP Financial. (Doc. 104 at 9-10).

551. Based on a random sample, <u>ITS bank-product customers in January and February 2013 paid an average of over $550 in total fees</u>. (PX663 at 4-5). In contrast, for the last year for which Defendants made available such data (the 2012 tax filing season, for tax year 2011), ITS "e-file only" customers paid an average of $201.43 in total fees. (PX663 at 11; PX721).

552. This large difference of almost $350 in average fees is much greater than the additional $100 in explicit fees (*i.e.*, account, processing, technology, and transmission fees) paid to ITS Financial and/or Tax Tree by bank-product customers but not by "e-file only" customers.

553. The Court credits Dr. Cragg's explanation - which was not rebutted by any expert witness for Defendants - that the total fees paid by ITS bank-product customers in 2013 <u>included an embedded finance charge</u>, which ITS Financial used to pay the $2.85 million to GTP Financial, and which GTP Financial then used to pay the $2.1 million in interest to Downtown Capital Partners. (Doc. 126 at 43-45). ITS Financial collected this "hidden interest" through higher tax-preparation fees charged by franchisees to bank-product customers (which the franchisees then passed along to ITS Financial through royalty payments), and potentially also through explicit fees charged only to bank-product customers (e.g., technology and transmission fees). This embedded finance charge is reflected in the large difference in average fees paid by bank-product customers versus "e-file only" customers.

554. Dr. Cragg credibly explained that <u>changing the name or label given to a particular fee does not change its economic substance</u>. In other words, interest or other finance charges are still payments for the extension of credit - even if a party calls them something else - if they represent the economic cost of obtaining that credit. (*Id.* at 19-21, 28-29, 32-34, 45; PX663 at 9).

555. In e-mails regarding a potential RAL lender in October 2010, Ogbazion demonstrated both the knowledge and willingness to charge ITS customers interest disguised as a "fee" in order to avoid disclosing an APR of 480% to the customers and meeting state licensing requirements.  (Doc. 104 at 11-14; Doc. 126 at 47-40; PX496).

556. Similarly, ITS Financial admitted in a draft of its Operations Manual for a prior year that the company received "indirect" fees for its RALs because franchisees charged a "premium fee" for tax-preparation services.  (PX617 at 2).  In commenting on the draft, an ITS Financial official did not dispute the truth of that statement, but instead cautioned against actually saying it in the manual, because it would constitute an admission that the company was indirectly charging customers for RALs without proper disclosure.  (*Id.*)  ("As I mentioned in another chapter, there are many states that have RAL legislation and franchisees would have to apply for a broker license and comply with disclosure requirements.  It is much easier to say we simply charge tax preparation fees. […] You have to think about consumer protection statutes.").

557. Defendants have demonstrated a proclivity for naming and re-naming fees and products without regard to their economic substance.  (Doc. 103 at 8-9 (advances), Doc. 104 at 18-27 (rebates); PX364 at 4 (bank-product "application fees" used to provide return on investment to lender and to cover loan losses, not

to compensate for actual expense of processing applications); PX404 (check fees)).

558.     Using data samples collected by the court-appointed monitor Brady Ware & Schoenfeld (DX13 and DX14), Dr. Cragg calculated APRs for Instant Tax Service bank products sold in January 2013 that ranged from 367% to 2,326% (PX662 at 14 (Fig. 2 & 3)] and for those sold in February 2013 that ranged from 622% to 5,044%  (PX663 at 14) depending on the assumptions used.  (Doc. 126 at 18-31) (describing calculation method)).  The Court credits Dr. Cragg's calculations as accurate and as reflecting the economic cost of the credit extended through those bank products.  Defendants did not offer any expert testimony rebutting Dr. Cragg's APR calculations.

559.     The Court agrees with Dr. Cragg's assessment that the APRs for Instant Tax Service bank products in 2013 were extraordinarily high and far in excess of the rates charged for typical consumer credit.  (*Id.* at 10, 31-32).

560.     According to Ogbazion, Defendants and GTP Financial provided approximately 20,000 TILA disclosure forms to ITS customers during the 2013 tax filing season, and all of them showed an APR of zero and a finance charge of zero.  (Doc. 104 at 11, 14).  Rasey also testified that ITS Financial required its franchisees to provide TILA disclosure forms to all ITS customers who applied for RALs or IRALs in 2013, and that all of these forms showed an APR and a finance charge of zero. (Doc. 132 at 85-86).  But Rasey testified that nearly 40,000 ITS customers applied

for RALs from GTP Financial during the 2013 tax filing season, which is double the number of TILA disclosure forms cited by Ogbazion.  (*Id.* at 79-80; 156-58).

561.  Despite the zero APR listed on the TILA disclosure forms, the Tax Tree RT Agreement for the 2013 tax filing season concedes that both the RAL and the IRAL are "interest bearing loans."  (Doc. 126 at 34-37; DX3).  The Court rejects as not credible Rasey's testimony that the phrase "interest bearing loans" meant that the loans bore an interest rate of zero.  (Doc. 132 at 87-88).  An ordinary consumer reading the agreement would not interpret the phrase that way but would instead believe that the loan had a positive interest rate.  Rasey's interpretation is nonsensical because it results in a zero-interest loan being both an "interesting bearing loan" and a "non-interest bearing loan."

562.  The TILA disclosure forms provided to ITS customers who applied for RALs or IRALs during the 2013 tax filing season did not include a "total sale price" consisting of the total of the cash price of the tax-preparation services, additional charges, and the finance charge.  (DX4).

563.  There is no record evidence that, in the 2013 tax filing season, ITS Financial required its franchisees to provide TILA disclosure forms to their customers who only applied for an RT and not an IRAL or RAL.  (DX4 (TILA disclosure form only for IRAL and RAL applicants)).  Nor is there any record evidence that any franchisees actually provided TILA disclosure forms to "RT-only" customers.

564.    According to Rasey, historically, about one-third of ITS customers only apply for an RT and not any other type of bank product.  (Doc. 132 at 84).  ITS franchisees prepared about 70,000 tax returns in the 2013 tax filing season.  (Doc. 135 at 18).

## DEFENDANTS' HARM TO THE GOVERNMENT AND THE PUBLIC

565.    For the past three years, ITS has had about 150 franchisees each year.  In both 2011 and 2012, Instant Tax Service filed more than 110,000 tax returns each year.  The vast majority of the tax returns that Instant Tax Service filed were e-filed.  For most tax returns that Instant Tax Service prepares, customers also get an affiliated bank product of some kind.  In 2013, Instant Tax Service filed about 80,000 tax returns.   (Doc. 101 at 8:3-9:4).

566.    Defendants remain in a position where future violations will occur.  Absent an injunction, Defendants will continue to operate as a large tax-preparation franchisor with a national presence and with the same dishonest people who have caused the problems deliniated here.  The scope of the violations, and the potential for future violations, is substantial.

## DEFENDANTS' IMPACT ON ADMINISTRATION OF TAX LAWS

567.    The IRS has limited resources to monitor legal compliance among tax return preparers.  For example, there are roughly a million tax return preparers in the United States.  The IRS group responsible for enforcing compliance with the tax laws among preparers who prepare individuals' personal tax returns has fewer

than 5,000 revenue agents across the United States. (Doc. 106 at 219:18-25; 220:18-222:1; 223:7-23).

568. A key means the IRS employs to monitor compliance among tax return preparers who file returns electronically (a/k/a Electronic Return Originators or EROs) and are issued EFINs, such as Instant Tax Service store owners, is through ERO compliance visits. Due to limited government resources, these ERO compliance visits are typically conducted by less experienced IRS revenue agents to check for compliance with IRS regulations governing e-filing. These agents check for retention of required documents in customer files, such as signed Forms 8879 (customer authorization to e-file) and other signed customer authorization forms. (Doc. 106 at 223:24-224:19; 225:21-226:19; 227:7-228:8).

569. The IRS also has junior revenue agents conduct sight visits of tax return preparers to monitor compliance with regulations governing the Earned Income Tax Credit ("EITC") regulations - a refundable tax credit that low income individuals with qualifying income, including self-employment income from home businesses, are eligible to receive. The IRS conducts compliance checks specific to the EITC to ascertain if preparers are meeting due diligence requirements of the EITC. (Doc. 106 at 228:9-230:17).

570. The government attempts to conduct approximately 4,500 ERO and EITC compliance visits of tax return preparers each year, but does not have the resources to complete that many visits. (Doc. 106 at 230:18-231:1).

571.    Defendants' business centers upon actively obstructing these compliance visits, and thereby harming the government, by, as described above, assisting franchisees with preparation and use of fake W-2s, lying to IRS auditors, backdating/postdating tax forms, and forging customer signatures on required tax forms.  Defendants also interfere with the administration of the tax laws by permitting and encouraging illegal conduct at Instant Tax Service stores through their tolerance and willful blindness of improprieties.

572.    Defendants have also harmed the government when encouraging and facilitating paystub filing.  By instructing Instant Tax Service franchisees to obtain what are often incorrect EINs for paystub tax returns, Defendants substantially interfere with the administration of the federal tax laws, causing damage, expense, and delay.  Incorrect EINs may interfere with audits of employers whom Instant Tax Service incorrectly identifies as W-2 payors on paystub returns.  Detecting incorrect EIN numbers on paystub returns cannot be accomplished automatically, and instead requires significant man hours by the IRS.  (Doc. 109 at 83:23-87:15).

573.    Furthermore, Defendants actively undermine the IRS's essential tool for monitoring EROs-EFINs.  EFINs are a key mechanism for the IRS to enforce the tax laws because they are an essential means for the IRS to identify which preparers are preparing tax returns, to identify serial offenders of the tax laws, and to prevent repeated violations of the law through revocation or suspension of EFINs.  By trafficking in EFINs, assisting Instant Tax Service stores with

170

replacement of suspended EFINs, and instructing franchisees to include inaccurate

information on EFIN applications, Defendants substantially impede the

administration of the federal tax laws.  (Doc. 109 at 29:18-37:10).

574.   Moreover, Ogbazion has personally interfered with the administration of the tax

laws and harmed the government by willfully failing to pay ITS Financial's

employment taxes.  His willingness to do so, and his efforts to conceal corporate

funds in a secret account while doing so, further demonstrates that he is not a man

who can be trusted with the ownership and operation of a tax-preparation

franchisor.

## ESTIMATED ERROR RATE AND TAX HARM TO THE GOVERNMENT BY INSTANT TAX SERVICE

575.   The civil investigations of Instant Tax Service franchisees in Chicago, Las Vegas,

Kansas City/St. Louis, Indianapolis, and Los Angeles commenced as a result of

independent results from IRS compliance visits or PAC Audits of these

franchisees.  (Doc. 106 at 236:8-237:2).

576.   The IRS began its investigation of ITS Financial, TCA Financial, Tax Tree, and

Ogbazion as a result of common patterns of misconduct identified from the Instant

Tax Service franchisee investigations, including Schedule C abuses, improper and

fake W-2s, and erroneous filing statuses claimed on tax returns prepared by Instant

Tax Service stores across the United States.  (*Id.* at 234:18-236:7).

577.   The investigation of ITS Financial, TCA Financial, Tax Tree, and Ogbazion was

conducted by a team in the IRS Abusive Transactions Group ("ATAT Group"),

including that Group's director, Mark Stone, a lead revenue agent, and IRS Counsel.  Following referral of this case to the Department of Justice for possible civil injunctive action, attorneys from the Department of Justice, along with the IRS team, continued the investigation of defendants.  (*Id.* at 222:12-223:4, 233:20-234:17, 256:22-257:21).

578.  In order to determine if there was a pattern of misconduct at Instant Tax Service franchisees, the IRS' Small Business/Self-Employed ("SBSE") research group randomly selected a statistically valid sample of 238 customer tax returns from each franchise under investigation.  These returns were analyzed and of the 238 customers in each Instant Tax Service franchise, the IRS interviewed approximately 100 to 120.  (*Id.* at 237:22-239:3, 240:12-24, 242:5-15; PX647).

579.  Instant Tax Service customers selected for interview by the IRS were first contacted by letter which, among other things, informed the customer that the interview was voluntary and would not affect the customer's chance of being audited in the future.  This instruction was repeated to customers by IRS revenue agents during interviews.  (*Id.* at 242:16-244:1, 245:3-246:17; DX30; DX35).

580.  IRS interviews of randomly selected Instant Tax Service customers took place at the customers' residences, at IRS offices, or by telephone, depending on multiple factors, especially the convenience of the customer.  IRS managers instructed revenue agents, who are unarmed, not to conduct an interview at a customer's

home if he/she felt concerns about his/her safety. (Doc. 106 at 243:11-21, 244:2-21; Doc. 109 at 46:19-48:20).

581. The voluntary nature of the IRS interviews and instructions to Instant Tax Service customers that an interview would not affect their chances of being audited was critical to obtaining information from the customer without coercion or duress. (Doc. 106 at 245:3-247:9, 247:21-23; DX35).

582. Based on the random customer interviews (*i.e.*, excluding any non-random interviews of customers conducted during United States' investigations), there was a 50-70% error rate for tax returns prepared by Instant Tax Service franchisees in Chicago, Indianapolis, Kansas City/St. Louis, and Las Vegas. The IRS also extrapolated a dollar tax harm number of approximately $16 million for these franchisees (*i.e.*, excluding other Instant Tax Service franchisees across the country) for calendar year 2011, based upon common errors resulting in tax harm to the government. These errors include invalid Schedule C income, W-2 errors, as well as improper filing status, dependents and claims for education credits. (Doc. 106 at 249:11-250:5, 250:6-20, 250:21-251:8, 251:9-13, 252:9-18, 252:25-253:6; PX751 at 3).

583. Unlike an IRS audit, where taxpayers carry the burden of proving their claims for refund, the IRS' study to determine error rates and tax harm among Instant Tax Service franchisees gave customers the benefit-of-the-doubt. Customers were not required to substantiate what appeared on their tax return and, unlike an audit, if

173

they refused to cooperate with the IRS, the government did not count that customer in the error rate or projected tax harm. If the government's study has been conducted using the assumptions employed during IRS audits, the projected $16 million tax harm would likely have been higher. (Doc. 106 at 253:7-21, 254:18-255:25).

584. By administrative summonses, the IRS also sought the Instant Tax Service customer files of the 238 customers selected by IRS SBSE research for each Instant Tax Service franchise. After these customer files were received, the IRS examined the files to compare the documentation in them to disclosures made by Instant Tax Service customers who were interviewed by IRS revenue agents as part of the investigation. (*Id.* at 239:9-240:3, 241:11-242:4).

585. From a random sample of 480 tax returns prepared by ITS franchisees in 5 cities in the 2011 tax filing season, the IRS determined, from examining the franchisees' customer files, that numerous files contained insufficient documentation to claim the earned income tax credit, yet the credit was claimed anyway. The IRS determined that such improprieties could have resulted in a potential total tax harm to the government of over $1.4 million. (Doc. 120 at 132:23-139:4; PX 756).

586. The Court credits the expert testimony of Roy Nord (which was not rebutted by any expert testimony for Defendants) finding that the IRS research-group study of the tax harm caused by ITS franchisees in five cities for the 2011 tax filing season

was methodologically sound and statistically valid. (Doc. 115 at 195:14-199:21; PX 751; PX 732).

587. The sample of ITS customer returns examined as part of the IRS tax harm study was a statistically valid random sample. (Doc. 115 at 205:10-205:20).

588. The Court credits Nord's testimony (which was not rebutted by any expert witnesses called by Defendants) that, with 99% confidence, <u>the true value of the tax harm for 2011 across the five cities in the IRS study was in the range of $10 million to $25 million</u>. (*Id.* at 201:21-202:25; PX 732 at 8).

589. Out of the 108 ITS customers from Chicago who were interviewed by the IRS, Defendants identified three customers for whom they alleged the IRS overestimated the tax harm caused by ITS franchisees by a total of around $8,000. (*Id.* at 224:18-226:15; 231:24-233:23).

590. ITS Financial's encouragement and toleration of unreasonably high error rates for the completeness of tax returns prepared by its franchisees, along with its lack of centralized review of those returns before they were filed with the IRS, contributed to causing significant errors on those returns. These consequent errors included improper claims for the EITC, which was identified by the IRS as a major cause of the tax harm attributable to Instant Tax Service. (Doc. 123 at 15:22-22:33; Doc. 120 at 27:30-34:6).

## HARM TO DEFENDANTS' CUSTOMERS

591.   Defendants have harmed the public by marketing and selling fraudulent (indeed at
       times non-existent) loan programs to induce the public to have their tax returns
       prepared at Instant Tax Service.  In many instances customers did not agree to
       have Instant Tax Service prepare their returns, but Instant Tax Service (having
       obtained the customers' social security numbers and other sensitive financial
       information by way of deceptive loan or "rebate" offerings) went ahead and filed
       return anyway, locking those customers in to Instant Tax Service without their
       consent.  All this was done to enable ITS to charge exorbitant fees, with or without
       customer authorization.  Defendants also harm the public by promoting and
       facilitating the preparation and filing of  inaccurate tax returns, including paystub
       tax returns, which inevitably, in some instances, understate income and expose
       customers to resulting liabilities.

592.   Defendants' harm to the public encompasses not just their customers, but also
       parties who conduct business with them and are defrauded by them, including
       lenders and service providers.

593.   Defendants harm to the public is extensive and egregious, indeed appalling.  This
       is especially so given the nature of Instant Tax Service's core customer -- the
       working poor -- who are particularly vulnerable to Defendants' fraudulent
       practices.  Ogbazion, as the primary decision-maker and sole owner of all
       corporate Defendants, has consistently and systematically harmed the public for

years through fraudulent practices at his own Instant Tax Service stores, as well as

through his management over a fundamentally corrupt tax-preparation franchise

system with nationwide presence.

594. The fraud perpetrated by Instant Tax Service stores throughout the country against

the public would not have been possible without Defendants' direction,

instruction, aid, and assistance, and is likely to continue if Defendants are not

permanently barred from the tax-preparation business. Defendants cannot be

trusted to operate as an honest tax-preparation franchisor.

## II. CONCLUSIONS OF LAW

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1340 and 1345

and 26 U.S.C. (I.R.C.) § 7402(a). (Doc. 1 at ¶ 12; Doc. 11 at ¶ 12; Doc. 77 at 1).

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). (Doc. 1 at ¶ 13;

Doc. 11 at ¶ 13).

## RELIEF REQUESTED BY PLAINTIFF

3. The primary relief sought by Plaintiff is the entry of a permanent injunction under

I.R.C. § 7402(a) prohibiting all four Defendants (individually and through any

other name or entity) and their representatives, agents, servants, employees,

attorneys, and anyone in active concert or participation with them, from directly or

indirectly:

177

      a.      acting as federal tax return preparers or owning, operating, or working in a tax preparation business or franchisor;

      b.      supervising or managing federal tax return preparers;

      c.      assisting with or directing the preparation or filing of federal tax returns, amended returns, claims for refund, or other related documents, for any person or entity other than themselves; or

      d.      appearing as representatives on behalf of any person or organization whose tax liabilities are under examination or investigation by the IRS. (Doc. 1 at 35).

4.      The additional relief sought by Plaintiff is the entry of a permanent injunction under I.R.C. §§ 7402(a) and 7408 against all four Defendants (individually and through any other name or entity) and their representatives, agents, servants, employees, attorneys, and those persons in active concert or participation with them, from directly or indirectly:

      e.      engaging in conduct subject to penalty under I.R.C. § 6701; and

      f.      engaging in other conduct as further specified in the complaint.  (Doc. 1 at 35-37).

5.      The primary relief sought by Plaintiff would effectively preclude all four of the Defendants from engaging in the tax-preparation business in any capacity, including as the franchisor of separate franchisee companies that are engaged in tax preparation.  (*See* Docs. 44, 51, 53, 54.)

## INJUNCTIVE RELIEF IS NECESSARY
## AND APPROPRIATE UNDER I.R.C. § 7402

**A.      GENERAL LEGAL PRINCIPLES**

6.      Section 7402(a) of the Internal Revenue Code declares that courts can "make and

issue in civil actions […] orders of injunction […] orders appointing receivers, and

such other orders and processes […] as may be necessary or appropriate for the

enforcement of the internal revenue laws." I.R.C. § 7402(a). By its terms, the

statute allows for remedies "in addition to and not exclusive of any and all other

remedies of the United States." *Id.*

7.      "Section 7402 'encompasses a broad range of powers necessary to compel

compliance with the tax laws,' and provides the Court with the authority to fully

enjoin the operation of defendants' businesses." (Doc. 54 at 3) (quoting *United*

*States v. Ernst & Whinney*, 735 F.2d 1296, 1300 (11th Cir. 1984)).

8.      Section 7402 manifests a Congressional "intention to provide the district courts

with a full arsenal of powers to compel compliance with the internal revenue

laws." (*Id.* at 2) (quoting *Brody v. United States*, 243 F.2d 378, 384 (1st Cir.

1957) (citing *United States v. Gibson*, No. 08-14700, 2010 U.S. Dist. LEXIS

27831, at *10 (E.D. Mich. Mar. 24, 2010); *United States v. Brier*, No. 09-607-ML,

2010 U.S. Dist. LEXIS 121976, at *43-48 (D.R.I. Nov. 5, 2010))). This includes

issuance of injunctions as may be "necessary or appropriate for the enforcement of

the internal revenue laws." I.R.C. § 7402(a); *see United States v. First Nat'l City*

*Bank*, 379 U.S. 378, 380 (1965) (also discussing the importance of furthering the

"public interest" in connection with § 7402); *United States v. Hendrickson*, No. 07-1510, 2008 U.S. App. LEXIS 27988, at *5 (6th Cir. June 11, 2008)).

9.      Section 7402 "authorizes the fashioning of any appropriate remedy without enumerating the ways in which the revenue laws may be violated or their intent thwarted." (Doc. 53 at 2) (quoting *United States v. Bailey*, 789 F. Supp. 788 (N.D. Tex. 1992)); *see United States v. Kaun*, 633 F. Supp. 406, 409 (E.D. Wis. 1986), *aff'd on other grounds*, 827 F.2d 1144 (7th Cir. 1987) ("By its very terms, § 7402 authorizes the federal district courts to fashion appropriate, remedial relief designed to ensure compliance with both the spirit and the letter of the Internal Revenue laws-all without enumerating the many, particular methods by which these laws may be violated or their intent thwarted").

10.     District courts have the inherent power to issue injunctions. *See, e.g.*, *Wheeling-Pittsburgh Steel Corp. v. Mitsui & Co.*, 221 F.3d 924, 927 (6th Cir. 2000); *Matter of Warrant Authorizing Interception of Oral Communications within Premises Known as 165 Atwells Ave., Providence, R. I.,* 673 F.2d 5, 6-7 (1st Cir. 1982); *see also Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 539 (7th Cir. 2012); *Klay v. United Healthgroup, Inc*., 376 F.3d 1092, 1097 (11th Cir.2004).

11.     Section 7402, however, "goes beyond merely codifying a district court's general equity power to grant injunctions" and "gives the district courts a full range of powerful tools to ensure the enforcement of both the spirit and the letter of the internal revenue laws." (Doc. 53 at 2) (quoting *United States v. Moser*, No. CV-

05-00262 ACK-BMK, 2005 U.S. Dist. LEXIS 28256, at *15 (D. Haw. Oct. 17, 2005)).

12. Moreover, under Section 7402(a), "there need not be a showing that a party has violated a particular Internal Revenue Code section in order for an injunction to issue." (*Id.*); *see Ernst & Whinney*, 735 F.2d at 1300; *see also United States v. Ekblad*, 732 F.2d 562 (7th Cir. 1984). The statute has even "been relied upon to enjoin activities of third parties that encourage taxpayers to make fraudulent claims." *Ernst & Whinney*, 735 F.2d at 1300 (citing *United States v. Landsberger*, 692 F.2d 501 (8th Cir.1982)).

13. "Given this wide scope, Section 7402 grants district courts the authority to enjoin the operation of businesses that interfere with the administration of the Internal Revenue laws if such injunction is appropriate." (Doc. 53 at 2).[2]

14. "Congress has granted the courts broad power to issue orders necessary to enforce the internal revenue laws and prevent any conduct that interferes with administration of those laws, including the power to enjoin federal tax return

---

[2] *See Brier*, 2010 U.S. Dist. LEXIS 121976, at *43-48 (enjoining tax preparers and operation of numerous tax preparation businesses under § 7402); *Gibson*, 2010 U.S. Dist. LEXIS 27831, at *10, 15-16 (enjoining defendant and defendant's companies under § 7402(a) from preparing federal tax returns); *Ernst & Whinney*, 735 F.2d at 1300 (enjoining defendant pursuant to § 7402 from acting as a tax adviser); *United States v. Pugh*, 717 F. Supp. 2d 271, 300-303 (E.D.N.Y. 2010) (holding the "power to permanently enjoin defendants from acting as federal tax preparers falls within the authority granted to this court under I.R.C. § 7402(a)"); *United States v. Dove*, No. 1:10-cv-0060, 2010 U.S. Dist. LEXIS 141445, at *5-6 (N.D. Ill. Apr. 16, 2010) (enjoining defendant under § 7402 from "preparing federal income tax returns"); *United States v. Buddhu*, No. 3:08-cv-0074 (CFD), 2009 U.S. Dist. LEXIS 39882, at *15-16 (D. Conn. May 12, 2009) (enjoining defendants from preparing taxes under § 7402)).

preparers and those who aid and assist tax return preparers from continuing to operate."  (Doc. 53 at 8) (citing I.R.C. §§ 7402, 7408).

15.    Courts have separately analyzed and relied on § 7402 to enjoin companies and individuals under § 7402 who are involved in the operation of illicit tax preparation businesses, or who engage in conduct that interferes with the administration of the internal revenue laws from continued operation.  *Brier*, 2010 U.S. Dist. LEXIS 121976, at *43-48. [3]

16.    The availability of a permanent injunction under § 7407 does not preclude the grant of the same or a similar remedy under § 7402.  As stated by the Eleventh Circuit:  "Congress intended the tax preparer regulations to be cumulative. Section 7407(c) recognizes that the injunctive action against a tax preparer is meant to be 'separate and apart from any other action brought by the United States against such income tax preparer or any taxpayer.'  The intent that § 7407 be just one weapon in the arsenal against tax preparer abuses does not suggest any intent to deprive the IRS of power to regulate activities not covered by the tax preparer

---

[3] *See also United States  v. Jones*, No. 4:09-cv-00547-EJL, 2011 U.S. Dist. LEXIS 73987, at *23-25 (D. Idaho July 7, 2011) (finding defendant's "fraudulent activities are sufficiently egregious that a narrow injunction prohibiting only certain enjoinable activities is unlikely to prevent continued interference by [defendant] with the proper administration of the internal revenue laws," and enjoining defendants under § 7402 "from preparing tax returns for others"); *Pugh*, 717 F. Supp. 2d, at 300-303 (separately discussing § 7402 at length and expressly enjoining defendants under § 7402(a) from "acting as federal income tax preparers"); *United States v. Littrice*, No. 08 C 2432, 2011 U.S. Dist. LEXIS 89553, at *10 (N.D. Ill. Aug. 8, 2011) (separately enjoining individual and company defendants under § 7402 "from participating in tax return preparation for others"); *Dove*, 2010 U.S. Dist. LEXIS 141445, at *5-6 (separately enjoining defendant under § 7402 from preparing tax returns); and *United States v. Fernandez*, No. 6:04-CV-1772-Orl-31JGG, 2005 U.S. Dist. LEXIS 9757, at *10 (M.D. Fla. May 3, 2005) (separately enjoining defendant and her businesses under § 7402 from preparing taxes).

statutes." *Ernst & Whinney*, 735 F.2d at 1301 n.12.  The statute itself also makes this clear:  "The remedies hereby provided are *in addition to and not exclusive of any and all other remedies* of the United States in such courts or otherwise to enforce such laws."  I.R.C. § 7402(a) (emphasis added).[4]

17.   Based on the foregoing, the Court concludes that I.R.C. § 7402(a) provides the Court the authority to grant Plaintiff the relief it requests against Defendants.

## B.   DEFENDANTS HAVE REPEATEDLY VIOLATED THE TAX LAWS AND INTERFERED WITH THEIR ADMINISTRATION BY THE IRS

18.   The Court finds that, in conducting their business, Defendants have repeatedly engaged in serious misconduct warranting an injunction under I.R.C. § 7402.  This misconduct includes express violations of internal revenue laws, conduct that thwarts the spirit or intent of the internal revenue laws, and conduct that interferes with the administration of the internal revenue laws-any of which can warrant a permanent injunction.[5]

---

[4] *See also United States v. Benson*, 561 F.3d 718, 727 n.4 (7th Cir. 2009) ("Section 7402(a) makes clear that the remedies it provides 'are in addition to and not exclusive of any and all other remedies of the United States in such courts or otherwise to enforce' the tax laws."); *United States v. Hendrickson*, No. 07-1510, 2008 U.S. App. LEXIS 27988, at *5-6 (6th Cir. June 11, 2008) (holding that § 7402(a) "gives district courts the authority to grant injunctions 'necessary or appropriate for the enforcement of the internal revenue laws,'" and rejecting as "patently meritless" defendants' assertion that "the district court lacked jurisdiction in this case because another statutory provision, I.R.C. § 6201, authorizes and requires the Secretary of the Treasury to determine and assess taxes").

[5] *See Moser*, 2005 U.S. Dist. LEXIS 28256, at *15 (thwarting intent or spirit); *United States v. Kaun*, 633 F. Supp. 406, 409 (E.D. Wis. 1986), *aff'd on other grounds*, 827 F.2d 1144 (7th Cir. 1987) (same); *see also United States v. Watts*, No. 3:11–cv–00116–JEG–TJS, 2012 WL 763564, at *2 (S.D. Iowa Jan. 20, 2012) (interference with administration and enforcement); *United States v. Pugh*, 717 F. Supp. 2d 271, 300 (E.D.N.Y. 2010) (same); *United States v.*

19. Much of Defendants' misconduct implictes criminal statutes, illustrating the gravity of Defendants' offenses.

### i.     PREPARING OR PRESENTING FALSE TAX DOCUMENTS

20. Defendants have prepared false tax documents, filed false documents with the IRS, and encouraged others to do so.  Conduct of that type is the subject of criminal provisions in the Internal Revenue Code and other federal criminal statutes.  *See, e.g.*, I.R.C. § 7206(2) (willfully aiding or assisting in the preparation or presentation of materially false or fraudulent documents in connection with the tax laws); I.R.C. § 7212 (corruptly endeavoring to obstruct or impede tax law administration); 18 U.S.C. § 1001(a)(2) (knowingly and willfully making false statements in any matter within the jurisdiction of the executive branch).

21. Filing tax returns based only on paystubs rather than valid employer-issued IRS Forms W-2 inevitably results in errors and omissions on tax returns and thus the submission of false tax documents to the IRS.  Finding of Fact (FOF) ¶¶ 195-196.  Therefore, paystub filing is not some trivial infraction, as suggested by Defendants.  (Doc. 78 at 5-7).  Indeed, if practiced on a wide scale as Defendants instruct, encourage, and facilitate, paystub filing can seriously disrupt the operation of our federal tax system.  This is obviously problematic, as "taxes are the lifeblood of government."  *Bull v. United States,* 295 U.S. 247, at 259-260 (1935).

---

*Baisden*, No. 1:06-cv-1368 OWW TAG, 2007 WL 1087162, at *16 (E.D. Cal. Apr. 10, 2007)).

22. IRS instructions require that returns be filed based on information from a W-2 rather than a paystub. *See* IRS Publication 1345, Handbook for Authorized IRS e-file Providers of Individual Income Tax Returns, at 28 ("EROs must not electronically file individual income tax returns prior to receiving Forms W-2, W-2G or 1099-R."). ITS franchisees also declare, under penalty of perjury, that they will comply with all IRS publications governing tax preparation when they apply for an EFIN. (PX 647 at 2). A violation of IRS Publication 1345 in this context is deliberate and willful.

23. Defendants submitted false documents to the IRS when they operated corporate-owned stores and filed paystub returns and Defendant Ogbazion personally instructed employees at the corporate-owned stores to file paystub returns. (FOF ¶¶ 204-06).

24. After selling the corporate-owned stores, Defendants trained and encouraged their franchisees to file paystub returns to boost Defendants' profits from royalties. (FOF ¶¶ 212-64).

25. Defendant Ogbazion and other ITS Financial officials directed a paystub training session called the Stub Shop. (FOF ¶¶ 213-47). It is indisputable that ITS Financial and Ogbazion knew of franchisees' paystub filing practices, encouraged the practice, and made no significant effort to stop it.

26.   Defendants have also encouraged their franchisees to prepare false Forms 8879,

which tax return preparers must sign to certify that the returns they file comply

with IRS Publication 1345.  *See* IRS Form 8879, Part III.

27.   Furthermore, at ITS Financial's instruction, ITS tax preparers have had customers

sign Forms 8879 when they apply for loans in December, before they have their

W-2s.  (FOF ¶¶ 197, 286-94).  When customers sign the forms, they declare under

penalty of perjury that they have examined copies of their returns and

"accompanying schedules and statements" and that the return is "true, correct, and

complete."  *See* IRS Form 8879, Part II.  By instructing their franchisees to have

their customers prematurely sign the forms, Defendants assisted in preparing false

tax documents and potentially suborned perjury from ITS customers.

**ii.   FILING TAX RETURNS WITHOUT CUSTOMER
         AUTHORIZATION**

28.   Defendants have filed tax returns for customers without their permission and

encouraged their franchisees to do the same.  (FOF ¶¶ 314-18).  This contravenes

IRS instructions and the spirit and intent of the internal revenue laws.  *See* IRS

Publication 1345 at 26 ("[T]axpayers must sign and date the appropriate form

[8878 or 8879] before the ERO originates the electronic submission of the

return").

29.   When Defendants owned corporate stores, Defendant Ogbazion instructed

employees to file paystub returns without customer authorization.  (FOF ¶¶ 204,

314).  Defendants' customers were lead to believe that their returns were being

prepared as estimates for purposes of applying for a loan.  Defendants then intentionally filed those returns without their customers' knowledge or consent. (FOF ¶¶ 204-05).

30.    Defendants' franchisees have continued this practice, with Defendants' help. (FOF ¶¶ 315-18).  Defendants receive royalties of approximately 18% of the revenue generated from this fraudulent practice.  (FOF ¶ 345).

31.    Defendants' practice of filing paystub returns without customer authorization and encouraging franchisees to do the same stems from the marketing of fraudulent and deceptive Instant Cash Loans.  All of the customers who testified at trial went to an ITS store to apply for an Instant Cash Loan and ended up having a tax return filed without their consent.  (FOF ¶ 318(a)-(s)).

32.    In 2010, Defendants marketed Instant Cash Loans despite knowing that they could not offer them.  (FOF ¶¶ 84-108).  They did so because the false marketing was generating calls from customers.  (*See* PX 654[6]; PX 104[7]).

33.    Defendants have made other false or misleading representations regarding loans to attract tax return preparation customers.  For example, Defendant Ogbazion once intentionally ran an "instant denial" program in which his employees misrepresented to customers that they were applying for a loan with Republic

---

[6] "The ICL ad should stop on Sunday . . . This was a decision made here at corporate based on the number of calls that San Antonio had received."

[7] Decision made to continue running ads when an area developer said, "continue with the current run its generating phone calls."

Bank when, in fact, his employees did not even submit a loan application to the bank. (FOF ¶¶ 115-16). Similarly, in 2010, franchisees reported to ITS Financial employees, including Defendant Ogbazion, that they were running fake loan programs to get customers. (FOF ¶ 109, PX 128[8]; PX 108[9]).

34. No record evidence indicates that ITS Financial did anything to stop the fake loan programs run by the franchisees. When Defendant Ogbazion was told about one franchisee's fake loan program, he did not object and asked the franchisee only: "Hope you ready dude. Happy new year to you. What you doing tonight? Taxes hopefully." ITS Financial's general counsel also testified that the company did not investigate the sham loan programs these franchisees purported to run. (FOF ¶ 109).

### iii. OBSTRUCTING IRS ENFORCEMENT OF THE TAX LAWS

35. Defendants have also engaged in conduct to obstruct the IRS from enforcing and administering the internal revenue laws. Criminal provisions in the Internal Revenue Code may apply to such conduct. *See* I.R.C. § 7212 (corruptly endeavoring to obstruct or impede tax law administration).

36. For example, when Defendants owned tax-preparation stores, their employees altered customer files by fabricating Forms W-2 and forging customer names on

---

[8] "We ain't telling them shit. We told them come to our office and fill out application. If the denies. Which it will. Lol. We will give you 50 dollars off ur preparation fees. You see it still works . . . Most black folks used to getting denied so it won't come as a shock."

[9] "I think the word is getting out that everyone is getting denied. Yes, we've been doing fake bank apps and just denying everyone, fun."

Forms 8879. (FOF ¶¶ 286-95). They did so at Defendant Ogbazion's instruction and in anticipation of IRS compliance visits to cover up instances of filing paystub returns and filing returns without customer authorization. (*Id.*)

37. Defendants have also advised their franchisees to engage in the same practice to impede IRS enforcement of its e-filing rules. (FOF ¶¶ 296-309; *see* PX 523[10]; PX 490 at 2[11]).

38. Evidence of altered W-2s printed from the Drake software shows that franchisees have indeed engaged in the obstructive and dishonest practices that Defendants teach and encourage. (FOF ¶¶ 310-11; *see* PX 684).

39. Defendants have further impeded tax administration by assisting their franchisees in circumventing the enforcement of IRS rules governing the electronic filing of tax returns.

40. Participation in the IRS e-file program, including retention of an EFIN, is contingent on "adhere[nce] to all requirements of [IRS] revenue procedure and the publications and notices governing IRS e-file," including IRS Publications 1345 and 3112. *Brier*, 2010 WL 4510945, at *10; *see* IRS Revenue Procedure 2007-40; IRS Publication 1345 ("Handbook for Authorized IRS e-file Providers of Individual Income Tax Returns") (Rev. 03-2009); IRS Publication 3112 ("IRS e-

---

[10] Defendant Ogbazion: "[m]ake sure . . . all W2's are in the folder. Even if they're printed from Drake. I'm sure you'll have an IRS visit soon."

[11] Defendant Ogbazion: "Print W-2s from Drake if you don't have them."

file Application and Participation") (Rev. 05-2013); *see also* IRS Publication 3112 (Rev. 11-2004).

41. Defendant Ogbazion admitted that when he applied for EFINs using IRS Form 8633, he stated under penalty of perjury that he understood that acceptance in the IRS e-file program was not transferrable. Defendant Ogbazion then transferred EFINs to persons who were not listed on the EFIN applications that he signed. (FOF ¶¶ 158-62).

42. ITS Financial also advised its franchisees who were partnerships not to list their partners on Form 8633, even though the form requires the applicant, under penalty of perjury, to list all partners with a 5% or greater interest in such partnerships. (FOF ¶¶ 172-77). Through this practice, ITS Financial interfered with and obstructed the administration of federal tax laws and potentially suborned perjury from its franchisees.

43. ITS Financial also told its franchisees that the reason not to list partners on Form 8633 was that if the IRS denied the applicant's EFIN application, the applicant's partners would not be eligible to re-apply for two years. (*Id.*) As a result, Defendants impeded the IRS's ability to administer the application process for its e-file program.

44. Aiding or assisting others to replace EFINs in order to evade IRS EFIN suspensions substantially interferes with the proper administration of the internal revenue laws and constitutes fraudulent and deceptive conduct under I.R.C. §

190

7402(a). *Brier,* 2010 WL 4510945, at *10-11, 16-17 (issuing preliminary injunction barring operation of tax preparation business as a result of fraudulent conduct, including an "EFIN charades" or "EFIN roulette" in which defendants obtained multiple EFINs in an attempt to evade IRS suspensions).

45. Defendants have engaged in the same fraudulent conduct by encouraging and helping their franchisees to maintain back-up EFINs, borrow or share EFINs, and even create new entities to obtain new EFINs unlawfully in the event the IRS suspends one of their EFINs. (FOF ¶¶ 151-92; PX 506[12]; PX 514 at 4[13]).

46. The purpose of this misconduct was to circumvent the IRS's suspension of that franchisee's ability to file tax returns electronically. Defendants directly profited from the circumvention because it allowed Defendants to continue receiving royalties from the returns filed by that franchisee under the new EFIN.

47. Because Defendants' serious misconduct with respect to EFINs, as described above, involved obstructing the IRS's ability to administer and enforce its e-filing program, the Court rejects Defendants' characterization of these practices as mere "alleged improprieties." (Doc. 78 at 10).

### iv. WILLFULLY FAILING TO PAY OVER WITHHELD TAXES

48. The IRS assessed over $1 million in civil penalties under I.R.C. § 6672 against Defendant Ogbazion for willfully failing to pay over employment taxes owed by

---

[12] "I would work on getting some new EFIN's under a different entity's name for back up."

[13] "Our EFIN is still suspended effective immediately. We need an alternative EFIN to turn our 'world' right side up."

ITS Financial –taxes that had been withheld from the wages of ITS Financial

employees and belonged to Plaintiff, not ITS Financial. Defendant Ogbazion

knew that he had a legal duty to pay over these trust-fund taxes, but he chose to

use the withheld taxes to pay other corporate expenses instead. (FOF ¶¶ 57-65).

49. The Court finds that this was serious misconduct by Defendant Ogbazion.

Willfully failing to pay over employment taxes can be a federal crime. *See* I.R.C.

§ 7202.

50. In attempting to settle those penalty assessments, Defendant Ogbazion also

provided false information about his assets to the IRS, which is also a serious

transgression with potential criminal penalties. (FOF ¶¶ 65-74); *see* I.R.C.

§ 7206(2); 18 U.S.C. § 1001(a)(2).

### v. COMMINGLING OF TAXPAYER REFUNDS

51. Defendants' practice of commingling taxpayer refunds received from the IRS into

aggregated bank accounts holding the refunds of many thousands of customers

violated I.R.C. § 6695(f) and impeded the administration of the tax laws. (FOF ¶

469-75).

52. Section 6695(f) imposes a civil penalty on "[a]ny person who is a tax return

preparer who endorses or otherwise negotiates (directly or through an agent) any

check made in respect of the taxes imposed by this title which is issued to a

taxpayer (other than the tax return preparer)." However, the penalty "shall not

apply with respect to the deposit by a bank (within the meaning of section 581) of

192

the full amount of the check in the taxpayer's account in such bank for the benefit of the taxpayer."  I.R.C. § 6695(f).

53.   Tax Tree's process for aggregating many ITS customer tax refunds into large, non-taxpayer-specific bank accounts necessarily involves the negotiation of the customers' refund checks (or, equivalently, their electronic fund transfers from the IRS).  The statute contains an express exception for banks depositing refunds into taxpayer-specific accounts, which suggests that such deposits would otherwise be covered by the statute but for the exception.  In contrast, there is no explicit exception for non-bank payment processors such as Tax Tree or tax-preparation franchisors such as ITS Financial.

### vi.   OTHER FRAUDULENT AND MISLEADING COMMERCIAL PRACTICES

54.   In addition to conduct that violates the spirit or letter of the internal revenue laws or interferes with their administration, conduct that constitutes "fraudulent and misleading commercial practices" is also "subject to permanent enjoinment" under § 7402.  (Doc. 53 at 3).  The preponderance of evidence shows that Defendants have also engaged in other fraudulent and misleading commercial practices in operating their business.

55.   The most egregious of these practices was Defendant Ogbazion's causing an employee to forge ITS customer names on duplicate refund checks and then using those funds to pay operating expenses of ITS Financial.  (FOF ¶¶ 6-43).

56.    The fact that Defendant Ogbazion has repeatedly lied to various parties over the years about his purported reasons for the forgery raises serious questions about his honesty, even when under oath.  (FOF ¶¶ 44-56).  After considering the company's financial situation at the time, Defendant Ogbazion's use of the funds for corporate purposes, his failure to inform either of the relevant banks about the forgery, and credible trial testimony from another witness refuting his latest rationalization for his conduct, the Court has no choice but to conclude that Ogbazion lied at trial about causing the checks to be forged.  *Id.*

57.    Ogbazion's lack of candor with the Court on this issue is strong evidence that the Court cannot trust him to own and operate an honest, law-abiding tax preparation franchise going forward, even one operating under an injunction barring specified misconduct.

58.    Other fraudulent and misleading commercial practices by the Defendants over the years include:

    g.    falsely advertising loan products that did not exist (FOF ¶¶ 84-116);

    h.    deceiving customers into believing they had been denied for loan products, when in fact, the products did not exist (FOF ¶¶ 115, 109);

    i.    deceiving creditors about the ownership or extent of corporate assets (FOF ¶¶ 429-58);

    j.    charging and profiting from phony "service bureau fees" and other misleading "junk" fees (FOF ¶¶ 332-369); and

k.  encouraging and helping their franchisees to obfuscate the size of their fees (FOF ¶¶ 370-82).

59.  In sum, the Court finds that the repeated, widespread, and serious misconduct described herein poses a serious, continuing threat to the enforcement and administration of the internal revenue laws and is appropriately addressed through injunctive relief under I.R.C. § 7402

## C. THE COURT DRAWS AN ADVERSE INFERENCE FROM THE SILENCE OF KYLE WADE, ITS FINANCIAL'S FORMER VICE PRESIDENT OF FRANCHISE MARKETING

60.  Wade, a former ITS Financial vice president called as a witness by Plaintiff, asserted his Fifth Amendment right against self-incrimination in response to questions from Plaintiff. "The Fifth Amendment privilege not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution, but also privileges him not to answer questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *In re Morganroth*, 718 F.2d 161, 165 (6th Cir. 1983) (citing *Lefkowitz v. Turley*, 414 U.S. 70, 94 (1973)).

61.  "Before a witness . . . is entitled to remain silent, there must be a valid assertion of the Fifth Amendment privilege." *Id.* at 167. "A blanket assertion of the privilege by a witness is not sufficient […] and the privilege cannot be claimed in advance of the questions. The privilege must be asserted by a witness with respect to particular questions, and in each instance, the court must determine the propriety

of the refusal to testify." *Id.*[14]  Based on Wade's question-by-question assertion of the privilege, the Court finds he had reasonable cause to assert his privilege in response to each question.

62.    The trier of fact in a civil case may draw an adverse inference against a party for invoking his Fifth Amendment privilege. *Baxter v. Palmigiano*, 425 U.S. 308, 96 (1976).  Appellate courts have extended this principle to permit the finder of fact to draw an adverse inference against a civil litigant when a non-party former employee asserts his Fifth Amendment privilege. *Rad Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271 (3d Cir. 1986) (affirming jury verdict in which district court (1) admitted into evidence depositions of party's ex-employees who invoked their Fifth Amendment privilege, and (2) allowed the jury to draw an adverse inference from the ex-employees' silence).[15]

63.    Although Wade is not a party to this lawsuit, he is a former employee-the former VP of Marketing-for ITS Financial.  According to other documentary and testimonial evidence admitted at trial, Wade played a central role in training and

---

[14] *See also United States v. Highgate*, 521 F.3d 590, 594 (6th Cir. 2008) (referring to the Sixth Circuit's "general rule that a subpoenaed witness must take the stand and assert the privilege in response to particular questions"); *but see Davis v. Straub*, 430 F.3d 281, 288 (6th Cir. 2005) (holding that Supreme Court law does not require defense witnesses invoking the Fifth Amendment privilege to invoke the right on a question-by-question basis).

[15] *See also Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983) ("The fact that the invokers of the privilege are no longer employees of the defendant does not necessarily bar admittance of their refusals to testify as vicarious admissions of their former employer."); *see also Cerro Gordo Charity v. Fireman's Fund American Life Ins. Co.*, 819 F.2d 1471, 1481 -1482 (8th Cir. 1987) (affirming jury verdict in which non-party, non-member of plaintiff charitable trust was called to the stand solely to assert the Fifth Amendment and jury was allowed to draw adverse inference against plaintiff).

interacting with ITS franchisees, including conducting weekly conference calls, hosting the "Stub Shop" training, training new franchisees, and attending a Zee Advisory Council meeting. (FOF ¶¶ 4, 188-89, 213-53, 264, 273, 312, 381). Wade also encouraged franchisees to circumvent IRS suspensions by creating new EFINs and lied to IRS investigators regarding documents accessible during IRS compliance visits. (FOF ¶¶ 188-89, 312). All of these topics and functions played a central role in Plaintiff's case under I.R.C. § 7402.

64.     Because of the independent, corroborating record evidence of wrongdoing, and because Wade was a high-ranking executive of ITS Financial and corroborating evidence shows that, as an employee, he was involved in the wrongdoing alleged by Plaintiff, the Court draws an adverse inference against Defendants based on Wade's silence.

## D.     ABSENT AN INJUNCTION GRANTING THE RELIEF REQUESTED BY PLAINTIFF, DEFENDANTS' ILLICIT BEHAVIOR IS LIKELY TO RECUR

65.     Injunctive relief under I.R.C. § 7402(a) is appropriate if the defendant is "reasonably likely to violate the federal tax laws again." *United States v. Thompson*, 395 F. Supp. 2d 941, 945-46 (E.D. Cal. 2005) (citing *United States v. Harkins*, 355 F. Supp. 2d 1175, 1180 (D. Or. 2004); *United States v. Kaun*, 827 F.2d 1144, 1150 (7th Cir. 1987)).[16]

_____

[16] *See also United States v. Sperl*, No. 3:06–0175, 2008 WL 2699402, at *10 (M.D. Tenn. June 30, 2008) (injunctive relief is "appropriate pursuant to the Court's inherent equity powers and 26 U.S.C. § 7402(a) to prevent recurrence" of defendant's conduct); *United States v. The Joy*

66. In predicting the likelihood of future violations, a court must assess "the totality of the circumstances surrounding the defendant and his violations." *Thompson*, 395 F. Supp. 2d at 946 (citation omitted). Courts may consider factors such as: (1) the gravity of harm caused by the offense; (2) the extent of the defendant's participation and the defendant's degree of scienter; (3) the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve the defendant in such transaction; (4) the defendant's recognition of his or her own culpability; and (5) the sincerity of the defendant's assurances against future violations. *Id.*; *see also United States v. Hedgelender, LLC*, No. 1:10-cv-01054(TSE/IDD), 2011 WL 2686279, at *9-10 (E.D. Va. May 23, 2011) (citing *Abdo v. IRS*, 234 F. Supp. 2d 553, 564 (M.D.N.C. 2002), *aff'd*, 63 Fed. Appx. 163 (4th Cir. 2003)).

67. Based on its findings of fact and the totality of circumstances surrounding Defendants and their violations, the Court concludes that, absent the permanent injunctive relief requested by the Plaintiff, Defendants are reasonably likely to violate and interfere with the proper administration of the federal tax laws again. Thus, the injunctive relief requested by Plaintiff is necessary and appropriate under I.R.C. § 7402(a).

---

*Foundation*, No. Civ. 02-1069, 2002 WL 32082896, at *1 (C.D. Ill. October 18, 2002) (same).

68.   As described above, Defendants' repeated violations of, and interference with, the internal revenue laws over an extended time period have been serious offenses that have harmed not only Plaintiff but also Defendants' customers.

69.   As described above, many of these offenses have been knowingly caused by Defendants directly or caused by Defendants' franchisees with Defendants' knowledge.

70.   As Defendant Ogbazion is the sole owner and CEO of the defendant entities, there is a high likelihood that his position will allow him the opportunity to engage in the behavior in question again.

71.   The fundamental question forming the basis of the Court's "likelihood of recurrence" analysis is whether or not Defendant Ogbazion can be trusted to obey a limited injunction that allows him and ITS to remain in business with restrictions.  Based on the foregoing, the Court concludes that it cannot.  To summarize:

   a.   In 2006, Defendant Ogbazion personally instructed employees to file customer returns off of paystubs and without customer authorization.  He then personally instructed employees to manipulate customer files to prevent the IRS from detecting these actions.  (FOF ¶¶ 286-95).

   b.   In 2007, Defendant Ogbazion caused ITS employees to forge customer names to RAL checks and had the money deposited in corporate accounts.  The money was used for ITS Financial's business operations.  For years,

Defendant Ogbazion denied having forged the checks, lying to the defrauded customers and his employees. At trial in 2013, he admitted to falsely signing customer names to checks and depositing them into the company's payroll account, but then fabricated an additional story to justify the fraud. (FOF ¶¶ 6-56).

c.      In 2007, Defendant Ogbazion orchestrated an "instant denial" program for customers applying for loans at corporate-owned stores. (FOF ¶¶ 115-16).

d.      In 2009 (last two quarters of the year) and 2010 (first two quarters of the year), Defendant Ogbazion personally decided not to pay ITS Financial's employment taxes and chose to pay other creditors instead. (FOF ¶¶ 57-74).

e.      In 2010, when the company found itself in a precarious financial position, Defendant Ogbazion authorized running false loan advertisements to increase revenue and appease his franchisees. (FOF ¶¶ 84-116).

f.      Also in 2010, when the company was unable to offer loan products to its customers, Defendant Ogbazion engaged in false advertising and falsely assured ITS Financial employees and franchisees that the company would be able offer loans through Santa Barbara Bank and Trust, knowing that the bank had already refused to offer RALs to ITS Financial. (FOF ¶¶ 117-124).

g.  Again in 2010, Defendant Ogbazion learned of franchisees running fake loan programs and pretending to submit fake loan applications to banks and did nothing to stop it. (FOF ¶¶ 109(a)-(e)).

h.  Also in 2010, Defendant Ogbazion obstructed IRS civil law enforcement by encouraging franchisees to use fake W-2s to deceive IRS investigators. (FOF ¶ 296-304).

i.  In 2011, Defendant Ogbazion instructed an ITS vice president and franchisee to lie to an IRS agent regarding the information available to ITS franchisees from their tax-preparation software so that the IRS could not detect manipulation of customer files. (FOF ¶ 312).

j.  In 2011 and 2012, Defendant Ogbazion knowingly and personally encouraged franchisees to file returns based on paystubs. (FOF ¶¶ 254-63).

k.  Finally, also in 2011 and 2012, while the company was being pursued by creditors and ITS Financial's general counsel was negotiating to pay fractions of their debt to creditors, Defendant Ogbazion transferred company funds to a secret account without disclosing the existence of the account, or its balance, to the company's general counsel. (FOF ¶¶ 429-458).

72.  Given Defendants' passive admission that "mistakes were made" in the face of extensive evidence of serious misconduct, the Court finds Defendants have not truly recognized the full extent of their culpability.

73.    In light of this conduct, the Court cannot treat as sincere or credible Defendants'

promises to comply voluntarily with the law going forward, or to comply with an

injunction that permits Defendants to remain in business with restrictions.

Defendant Ogbazion, as the key decision maker for the company, has been the

driving force behind all of the conduct at issue in this case.  If Defendant

Ogbazion continues to run the company, similar violations of the law are likely.

Defendant Ogbazion has shown no willingness or ability to choose compliance

over financial survival or profitability.  Additionally, many of the violations at

issue in this case-filing paystub returns, filing without authorization, and deceiving

customers to generate business-are at the core of the company's and Defendant

Ogbazion's business model.  This business model is therefore also likely to give

rise to future violations.

74.    In support of the idea that their new compliance efforts will prevent further

wrongdoing, Defendants rely excessively on the fact that they have switched tax-

preparation software from Drake to Crosslink.  Most of Defendants' wrongdoing-

forging checks, running false advertisements, training franchisees to paystub file,

obstructing and encouraging others to obstruct the IRS, and lying and encouraging

others to lie to IRS employees-has nothing to do with tax-preparation software.

Even so, the evidence shows that Defendants could have, but never did, request

Drake to provide some of the features now available in Crosslink.  (FOF ¶¶ 400-

11).  Additionally, according to Defendants, Crosslink (or a failure by its users)

has frustrated ITS Financial's efforts to monitor its franchisees for the last two years. (FOF ¶ 516). There is no evidence that Defendants' switching of tax-preparation software will prevent recurrence of the conduct at issue in this case.

75. Defendants' new compliance program has also been instituted by Defendant Ogbazion. The compliance program, therefore, will only succeed to the extent Defendant Ogbazion wants or allows it to succeed. For the reasons stated above, the Court concludes that Defendant Ogbazion will not voluntarily regulate himself, his company, or the company's franchisees.

76. The Plaintiff's requested relief will shut down Defendants' business. The Court recognizes the significance of granting such relief. In light of the foregoing, however, the Court finds that Defendant Ogbazion would not be likely to comply with a conduct-specific injunction.

77. Additionally, reports by a neutral, third-party monitor appointed under the preliminary injunction show that a conduct-specific injunction will not suffice to curb the harm done to consumers and Plaintiff. (*See* PX 743, 657). The Court's preliminary injunction required ITS Financial to engage a neutral, third party monitor to examine whether or not ITS franchisees were, as the injunction required, scanning and saving W-2s, authorization-to-file forms, fee disclosure forms, and, when appropriate, documentation regarding any claims made on a Schedule C. (Doc. 37 at §§ II.E.3-6, VI.B, VII.A, IX). According to random samples of customer files for January and February of 2011 – the peak of ITS's

filing season - franchisees failed to produce all of these documents to the third party monitor more often than not.  (PX 743 at 4; PX 657 at 3).

78.  Defendants have also violated the preliminary injunction in during the course of the 2013 tax filing season.  These violations strongly demonstrate that Defendants are unlikely to abide by a permanent injunction that only prohibits or requires specific conduct and allows them to continue to operate in the tax-preparation business, as the preliminary injunction did.  Defendants' violations of the preliminary injunction are further evidence that, absent an order putting Defendants out of the tax business, Defendants' illicit behavior is likely to recur.

   **i.  DEFENDANTS' VIOLATIONS OF THE OHIO EQUAL CREDIT OPPORTUNITY ACT**

79.  The federal Equal Credit Opportunity Act (ECOA) prohibits creditors from discriminating against applicants in credit transactions on several bases, including sex and marital status.  15 U.S.C. § 1691(a)(1); *see* 12 C.F.R. §§ 202.1, 202.4(a).

80.  An individual may file a federal tax return as a "head of household" only if, among other requirements, he or she is not married at the end of the year.  I.R.C. §§ 2(b), 6012(a)(1)(A)(ii).

81.  In the Final Pretrial Order, with regard to Defendants' past loan programs, Defendant Ogbazion admitted that Tax Tree "automatically pre-denied single males who file head-of-household" and that Defendant Ogbazion "personally participated in the design of Tax Tree's pre-denial criteria."  (Doc. 77 at 4, ¶ 14).

82. The State of Ohio prohibits creditors from discriminating against applicants for credit on the basis of sex, marital status, or military status. Ohio Rev. Code Ann. § 4112.021(B)(1)(a). The statute also requires creditors to provide applicants with a specific notice regarding this Ohio law. *See id*. § 4112.021(B)(1)(g).

83. Remedial statutes such as the ECOA and its Ohio analogue are to be liberally interpreted in favor of the consumer. *Clemmer v. Key Bank, N.A.*, 539 F.3d 349, 353 (6th Cir. 2008) (provisions of the Consumer Credit Protection Act, 15 U.S.C. § 1601 et seq., which include the ECOA, 15 U.S.C. §§ 1691-1691f, the Truth in Lending Act, 15 U.S.C. §§ 1601-1667f, and the Electronic Funds Transfer Act, 15 U.S.C. §§ 1693-1693r, should be liberally construed); *Brothers v. First Leasing*, 724 F.2d 789, 793-94 (9th Cir. 1984) (regarding the ECOA); Ohio Rev. Code Ann. § 4112.08 ("This chapter shall be construed liberally for the accomplishment of its purposes. . . .").

84. For purposes of the ECOA, "credit" is broadly defined as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its [sic] payment or to purchase property or services and defer payment therefor." 15 U.S.C. § 1691a(d); *see also* 12 C.F.R. § 202.2(j). A finance charge is not necessary for a transaction to constitute "credit" under the ECOA. 12 C.F.R. Part 202, Supplement I (Official Staff Interpretations), § 202.2, ¶ 2(c)(2)(v), Comment 2(j). The definition of "credit" is substantially the same in the Ohio statute. *See* Ohio Rev. Code Ann. § 4112.021(A)(1).

85.    Defendants' ICL, IRAL, and RAL products (or similar products dubbed
       "advances") in the 2011 through 2013 tax filing seasons were "credit" for
       purposes of the ECOA and Ohio Rev. Code Ann. § 4112.021.  Defendants granted
       their customers the right to incur debts in the amount of the ICL, IRAL, or RAL
       and to defer their repayment until the customers received their tax refunds.  (PX
       579; DX 4; DX 40; JX1 at 226[17]; Doc. 132 at 72-73, 76-78).

86.    For purposes of the ECOA and the Ohio statute, a "creditor" includes not only any
       person who regularly extends credit but also any person who regularly arranges for
       the extension of credit.  15 U.S.C. § 1691a(e); Ohio Rev. Code Ann. §
       4112.021(A)(2).  The term also includes a person who, in the ordinary course of
       business, regularly participates in a credit decision (including setting the terms of
       the credit), regularly refers prospective applicants to creditors, or regularly selects
       or offers to select creditors to whom requests for credit may be made.  12 C.F.R.
       § 202.2(l); *see* 12 C.F.R. Part 202, Supplement I (Official Staff Interpretations),
       § 202.2, ¶ 2(l), Comments 1 and 2 (including all persons participating in credit
       decisions and, e.g., real estate brokers, automobile dealers, home builders, or
       home-improvement contractors who do not participate in credit decisions but do
       accept applications and refer applicants to creditors).

87.    During the 2011 and 2012 tax filing seasons, Defendants were creditors for
       purposes of the ECOA and Ohio Rev. Code Ann. § 4112.021 because they

---

[17] ITS Operations Manual calling the ICL "a loan" and the RAL a "seasonal credit
product."

regularly extended ICLs and RALs to customers, arranged for or selected Instant

Tax Service franchisees to extend ICLs to customers, and/or participated in setting

the terms for the ICLs and RALs (including the policy to deny the applications of

all male heads-of-households).  (*See* PX 364; PX 382; PX 579; Doc. 11 at ¶ 52;

Doc. 132 at 74-76).

88.     During the 2013 tax filing season, Defendants and GTP Financial were creditors

for purposes of Ohio Rev. Code Ann. § 4112.021 because GTP Financial regularly

extended RALs to customers and Defendants regularly arranged for that extension

of credit by selecting and contracting with GTP Financial to be the RAL lender for

Instant Tax Service franchisees.  (*See* DX 4; DX 40 at 1, 4-5; Doc. 132 at 76-79).

89.     For purposes of the ECOA, "discriminate" means "to treat an applicant less

favorably than other applicants."  12 C.F.R. § 202.2(n).  Under the ECOA,

disparate treatment of applicants on a prohibited basis is illegal whether or not it

results from a conscious intent to discriminate.  12 C.F.R. Part 202, Supplement I

(Official Staff Interpretations), § 202.4, ¶ 4(a), Comment 1.

90.     During the 2011 and 2012 tax filing seasons, Defendants unlawfully discriminated

against male head-of-household applicants for the ICL and RAL products, in

violation of 15 U.S.C. § 1691(a)(1) and Ohio Rev. Code Ann. § 4112.021(B)

(1)(a), by automatically denying their applications on the basis of their sex and

marital status.  The denials resulted in those single male applicants being

automatically ineligible for loan amounts above $50, while female applicants and married male applicants were eligible for loan amounts above $50.

91.   During the 2013 tax filing season, Defendants and GTP Financial unlawfully discriminated against active-duty members of the U.S. military and their dependents, in violation of Ohio Rev. Code Ann. § 4112.021(B)(1)(a), by offering a RAL product that such members and their dependents were not eligible to apply for or receive because of their military status.

92.   The Preliminary Injunction Order in this case prohibited Defendants from, among other things, offering any loan or refund advance product to their customers (either directly or through a third party) that violated any lending, tax, or consumer protection laws.  (Doc. 37 at § II.A).  The Preliminary Injunction Order also required Defendants' RAL program to comply with all applicable state laws where it was offered, including all lending and consumer protection laws.  (*Id*. at § II.E).

93.   Defendants' unlawful discrimination in violation of Ohio Rev. Code Ann. § 4112.021(B)(1)(a) during the 2013 tax filing season also represented a violation of the Preliminary Injunction Order.

94.   Defendants' inability or unwillingness to comply with the Preliminary Injunction Order suggests that they will be unable or unwilling to comply with the requirements of any permanent injunction that does not shut down ITS Financial and Tax Tree.

ii.     **DEFENDANTS' VIOLATIONS OF THE FEDERAL TRUTH IN
        LENDING ACT**

95.    The purpose of the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601-1667f, is to

       foster the informed use of credit by requiring meaningful disclosure of credit

       terms, thus revealing the full price of credit to the consumer.  *See* 15 U.S.C. §

       1601(a); *Cornist v. B.J.T. Auto Sales, Inc.*, 272 F.3d 322, 326 (6th Cir. 2001).

96.    As a remedial statute, the TILA should be liberally construed in favor of the

       consumer.  *Begala v. PNC Bank, Ohio, N.A.*, 163 F.3d 948, 950 (6th Cir. 1998).

97.    Because the TILA is a remedial statute, courts should focus on the economic

       substance, rather than the form, of the credit transactions at issue when applying

       the statute.[18]  A focus on economic substance is especially apt here, as courts

       apply a substance-over-form doctrine in federal tax law cases requiring them to

       "look past the labels the parties give to a structure to determine its economic

       reality."  *Edwards*, 148 F.3d at 436.[19]

98.    Because the titles of the Consumer Credit Protection Act (15 U.S.C. § 1601 et

       seq.) have a common purpose of consumer protection, courts may draw upon case

       law interpreting one title (e.g., the Equal Credit Opportunity Act (ECOA)) as

---

[18] *See, e.g.*, *Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 753-54 (7th Cir. 2000); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 436 (5th Cir. 1998); *Clark v. Rent-It Corp.*, 685 F.2d 245, 248 (8th Cir. 1982); *Turner v. E-Z Check Cashing of Cookeville, TN, Inc.*, 35 F. Supp. 2d 1042, 1047 (M.D. Tenn. 1999).

[19] *See, e.g.*, *Consolidated Edison Co. v. United States*, 703 F.3d 1367, 1374 (Fed. Cir. 2013); *AWG Leasing Trust v. United States*, 592 F. Supp. 2d 953, 975 (N.D. Ohio 2008).

persuasive authority when interpreting another title (e.g., the TILA).  *Clemmer v. Key Bank, N.A.*, 539 F.3d 349, 353 (6th Cir. 2008).

99.     Congress granted the Board of Governors of the Federal Reserve System the authority to issue regulations under the TILA, which the Board used in promulgating Regulation Z (12 C.F.R. Part 226).  In addition, entries in the Board's Official Staff Commentary interpreting Regulation Z (12 C.F.R. Part 226, Supplement I) generally warrant deference from courts unless they are demonstrably irrational.  *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 874, 882 (2011); *Begala*, 163 F.3d at 950.

100.    The TILA requires creditors to disclose various items for each consumer credit transaction they undertake, including the identity of the disclosing creditor, the amount financed, the finance charge, the annual percentage rate, and (for credit sales) the total sale price.  15 U.S.C. § 1638(a).

101.    For purposes of the TILA, "credit" means "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment."  15 U.S.C. § 1602(f).  Also, a "consumer credit transaction" is one in which "the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes."  15 U.S.C. § 1602(i).

102.    For purposes of the TILA, a "creditor" refers only to a person who both:

l.      regularly extends, whether in connection with loans, sales of property or

services, or otherwise, consumer credit which is payable by agreement

in more than four installments or for which the payment of a finance

charge is or may be required; and

m.     is the person to whom the debt arising from the consumer credit

transaction is initially payable on the face of the evidence of

indebtedness or, if there is no such evidence of indebtedness, by

agreement.  15 U.S.C. § 1602(g); *see also* 12 C.F.R. § 226.2(a)(17)(v)

(credit extended "regularly" if over 25 times in preceding or current

calendar year).

103.    The TILA applies to "credit sales" in which the seller of a good or service also

provides credit by allowing the consumer to defer payment for the good or service.

*See* 15 U.S.C. §§ 1602(g)(1), 1602(h), 1602(i), 1638(a)(7); 12 C.F.R. §

226.2(a)(9);  *Cornist*, 272 F.3d at 326 ("Through requiring relatively uniform

disclosures by sellers, TILA endeavors to enable consumers to evaluate credit

offers separately from the purchase of merchandise, and thereby to create an active

market providing more efficient credit prices.").  The application of the TILA to

credit sales is consistent with the ECOA, which also applies to credit sales.[20]

---

[20] *See* 15 U.S.C. § 1691a(d); *Mays v. Buckeye Rural Elec. Co-op., Inc.*, 277 F.3d 873,
876, 879 (6th Cir. 2002) (electricity service provider was a creditor under the ECOA); *Mick v.
Level Propane Gases, Inc.*, 183 F. Supp. 2d 1014, 1018-20 (S.D. Ohio 2000) (propane gas
supplier was a creditor under the ECOA); *see also* 12 C.F.R. Part 202, Supplement I (Official
Staff Interpretations), § 202.3, ¶ 3(c), Comment 1 ("If a service provider (such as a hospital,

104.    For credit sales, the "total sale price" required to be disclosed under the TILA is

the total of the cash price of the property or services, additional charges, and the

finance charge.  15 U.S.C. § 1638(a)(7); *see also* 12 C.F.R. § 226.18(j).

105.    The TILA defines a "finance charge" as follows in 15 U.S.C. § 1605(a):

Except as otherwise provided in this section, the amount of the finance
charge in connection with any consumer credit transaction shall be
determined as the sum of all charges, payable directly or indirectly by the
person to whom the credit is extended, and imposed directly or indirectly
by the creditor as an incident to the extension of credit.  The finance charge
does not include charges of a type payable in a comparable cash
transaction.  The finance charge shall not include fees and amounts
imposed by third party closing agents (including settlement agents,
attorneys, and escrow and title companies) if the creditor does not require
the imposition of the charges or the services provided and does not retain
the charges.  Examples of charges which are included in the finance charge
include any of the following types of charges which are applicable:
      (1) Interest, time price differential, and any amount payable under
          a point, discount, or other system or additional charges.
      (2) Service or carrying charge.
      (3) Loan fee, finder's fee, or similar charge.
      (4) Fee for an investigation or credit report.
      (5) Premium or other charge for any guarantee or insurance
          protecting the creditor against the obligor's default or other
          credit loss.
      (6) Borrower-paid mortgage broker fees, including fees paid
          directly to the broker or the lender (for delivery to the broker)
          whether such fees are paid in cash or financed.

106.    Regulation Z further defines a finance charge as "the cost of consumer credit as a

dollar amount.  It includes any charge payable directly or indirectly by the

consumer and imposed directly or indirectly by the creditor as an incident to or a

---

doctor, lawyer, or merchant) allows the client or customer to defer the payment of a bill, this
deferral of debt is credit for purposes of the regulation, even though there is no finance charge
and no agreement for payment in installments.").

condition of the extension of credit.  It does not include any charge of a type

payable in a comparable cash transaction."  12 C.F.R. § 226.4(a).  The Official

Board Commentary further explains: "Charges imposed uniformly in cash and

credit transactions are not finance charges.  In determining whether an item is a

finance charge, the creditor should compare the credit transaction in question with

a similar cash transaction.  A creditor financing the sale of property or services

may compare charges with those payable in a similar cash transaction by the seller

of the property or service."  12 C.F.R. Part 226, Supplement I (Official Staff

Interpretations), § 226.4, ¶ 4(a), Comment 1.

107.    Regulation Z further specifies that "[t]he finance charge includes fees and amounts

charged by someone other than the creditor, unless otherwise excluded under this

section, if the creditor (i) requires the use of a third party as a condition of or an

incident to the extension of credit, even if the customer can choose the third party,

or (ii) retains a portion of the third-party charge, to the extent of the portion

retained."  12 C.F.R. § 226.4(a)(1).

108.    Regulation Z also states that application fees charged to all applicants for credit,

whether or not credit is extended, are not finance charges.  12 C.F.R. § 226.4

(c)(1).  However, the Official Board Commentary notes that, in order to be

excluded from the finance charge, application fees must be used to recover the

costs associated with processing applications for credit, such as the costs of

obtaining credit reports, credit investigations, or appraisals.  12 C.F.R. Part 226, Supplement I (Official Staff Interpretations), § 226.4, ¶ 4(c)(1), Comment 1.

109. Regulation Z also states that charges for unanticipated late payments are not finance charges.  12 C.F.R. § 226.4(c)(2).

110. The Official Board Commentary to Regulation Z addresses RALs.  It notes that "[c]reditors may charge fees for RALs in addition to fees for filing the consumer's tax return electronically."  It also states:  "If the consumer is required to repay more than the amount borrowed, the difference is a finance charge unless excluded under [12 C.F.R]. § 226.4.  In addition, to the extent that any fees charged in connection with the loan (such as for filing the tax return electronically) exceed those fees for a comparable cash transaction (that is, filing the tax return electronically without a loan), the difference must be included in the finance charge."  12 C.F.R. Part 226, Supplement I (Official Staff Interpretations), § 226.17, ¶ 17(c)(1), Comment 17.

111. Under the TILA, Instant Tax Service's RT product offered in 2013 was a consumer credit transaction and a credit sale of services.  ITS franchisees were creditors because they regularly granted their RT customers the right to defer the payment of fees owed to the franchisees for the service of preparing and filing personal income tax returns for the customers.  Because the franchisees required the customers to use Tax Tree's payment-processing services in order to obtain the fee deferral (i.e., as a condition of or an incident to the extension of the credit), the

fees charged to the customers by Tax Tree were finance charges under 12 C.F.R. § 226.4(a)(1).

112. The RT was not a cash transaction under the TILA because it was a credit sale of tax-preparation services. The comparable cash transaction for an RT was an "e-file only" customer paying an ITS franchisee for return-preparation and return-filing services at the time those services were rendered. Therefore, the fees charged by Tax Tree for an RT were not of a type payable in a comparable cash transaction because Tax Tree did not provide its services (e.g., establishing temporary bank accounts) or charge its fees to "e-file only" customers.

113. Under the TILA, Instant Tax Service's RAL and IRAL products offered in 2013 were consumer credit transactions each consisting of two extensions of credit: (a) GTP Financial (a creditor) regularly granting ITS customers the right to incur debts in the amount of the RAL or IRAL owed to GTP Financial and to defer their payment until the time that the customers received their tax refunds, and (b) ITS franchisees regularly granting their customers the right to defer the payment of fees owed to the franchisees for the service of preparing and filing personal income tax returns for the customers. The second extension of credit stems from the fact that every IRAL or RAL transaction also involved an RT. Because GTP Financial required ITS customers to use Tax Tree's payment-processing services in order to obtain an IRAL or RAL (i.e., as a condition of or an incident to the

extension of the credit), the fees charged to customers by Tax Tree were finance charges under 12 C.F.R. § 226.4(a)(1).

114.  Because the RT was a credit sale of services and not a cash transaction, the RT cannot be a comparable cash transaction for an IRAL or RAL under the TILA.  An "e-file only" transaction was a comparable cash transaction for an IRAL or RAL because it did not involve either of the two extensions of credit inherent in an IRAL or RAL; yet, like an IRAL or RAL, it still involved the preparation and filing of tax returns for a fee.  Therefore, the fees charged by Tax Tree for an IRAL or RAL were not of a type payable in a comparable cash transaction because Tax Tree did not provide its services (e.g., establishing temporary bank accounts) or charge its fees to "e-file only" customers.

115.  The fees charged by Tax Tree were not for "unanticipated late payments" under 12 C.F.R. § 226.4(c)(2) because the very purpose of the RT was to allow customers to defer payment for their tax-preparation services until they received their tax refunds.  Thus, those payments were not "unanticipated" because all parties expected them to be paid after the tax-preparation services were provided.

116.  The bank products that Instant Tax Service offered in 2013 also involved a finance charge of "hidden" interest that was embedded in the fees and royalties collected by ITS Financial for payment to GTP Financial.  This additional finance charge is reflected in the large difference in average total fees paid by bank-product and "e-

216

file only" customers, as that difference cannot be accounted for solely by the fees charged by Tax Tree.

117. In *People v. JTH Tax, Inc.*, 151 Cal. Rptr. 3d 728, 732-40 (Cal. Ct. App. 2013), a state court of appeals affirmed the decision of the trial court, reached after a nine-day bench trial, that a nationwide tax-preparation franchisor (Liberty Tax Service) had violated the TILA by failing to disclose as a finance charge a "handling fee" that was imposed for a product similar to the RT called an Electronic Refund Check (ERC). The trial court had concluded that the handling fee was a finance charge because the customer had to pay it in order to defer payment of his or her tax-preparation fees. *Id*. at 736. The court of appeals rejected the franchisor's argument that the fee was not a finance charge because it was a fixed amount that was used to cover the cost of opening temporary bank accounts. *Id*. at 736-37. The court also rejected the franchisor's argument that the handling fee was imposed in comparable cash transactions because a small number of customers who did not defer their tax-preparation fees using an ERC also paid the handling fee. *Id*. at 737-739. This case is persuasive authority for the proposition that the RT is a consumer credit transaction rather than a cash transaction under the TILA and that the fees charged by Tax Tree to bank-product customers (but never to "e-file only" customers) are finance charges under the TILA.

118. In *Smith v. Intuit, Inc.*, Case No. 5:12-CV-222 EJD, 2012 WL 3945485 (N.D. Cal. Sept. 10, 2012), the district court dismissed without prejudice under Fed. R. Civ.

P. 12(b)(6) the plaintiffs' state-law claims against the maker of Turbo Tax software.  The plaintiffs claimed, in part, that the fee charged for a Turbo Tax bank product similar to the RT called a Refund Processing Option (RPO) was an undisclosed finance charge that violated California's RAL statute and usury laws. *Id*. at *1.  Based on the pleadings, the court found that the RPO was not a RAL because it was not a "loan" as defined by the applicable state statute, which required loans to involve the delivery of a "sum of money" and did not include credit sales for goods or services.  *Id*. at *2-3.  Hence, the state RAL statute was inapplicable to the RPO fee.  The court also found that California's usury statute did not apply to the RPO fee because that law did not cover fees charged in exchange for the deferral of payment on sales of goods or services-i.e., credit sales.  *Id*. at *4-6.

119.   *Intuit* is distinguishable from this case because that court was considering whether an RT-type product was a "loan" under state laws that did not treat credit sales of services as loans.  In contrast, the federal law at issue here (the TILA) unequivocally treats credit sales of services as credit transactions rather than cash transactions, so the holding in *Intuit* is inapposite.  In addition, to the extent that the *Intuit* court was commenting on the economic substance of an RT-type product, it was doing so without the aid of expert testimony by a professional economist, as that case was decided on a motion to dismiss.  Having had the benefit of such testimony from Dr. Cragg, which was not rebutted by any expert

testimony from Defendants, this Court is convinced that the RT was, in substance, a loan or an extension of credit under the TILA.

120. During the 2013 tax filing season, GTP Financial violated the TILA by providing ITS customers who applied for or received RALs or IRALs with disclosure forms that showed inaccurate amounts for the finance charge and annual percentage rate and that failed to disclose the total sale price. The true APRs and finance charges were not zero, as was shown on all of the disclosure forms provided to ITS customers.

121. During the 2013 tax filing season, ITS franchisees violated the TILA by failing to provide the required disclosures of the finance charge, annual percentage rate, amount financed, and total sale price to their customers who only applied for an RT rather than an IRAL or RAL.

122. The Preliminary Injunction Order in this case prohibited Defendants from, among other things: (a) offering any loan or refund advance product to their customers (either directly or through a third party) that violates any lending, tax, or consumer protection laws, or (b) misrepresenting the terms, loan amounts, eligibility, and fees or costs associated with any refund loan to any customer. (Doc. 37 at §§ II.A, II.C).

123. Defendants violated the Preliminary Injunction Order during the 2013 tax filing season by offering loan products (IRAL, RAL, and RT) through third parties (GTP

Financial and ITS franchisees) that violated the TILA and by misrepresenting the terms, loan amounts, fees, and costs of the products on the TILA disclosure forms.

124.  The Preliminary Injunction Order allowed Defendants to offer a RAL product but only if, among other things: (a) the RAL product complied with all federal laws, including the TILA, and (b) Defendants required their franchisees to provide accurate TILA disclosures to all RAL applicants, whether or not the TILA was applicable to the RAL program.  (*Id.* at § II.E).

125.  Defendants violated the Preliminary Injunction Order during the 2013 tax filing season by offering two RAL products (the RAL and IRAL) that did not comply with the TILA and by causing their franchisees to provide inaccurate TILA disclosures to all RAL and IRAL applicants.

126.  Defendants' inability or unwillingness to comply with the Preliminary Injunction Order suggests that they will be unable or unwilling to comply with the requirements of any permanent injunction order that does not shut down ITS Financial and Tax Tree.

**iii.  DEFENDANTS' VIOLATIONS OF STATE LENDER LICENSING LAWS**

127.  The Preliminary Injunction Order in this case prohibited Defendants from, among other things: (a) offering any loan or refund advance product to their customers (either directly or through a third party) that violated any lending, tax, or consumer protection laws, and (b) offering any refund loan or advance products that were not "RAL products" as defined in the order.  (*Id.* at §§ II.A, II.D).

128. The Preliminary Injunction Order allowed Defendants to offer a RAL product but only if, among other things: (a) Defendants offered the RAL product only through a genuine, third party lender, and (b) the RAL program fully complied with all applicable state laws where it was offered, including all licensing, lending, and consumer protection laws.  *Id.* at § II.E.

129. Defendants violated the Preliminary Injunction Order during the 2013 tax filing season by offering a RAL product through GTP Financial in the State of Indiana without GTP Financial obtaining a state lending license, despite receiving explicit instructions from an Indiana government official that GTP Financial was required to obtain such a license in order to offer the RAL in that state.

130. Again, Defendants' inability or unwillingness to comply with the Preliminary Injunction Order suggests that they will be unable or unwilling to comply with the requirements of any permanent injunction order that does not shut down ITS Financial and Tax Tree.

**D.    APPLICATION OF TRADITIONAL EQUITABLE FACTORS ALSO SUPPORTS GRANTING THE RELIEF REQUESTED BY THE PLAINTIFF**

131. To obtain a permanent injunction under I.R.C. § 7402, Plaintiff must meet the requirements of that statute - *i.e.*, a showing that an injunction is "necessary or appropriate for the enforcement of the internal revenue laws."  *See* I.R.C. § 7402(a).  Satisfying the traditional equitable standard for an injunction "is not necessary because an injunction issued pursuant to § 7402 derives from the court's

statutory authority, not its equitable powers." *United States v. Dykeman*, No. 09–CV–867, 2009 WL 3735535, at *2 (E.D. Wis. Nov 6., 2009).[21]

132.   Although the Court need not weigh the traditional equitable factors to issue a permanent injunction under IRC § 7402, doing so supports granting the relief requested by Plaintiff.

133.   Traditionally, "[a] plaintiff seeking a permanent injunction must demonstrate that it has suffered irreparable injury, there is no adequate remedy at law, 'that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted,' and that it is in the public's interest to issue the injunction." *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006)).

134.   None of the factors is dispositive, nor are the factors necessarily given equal weight.  Rather, the Court, exercising its discretion, balances the factors on a sliding scale.  *See Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996)

---

[21] *See also Atchison, Topeka & Santa Fe R.R. Co. v. Lennen*, 640 F.2d 255, 260-61 (10th Cir. 1981) (reversing district court denial of preliminary injunction authorized by statute and noting that "applying traditional equitable criteria to determine whether to grant or deny an injunction authorized by statute" may constitute an abuse of discretion); *cf. United States v. Miami Univ.*, 294 F.3d 797, 817 (6th Cir. 2002) (*dicta* acknowledging holdings in Eighth and Ninth Circuits in which statutes at issue expressly authorized injunctive relief, and consequently satisfaction of traditional equitable factors was unnecessary); *Thompson*, 395 F. Supp. 2d at 945 (E.D. Cal. 2005) (because § 7402 "grants the court injunctive power, the government need only show that an injunction is appropriate for the enforcement of the internal revenue laws, without reference to the traditional equitable factors."); *United States v. Fitzgerald,* 2008 WL 2203936, at *3 (D. Or. 2008) (same).  *But see United States v. Cruz*, 611 F.3d 880, 887 (11th Cir. 2010) (holding that it was not reversible error for district court to consider equitable factors); *Ernst & Whinney,* 735 F.2d at 1301 (noting that "the decision to issue an injunction under § 7402(a) is governed by the traditional factors shaping the district court's use of the equitable remedy").

("None of these factors, standing alone, is a prerequisite to (Preliminary injunctive] relief; rather, the court should balance them"); *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 701 (2010) ("Liability is . . . measured along a sliding scale: the greater the injury, the less probable that injury need be in order to tip the balance in favor of the injured plaintiff, rendering defendant liable for the injury").

135. The findings of fact amply demonstrate that irreparable harm to the public and Plaintiff will inevitably result if Defendants are not enjoined.  Defendants' conduct, stretching over multiple years and many cities across the country, has already caused serious harm to their primarily low-income customers.  These customers have been duped into applying for phony loans, had their tax returns prepared and filed in violation of IRS rules, had their returns filed without their permission, and have been charged exorbitant fees that Defendants intentionally obfuscate, pursuant to Defendants' business model.

136. The massive filing of paystub returns by Defendants' franchisees and Defendants' considerable efforts to stop the IRS from discovering that very wrongdoing that they encouraged has also inevitably resulted in inaccurate tax-return filings and enormous administrative difficulties for the IRS that harm the public, the administration of our tax system, and Plaintiff.

137. "Because § 7402(a) explicitly provides that an order of injunction is 'in addition to and not exclusive of' other remedies for enforcing the tax laws, the United States

223

need not establish that it has no adequate remedy at law for an injunction under § 7402." *United States v. Rivera*, No. CV03–2520GHK(JWJX), 2003 WL 22429482, at *8 (C.D. Cal. July 18, 2003).[22]

138. Regardless, the Court finds that Plaintiff lacks alternative, adequate legal remedies here. The evidence shows that Defendants have engaged in and encouraged obstructionist tactics to thwart Plaintiff's usual civil law enforcement efforts. Defendants' conduct in helping to circumvent the IRS's suspension of its franchisees EFINs is but one example.

139. The balance of hardships also warrants relief. A permanent injunction would require Defendant Ogbazion, and perhaps his few remaining corporate employees, to find new work. But that hardship, though real, pales in comparison to the years of hardship the public has already endured, and would continue to endure, as well as the myriad harms to the United States, including interference with the administration of the tax laws to the tax harm posed by ITS's franchisees who engage in paystub filing and other violations if Defendants continue to operate.[23]

---

[22] To require otherwise would negate the statute's express language. *See United States v. Molen,* 2003 WL 23190606, at *3 (E.D. Cal. 2003) (acknowledging that, "[i]f an adequate remedy at law was sufficient to deny an injunction to the United States in tax matters, [the last sentence of § 7402(a)] would be rendered superfluous – and that is not something to be done lightly," but still finding that legal remedies would be inadequate).

[23] *See, e.g.*, *United States v. Buddhu*, No. 3:08–cv–0074 (CFD), 2009 WL 1346607, at *5 (D. Conn. May 12, 2009) ("While the [defendants] will be denied the right to earn a livelihood preparing income tax returns, the harm to them is substantially outweighed by the harm to which their clients are subjected by having fraudulent tax returns prepared in their names"); *Pugh,* 717 F. Supp. 2d at 302 (entering permanent injunction because "[t]he defendants' activities undermine public confidence in the fairness of the federal tax system and . . . a permanent

Upon the evidence presented at trial, the Court also cannot credit Defendant Ogbazion's promise to police his business independently.  Accordingly, only the full relief requested can prevent the hardship that will inevitably flow to Plaintiff and to the public.

140.	The public interest strongly favors a permanent injunction.  "The public interest is served by maintaining the integrity of the federal tax system and insuring that proper taxes are collected.  The public interest is also served when fraudulent and misleading commercial practices are stopped."  (Doc. 53 at 3) (internal citations omitted).  Defendants' conduct harms the public, particularly the working poor and minority customers they target.  The evidence presented at trial reflected a history of fraudulent and misleading business practices that harm consumers.  These practices also harm honest tax return preparers who follow the law, and are harmed by ITS's fraudulent and deceptive practices, which lock in customers and prevent them from going elsewhere.  Finally, the wrongs committed by Defendants, which the IRS has been unable to stop through its own resources, undermines the public's confidence in the integrity of the federal tax system.

## INJUNCTIVE RELIEF IS WARRANTED UNDER I.R.C. § 7408

141.	I.R.C. § 7408 empowers courts "to enjoin any person from further engaging in specified conduct," including acts "subject to penalty under section 6701" of the Internal Revenue Code, if a defendant has engaged in such conduct and

---

injunction will prevent taxpayers from having inaccurate, frivolous or fraudulent returns filed in their name that would subject them to liability for overdue taxes, penalties and interest").

"injunctive relief is appropriate to prevent recurrence of such conduct."  I.R.C.

§ 7408(a)-(c).

142.  I.R.C. § 6701 imposes penalties on any person who: (1) "aids or assists in,

procures or advises with respect to, the preparation or presentation of any portion

or a return, affidavit, claim, or other document"; (2) "knows (or has reason to

believe) that such portion will be used in connection with any material matter

arising under the internal revenue laws"; and (3) "knows that such portion (if so

used) would result in an understatement of the liability for tax of another person."

I.R.C. § 6701(a).

143.  Although Defendant Ogbazion operated tax preparation stores in the past, and all

parties submit as uncontroverted fact that TCA Financial owned tax preparation

stores as recently as April 30, 2013, whether Defendants qualify as tax return

preparers as a matter of law is irrelevant to determining whether they violated

§ 6701 and are subject to injunction under § 7408.  The purpose of § 6701 is to

penalize anyone, not just tax return preparers, "who aid others in the fraudulent

underpayment of their tax" and "lead" others "into fraudulent conduct."  (Doc. 53

at 4) (citing *Mullikin v. United States*, 952 F.2d 920, 928 (6th Cir. 1991)).

144.  Under § 6701(a)(1), "aid," "assistance," and "advice" by non-preparers includes

training or instructing others to illegally understate income, as well as recruiting

customers, delivering customer information to return preparers, and disseminating

tax refunds with the knowledge that understatement of income or fraudulent tax

refunds will result. (Doc. 53 at 4) (citing *United States v. Preiss*, No. 1:07CV00589, 2008 WL 2413895, at *5 (M.D.N.C. June 11, 2008) (issuing injunction under § 7408 for § 6701 violations by individual who recruited customers, distributed refunds, and provided other aid and assistance, but was not directly involved in preparing fraudulent tax returns); *United States v. Hansen*, No. 05cv0921-L (CAB), 2006 WL 4075446, at *11 (S.D. Cal. Dec. 13, 2006), *aff'd*, 277 Fed. Appx. 629 (9th Cir. 2008) (finding § 6701 violation and granting § 7408 injunction for aiding and assisting others to prepare returns that understate tax liability by providing sample tax returns and instructions on a website)).

145. Based on the findings of fact, the Court concludes that Defendants have provided aid, assistance, and advice to others in the preparation of tax returns that they knew, or had reason to believe, if used when preparing tax returns for customers, would result in understatement of tax liabilities on those customers' tax returns, by:

    (a)    Holding training sessions for their franchisees and ITS Financial area developers, with Defendant Ogbazion's knowledge, to prepare and file tax returns based on paystubs, including the November 2008 "Stub Shop" at which ITS Financial trainers noted that paystub returns can cause customers to "reciev[e] [a] bill from [the] IRS" from the resulting understatement of income (PX20 at 9; FOF ¶ 213-47);

(b)     Instructing their franchisees how to back-date documents and change dates in computers used to prepare paystub returns in order to conceal the practice from federal investigators (FOF ¶¶ 273-76);

(c)     Instructing their franchisees how to create fake W-2s to place in customer files, as well as to dispose of paystubs used to prepare and file tax returns, in order to conceal the practice of paystub filing from the IRS (FOF ¶¶ 277-311);

(d)     Holding off-the-record conference calls with select franchisees to ensure that they did not file too many paystub returns and attract attention from federal authorities (FOF ¶¶ 265-67);

(e)     Assisting their franchisees whose EFINs were suspended for paystub filing with setting up back-up EFINs, so that the franchisees could circumvent the IRS suspension and continue filing on paystubs (FOF ¶¶ 178-92);

(f)     Acknowledging that franchisees file on paystubs, knowing that the practice is prohibited by IRS Publication 1345, but advising franchisees that it is commercially necessary, and instructing them to inform customers that the customers are liable for resulting understatements of income, which Defendants know inevitably result from paystub filing (FOF ¶¶ 195-96, 248-72); and

(g)    Aiding, assisting, and, in many instances, controlling the process that allows for paystub filing-from advertising to dissemination of tax refunds from bank accounts controlled by Defendants.

146.    Preparing any document, not just tax forms, may qualify as conduct subject to penalties under § 6701 and an injunction under § 7408.  (Doc. 53 at 4). Documents that may constitute aid, assistance, or advice to others subject to penalty under § 6701 include advertisements, draft correspondence to the IRS, and written instructions to others, such as in marketing and training materials.  *Id.* (citing *United States v. Conces*, No. 1:05-CV-739, 2006 WL 1402198, at *3 (W.D. Mich. Apr. 24, 2006) (promotional materials and "fill-in-the blanks" letters to the IRS for use in tax evasion scheme violated § 6701 and justified injunction under § 7408); *United States v. Kotmair*, No. WMN–05–1297, 2006 WL 4846388, at *6 (D. Md. Nov. 29, 2006) (draft correspondence in violation of § 6701 identified as the basis for § 7408 injunction); *United States v. Cohen*, No. C04-0332P, 2005 WL 1491978, at *5 (W.D. Wash. May 13, 2005) (finding that promotional materials, in connection with tax fraud products sold online, violated § 6701 and warranted a § 7408 injunction)).

147.    Based on the findings of fact, the Court concludes that Defendants prepared documents that constitute aid, assistance, or advice to others in violation of § 6701, and that Defendants knew, or had reason to believe, that the documents, if

used when preparing tax returns for customers, would result in understatements of tax liabilities for those customers, including:

(a)    Training materials, such as the Stub Shop PowerPoint presentation and accompanying fill-in-the-blanks training materials (e.g., PX 430), which instruct others how to prepare paystub returns;

(b)    Advertisements used to lure customers into Instant Tax Service stores to have paystub returns prepared and filed; and

(c)    Written guidance to avoid IRS reject codes for e-filed tax returns based on paystubs (e.g., PX 594).

148.    Violation of I.R.C. § 6701 includes "ordering (or otherwise causing) a subordinate to do an act, and knowing of, and not attempting to prevent, participation by a subordinate in an act."  I.R.C. § 6701(c)(1).  Under I.R.C. § 6701, "'subordinate' means any other person (whether or not a director, officer, employee, or agent of the taxpayer involved) over whose activities the person has direction, supervision, or control."  I.R.C. § 6701(c)(2).

149.    Based on the findings of fact, the Court concludes that under § 6701(c), Defendants ordered or caused subordinates to commit, or failed to attempt to prevent participation by subordinates in, acts that violated § 6701 that Defendants knew, or had reason to know, would result in an understatement of tax liability, including the following:

(a)     Officers, employees, and independent contractors of ITS Financial

providing aid, assistance, or advice to franchisees regarding paystub filing

(FOF ¶¶ 193-276);

(b)     Defendant Ogbazion instructing employees of corporate-owned stores to

file paystub returns that were prepared for pre-season loans, including tax

returns filed without customer authorization (FOF ¶¶ 204-08); and

(c)     ITS Financial's failure to attempt to prevent paystub filing among its

franchisees when ITS Financial: (i) knew that paystub filing had occurred,

including notice through customer complaints and franchisee admissions

regarding the practice, and (ii) had the ability under its franchise

agreements to audit Instant Tax Service stores, as well as to discipline or

terminate franchisees caught paystub filing, but did not do so and instead

encouraged the practice.  (FOF ¶¶ 248-311).

150.    The large scale filing of paystub returns inevitably leads to the filing of returns

that understate a taxpayer's liability, in addition to inevitably resulting in the

submission of a false document to the IRS.

151.    An injunction under I.R.C. § 7408 for § 6701 violations is a "fact sensitive

determination," including whether "future violations could conceivably be

anticipated given Defendants' occupation, as they remain franchisors and admit to

providing training, marketing, and business support to franchisees."  (Doc. 53 at 6)

(citing *United States v. Stover*, 650 F.3d 1099, 1112 (8th Cir. 2011); *see United States v. Kapp*, 564 F.3d 1103, 1112 (9th Cir. 2009)).

152. Based on the findings of fact, and for the reasons stated above regarding I.R.C. § 7402 and the likelihood of recurrence, the Court concludes that an injunction against Defendants under I.R.C. §§ 7408 and 7402 is appropriate to prevent the recurrence of their conduct that was in violation of § 6701. The continuation of the conduct in question over multiple years while Defendant Ogbazion was CEO of the Defendant entities convinces the Court that the conduct would be likely to continue absent an injunction.

### III.    CONCLUSION

Accordingly, based on the foregoing findings of fact and conclusions of law:

1.     The Court finds that Defendants have engaged in conduct subject to penalty under I.R.C. § 6701 and that injunctive relief under I.R.C. § 7408 is appropriate to prevent the recurrence of that conduct;

2.     The Court finds that Defendants have engaged in conduct substantially interfering with the administration and enforcement of the internal revenue laws and that injunctive relief is appropriate to prevent the recurrence of that conduct under I.R.C. § 7402(a); and

3.     The Court hereby **GRANTS** the primary relief requested by Plaintiff. The Court will separately issue an Order of Permanent Injunction consistent

with the Court's findings of fact and conclusions of law and Fed. R. Civ. P.

65(d).

**IT IS SO ORDERED**.

Date:  November 6, 2013                                    */s/ Timothy S. Black*
                                                          Timothy S. Black
                                                          United States District Judge